# UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Scott Belknap, on behalf of himself and all others similarly situated, | Civil Action No.: 1:19-cv-11437 |
| Plaintiff, | |
| vs. | |
| Partners Healthcare System, Inc., | |
| Defendant. | CLASS ACTION |

## COMPLAINT

Plaintiff Scott Belknap, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.     This is a class action against Defendant Partners Healthcare System, Inc. ("Partners") concerning the failure to pay benefits under the Consolidated Cash Balance Program of Partners Healthcare and Member Organizations (f/k/a Massachusetts General Hospital Cash Balance Retirement Plan) ("Partners Plan") and the Brigham and Women's Hospital Retirement Plan ("Brigham Plan") (collectively, the "Plans") in amounts that are actuarially equivalent to a single life annuity, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  By not offering benefits that are actuarially equivalent to the single life annuity, Partners causes retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      The Plans are cash balance plans administered by Partners and use the same improper actuarial assumptions to calculate pension benefits. Under the Plans, Partners contributes a percentage of participants' salary to a hypothetical account each year, with interest accruing on Partners' contributions.  When participants retire, they can receive their benefits in one of the several annuity options.  To calculate the annuity options, Partners converts a participant's cash balance account to a single life annuity ("SLA").  If participants want to receive another annuity option, including a joint and survivor annuity, a certain and life annuity or a year-certain annuity (collectively, "Non-SLA Annuities"), Partners converts the SLA to one of those options using actuarial assumptions to calculate the present value of the future payments.

3.      These actuarial assumptions are based on a set of mortality tables to predict how long the participant and beneficiary will live and interest rates to discount the value of the expected payments to present value.  The mortality table and interest rate together are used to calculate a "conversion factor" which is used to determine the amount of the benefit that would be equivalent to the SLA.  ERISA requires that these Non-SLA Annuities be "actuarially equivalent" to an SLA, meaning that the present value of the payment streams must be equal.  *See* 29 U.S.C. § 1055 (d)(1)(B), (2)(A)(ii); 29 U.S.C. § 1002(27).

4.      Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who recently retired are expected to live longer than people who retired in previous generations. Older morality tables predict that people will die at a faster rate (i.e., a higher mortality rate) than current mortality tables. As a result, using an older mortality table to calculate a conversion factor decreases the present value of the Non-SLA Annuities and — interest rates being equal — the monthly payment that retirees who select these Non-SLA Annuities receive.

5.     The interest rate also affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of these Non-SLA Annuities and the amount of the monthly payment.

6.     Partners uses the 1951 Group Annuity Mortality Table projected to the 1960 Mortality Table, set back two years for participants, and set back three years for beneficiaries (the "Adjusted 1951 GAM") and a 7.5% interest rate to determine the present value of the Non-SLA Annuities under the Brigham Plan and for benefits earned prior to 2017 and for all balances for grandfathered participants under the Partners Plan.

7.     The Adjusted 1951 GAM is based on mortality rates from more than 60 years ago. Even with the modest projections and setbacks, using the Adjusted 1951 GAM depresses the present value of Non-SLA Annuities, resulting in monthly payments that are materially *lower* than they would be if Partners used reasonable, current actuarial assumptions — like the ones it uses in its audited financial statements to calculate the benefits it expects to pay retirees.

8.     Plaintiff worked for Massachusetts General Hospital for more than 37 years.  By using outdated mortality assumptions, Partners reduced the present value of Plaintiff's benefits by $10,099.77. This improper reduction causes Plaintiff and other participants and beneficiaries of the Plans to receive less than they should every month and will continue to affect them throughout their retirements.

9.     Defendant caused Plaintiff and Class Members to unknowingly forfeit and lose part of their vested benefits in violation of ERISA's anti-forfeiture rule. *See* ERISA § 503(a), 29 U.S.C. § 1053(a).

10.     Plaintiff seeks an Order from the Court reforming the Plans to conform to ERISA, payment of future benefits in accordance with the reformed Plans, as required under ERISA,

payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

12.     This Court has personal jurisdiction over Defendant because it is headquartered, transacts business or resides in, or has significant contacts with this District, and because ERISA provides for nationwide service of process.

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendant may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

14.     Plaintiff Scott Belknap is a resident of Morrill, Maine, and a participant in the Partners Plan. Mr. Belknap worked for Massachusetts General Hospital until he retired in 2016. Mr. Belknap is currently receiving a 50% joint and survivor annuity, with his wife as the beneficiary.

**Defendant**

15.     In 1994, Partners was formed as a non-profit corporation to operate a health system that combined Brigham and Women's Hospital ("BWH"), Massachusetts General Hospital ("MGH") and their respective affiliated organizations.

16.     Partners is an integrated health system and physicians network headquartered in Boston, Massachusetts. Partners is the sponsor of the Partners Plan and is the Plan administrator for both Plans.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

17.     ERISA provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." 29 U.S.C. § 1054(c)(3) (emphasis added). There are several forms of pension benefits that are subject to this requirement.

18.     ERISA requires that defined benefit plans pay married participants their benefits in the form of a qualified joint and survivor annuity (a "QJSA"). Unless the participant, with the consent of his or her spouse, elects an alternative form of payment, the QJSA is the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

19.     ERISA defines a QJSA as an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  *See* ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  For example, if a plan participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month for the rest of the spouse's life

after the participant's death. A QJSA must be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

20.     Pension plans may also offer participants alternative forms of survivor annuities, known as qualified optional survivor annuities (a "QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2)); *see also* 26 U.S.C. § 417(g). Common forms of QOSAs are joint and survivor annuities that have a different survivor benefit than the QJSA, "certain and life" annuities and "year certain" annuities. ERISA requires that all QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

21.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the participant's surviving spouse (i.e. a beneficiary) if the participant dies before reaching the plan's normal retirement age. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

22.     The Treasury regulations ("Regulations") for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[1] Indeed, a QJSA "must be at least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. §

---

[1]     26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity. For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities." 26 C.F.R. § 1.401(a)-11(b)(1)(i)

1.401(a)-20 Q & A 16; *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ("All other optional forms of benefit payable to the participant must be compared with the QJSA using a single set of interest and mortality assumptions that are reasonable and that are applied uniformly with respect to all such optional forms payable to the participant . . . .").

23.    ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans choose to offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the amount of the lump sum distribution be determined by calculating the present value of the benefit using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rate (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"), set by the Secretary of the Treasury (the "Secretary") pursuant to 26 U.S.C. §§ 417(e) and 430(h), which are based on current market rates and mortality assumptions.  *See* 29 U.S.C. §§ 1055(g)(3)(B) and 1083(h); 26 U.S.C. §§ 417(e) and 430(h).   By requiring the use of current market rates and mortality assumptions to calculate the present value of participants' accrued benefits, the Regulations ensure that lump sum distributions must be at least the actuarial equivalent of the QOSA, QJSA and QPSA.

24.    ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable; the corresponding Regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

---

[2]    *See* 26 C.F.R. § 1.430(h)(2)-1.
[3]    *See* 26 C.F.R. § 1.430(3)-1.

### *Reasonable Factors Must be Used When Calculating Actuarial Equivalence*

25.     "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[4]  Actuarial equivalence should be "cost-neutral," meaning that neither a pension plan nor its participants should be better or worse off if a participant selects either the normal retirement benefit or an optional form of benefit. *See Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 540 (S.D.N.Y. 2015).

26.     Under ERISA, "present value" must "reflect anticipated events."  Such adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed numerous Regulations describing how present value should reasonably reflect anticipated events, including:

(a)     The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)     A plan must determine optional benefits such as QJSAs, QOSAs, and QPSAs using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)     The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

---

[4]     According to Merriam Webster: "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

(d)    With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

27.    The Regulations also rely on the standards of the American Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability"). Like the Regulations and the ERISA present value definition, the SOA requires actuaries to use "reasonable assumptions." Actuarial Standard of Practice No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

28.    Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing*, 147 T.C. at 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018). As the court explained in *Dooley v. Am. Airlines, Inc.* concerning the actuarial equivalence of QJSAs, QOSAs and QPSAs, the assumptions must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

## SUBSTANTIVE ALLEGATIONS

### I.     THE PLANS

29.     On October 1, 1964 and January 1, 1976, MGH and BWH, respectively, established benefit plans to provide retirement income for eligible employees. Over the years, both plans have been amended and re-stated several times to include employees of hospitals and healthcare providers affiliated with both MGH and BWH. Effective January 1, 1990, the plan for MGH employees switched to a cash balance plan;[5] BWH switched on January 1, 1999. On January 1, 2016, the plan for MGH employees was renamed the Consolidated Cash Balance Program of Partners HealthCare and Member Organizations (the "Partners Plan"). Partners is the administrator for both the Plans.

30.     The Plans are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A), and defined benefit plans within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

31.     The assets of the Plans are pooled and invested in the Partners Master Trust ("Master Trust") (along with the assets of other retirement and pension plans), and each Plan has an undivided interest in the Master Trust.

32.     Under both Plans, the normal form of benefit is the Cash Balance Account Annuity, which is an SLA based on the amount in a participant's Cash Balance Account.

33.     The QJSA for both Plans is a 50% joint and survivor annuity.  The Plans also offer several QOSAs, including joint and survivor annuities of 66-2/3, 75 and 100%; certain and life

---

[5]     The limited exception is for the employees who participated in the Nantucket Cottage Retirement Plan, which used a final average pay formula until the accrual of benefits were frozen as of September 30, 2006.

annuities for 10, 15 or 20 years; and period-certain annuities for 10, 15 and 20 years.[6]  The Plans'
QJSA and QOSAs are collectively referred to herein as the "Non-SLA Annuities."

34.     For participants selecting any of the Non-SLA Annuities, Partners then converts
the Cash Balance Account Annuity into a Non-SLA Annuity using a 7.5% interest rate and the
Adjusted 1951 GAM.

35.     Under the Partners Plan, for certain participants who joined the Plan after January
1, 2016 (termed "non-grandfathered participants"), Partners converts the SLA to the Non-SLA
Annuities using the Treasury Mortality Table and a 5% interest rate.

## II.     The Non-SLA Annuities Are Not Actuarially Equivalent to the SLA.

### A.     Converting an SLA to Non-SLA Annuities

36.     As set forth above, ERISA requires that QJSAs and QOSAs be the "actuarial
equivalent" of an SLA.  *See* ERISA § 205(d)(1) and (2).  Accordingly, each of the Non-SLA
Annuities must be actuarially equivalent to the SLA that participants earned under the Plans.

37.     To convert an SLA into a QJSA or a QOSA, the present value of the ***aggregate***
(i.e., total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive
under both the SLA and the QJSA or QOSA must be determined.[7]  The present values are then
compared to determine the conversion factor.[8]  There are two main components of these present
value calculations: an interest rate and a mortality table.

38.     An interest rate is used to determine the present value of each future payment.  This
is based on the time value of money, meaning that money available now is worth more than the

---

[6]     The Plans also offer a lump sum option, which is not included in Plaintiff's definition of
Non-SLA Annuities.

[7]     As alleged above, a QPSA is the survivor annuity portion of a plan's QJSA.

[8]     The conversion factor is easily calculated by a computer model.  Defendant simply inputs
the assumptions and the model instantaneously calculates the conversion factor.

same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

39.    The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

40.    A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

41.    More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions.  After the 1951 GAM table used by the Plan, the SOA published mortality tables in 1971 (the "1971 GAM"), 1976, 1983, 1984 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

42.    Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

43.     Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[9] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[10]

44.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table

---

[9]     Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[10]     Available     at:     https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on June 25, 2019).

adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[11] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[12]

45.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

46.     Using the selected interest rate and mortality table, the present value of the SLA and the QJSA or QOSA can be compared to determine whether the amount of the QJSA or QOSA is actuarially equivalent to the SLA.

47.     Changes to mortality assumptions can have dramatic effects on the conversion factor and the value of a QJSA or QOSA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a QJSA, QPSA or QOSA decreases.

48.     As discussed, plans must use reasonable interest rates and reasonable mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

---

[11]     Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf

[12]     Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

**B.** **The Actuarial Assumptions Partners Uses to Calculate Its Liabilities to Pay Benefits Under the Plans Are Significantly Different Than the Ones Partners Uses to Calculate the Non-SLA Annuities**

**1.** **Partners Uses Reasonable, Updated Actuarial Assumptions to Calculate the Present Value of Its Liabilities to Pay Benefits.**

49.     Each year Partners estimates the actuarial present value of its obligation to pay benefits under the Plans in its audited financial statements.  Partners uses actuarial assumptions to perform the calculation that reflect the probability of payment (due to events such as participant death) and the time value of money (through discounts for interest), requiring Partners to select a mortality table and a discount rate.

50.     Partners prepares its audited financial statements under Generally Accepted Accounting Principles ("GAAP") and files them with the SEC each year as Form 10-K.  Under GAAP, actuarial assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[13]

---

[13]     As noted in an October 2015 "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability

51.     Partners uses reasonable, updated mortality assumptions to calculate the present value of its liabilities under the Plans.  For the year ending September 30, 2014, Partners used the RP-2000 mortality table, projected to 2014 and beginning with the year ending September 30, 2015, Partners used the RP-2014 mortality table.  The mortality tables Partners used each year have similar mortality rates as the applicable Treasury Mortality Table.[14]

52.     Partners also uses reasonable, updated discount rates to calculate its liabilities to pay benefits under the Plans in its financial statements.  The discount rates Partners has used since 2015 have followed market conditions and were consistent with the indexes that sponsors of pension plans commonly use to calculate the present value of their benefit obligations such as the Pension Discount Curve,[15] the FTSE (formerly Citi) Pension Liability Index,[16] and ERISA's "segment" interest rates.[17]

53.     The discount rates Partners used to calculate the actuarial present value of its liabilities to pay benefits under the Plans since 2014 are summarized in the chart below:

---

of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aersfra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits103015.pdf.

[14]     The applicable Treasury Mortality Table was the RP-2000 projected to the current year until 2017, which uses more conservative mortality rates than the RP-2014 that Partners began using for the year ending September 30, 2015.

[15]     The Pension Discount Curve uses the yields of AA zero coupon bonds with maturities ranging from 6 months to 30 years to discount pension liabilities.  *See*, *e.g.*, https://www.yieldbook.com/m/indices/FTSE-pension-liability.shtml

[16]     The FTSE (formerly Citi) Pension Liability Index is a single discount rate based on the yields from the Pension Discount Curve.

[17]     ERISA's "segment" rates use the average yields of bonds with maturities of years 0-5 ("1st Segment"), years 5-19 ("2nd Segment") and years 20 and later ("3rd Segment") of a future payment stream such as an annuity.  26 U.S.C. §§ 417(e)(3)(C) and (D).

| Date | Discount Rate |
|------|---------------|
| September 30, 2018 | 4.31% |
| September 30, 2017 | 3.90% |
| September 30, 2016 | 3.70% |
| September 30, 2015 | 4.50% |
| September 30, 2014 | 4.40% |

        2.      **Partners Uses Reasonable Actuarial Factors to Calculate the Non-SLA Annuities.**

54.      Unlike in its audited financial statements, Partners does not use reasonable, updated actuarial assumptions to calculate the Non-SLA Annuities; instead, Partners uses the Adjusted 1951 GAM and a 7.5% interest rate. Using the Adjusted 1951 GAM is unreasonable because it is severely outdated and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

55.      The Adjusted 1951 GAM uses mortality rates that are over half a century old and does not incorporate improvements in life expectancy that have occurred since it was published or since 1960, the date it was "projected to." According to the Centers for Disease Control and Prevention, in 1960, a 65-year-old had an average life expectancy of 14.3 years.[18]  In 2010, a 65-year-old had a 19.1-year life expectancy, a 33% increase. Even with the setbacks in the Adjusted 1951 GAM, the average employee in 2010 would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than if the life expectancies in the Adjusted 1951 GAM were used.

---

[18]     *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

56.     By using an outdated mortality table instead of a current one, Partners decreases the present values of the Non-SLA Annuities, thereby materially reducing the monthly benefits that participants and beneficiaries receive compared to what they would receive if Partners used updated, reasonable mortality assumptions.  Participants who receive Non-SLA Annuities that are calculated using the Adjusted 1951 GAM do not receive benefits that are actuarially equivalent to the SLA they earned under the Plans.

57.     "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

58.     During the relevant period, Partners' use of the Adjusted 1951 GAM table coupled with a 7.5% interest rate to calculate Non-SLA Annuities was unreasonable because these assumptions did not reflect market conditions or "reflect anticipated events" under ERISA § 3(27). Indeed, the assumptions Partners uses to estimate its liabilities, which GAAP requires "should represent the 'best estimate' for that assumption as of the current measurement date," significantly differ from the assumptions Partners used to calculate Non-SLA Annuities for the Plans' participants and beneficiaries.

59.     Had Partners used reasonable actuarial assumptions, such as the applicable Treasury Mortality Table and the discount rates in its audited financial statements (which together are nearly identical to the Treasury Assumptions), Plaintiff and the Class would have received,

and would continue to receive, actuarially equivalent benefits and monthly payments greater than what they currently receive.

60.      Plaintiff retired at age 62 and 3 months.  He is receiving a 50% joint and survivor annuity which pays $787.94 a month.  If Partners applied the Treasury Mortality Table applicable in 2016 and the 3.7% interest rate it used in its financial statements for the year ending September 30, 2016, Plaintiff's benefit would be $ $840.13, or $52.19 more per month than he is receiving using the Adjusted 1951 GAM and 7.5% interest rate, a 6.2% shortfall.  By using unreasonable assumptions, Partners reduced the present value of Plaintiff's benefits at the time of his retirement by $10,099.77.  The present value of Plaintiff's benefits was also less than the SLA he could have received at age 65, causing Plaintiff to unknowingly forfeit part of his accrued benefits in violation of ERISA § 203(a).

61.      The loss Plaintiff suffered to the present value of his benefits similarly affected all the Plans' participants and beneficiaries who began receiving benefits during the Class Period. The chart below illustrates the amount by which the benefits for a 65-year-old participant (with a 65-year-old spouse) who earned an SLA of $1,000 per month that retired in 2016 was reduced for the Plans' benefit options using the Plans' actuarial assumptions instead of reasonable ones.

| Benefit Form | 2016 Treasury Mortality Table and 3.7% Discount Rate | Adjusted 1951 GAM and 7.5% Discount Rate | Monthly Difference | Percent Difference |
|---|---|---|---|---|
| SLA | $1,000.00 | $1,000.00 | n/a | n/a |
| 5 YCLA | $992.00 | $978.95 | $13.05 | 1.3% |
| 10 YCLA | $967.22 | $927.22 | $40.00 | 4.3% |
| 15 YCLA | $926.15 | $863.69 | $62,49 | 6.7% |
| 50% JSA | $916.96 | $890.88 | $26.08 | 3.0% |

| | | | | |
|---|---|---|---|---|
| **66    -2/3% JSA** | $892.26 | $859.61 | $32.65 | 3.8% |
| **75% JSA** | $880.40 | $844.79 | $35.61 | 4.2% |
| **100% JSA** | $846.65 | $803.23 | $43.42 | 5.1% |

62.     While the amount of loss will vary depending on the age of the participant and the beneficiary and year of retirement, , *all* participants and beneficiaries who started receiving their Non-SLA Annuity benefits since 2013 are not receiving actuarially equivalent benefits because Partners uses unreasonable actuarial assumptions.

63.     Partners knew the Plans' actuarial assumptions were unreasonable and did not provide actuarially equivalent benefits as required by ERISA because the Plans use significantly different assumptions than the reasonable, current, market-based assumptions that Partners uses to calculate the present value of its liabilities under the Plans in its audited financial statements. Moreover, Partners uses much more reasonable actuarial assumptions — a 5% interest rate and the Treasury Mortality Table — to convert an SLA to the Non-SLA Annuities for non-grandfathered participants in the Partners Plan.

64.     Discovery will show that Partners' use of unreasonable actuarial assumptions deprived retirees and their spouses of tens of millions of dollars.

65.     Because the Plans used a grossly outdated, unreasonable mortality table throughout the relevant time period, the benefits paid to participants and beneficiaries who receive Non-SLA Annuities are *not* actuarially equivalent to what they would have received if they had selected an SLA, in violation of ERISA § 205 (d)(1)(B) and (d)(2)(A), 29 U.S.C. § 1055 (d)(1)(B) and (d)(2)(A).  Rather, the benefits paid to retirees receiving Non-SLA Annuities are much lower than they should be.

66.     Since Plaintiff's benefits were calculated using the Adjusted 1951 GAM table, Plaintiff has been harmed because he is receiving less each month than he would if Partners used current, reasonable actuarial assumptions to calculate his benefits.  Plaintiff, along with other participants and beneficiaries, has been substantially damaged by receiving a Non-SLA Annuity that is not actuarially equivalent to the SLA.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plans who are receiving Non-SLA Annuities calculated using the Adjusted 1951 GAM and a 7.5% interest rate.  Excluded from the Class are Defendant and any individuals who are subsequently determined to be fiduciaries of the Plan.

68.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

69.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Partners' wrongful conduct.

70.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

A.     Whether the Plans' formulae for calculating Non-SLA Annuities provide benefits that are actuarially equivalent to the SLA;

B.     Whether the Plans' actuarial assumptions are reasonable;

      C.      Whether the Plans should be reformed to comply with ERISA; and

      D.      Whether Plaintiff and Class Members should receive additional benefits.

71.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

72.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

73.     In the alternative, certification under Rule 23(b)(2) is warranted because Partners has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

74.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

75.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

76.     Partners improperly reduces annuity benefits for participants and beneficiaries who receive Non-SLA Annuities calculated using the Adjusted 1951 GAM table and a 7.5% interest rate below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires.

77.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

78.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plans' established methodologies for calculating actuarial equivalence of Non-SLA Annuities violate ERISA because they do not provide an actuarially equivalent benefit. By not providing an actuarially equivalent benefit, Partners has violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205, 29 U.S.C. §§ 1054 and 1055.

79.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits previously withheld from Non-SLA Annuities calculated using the Adjusted 1951 GAM table and the 7.5% interest rate under the Plans;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**For Reformation of the Plans and Recovery of Benefits Under the Reformed Plans**
**(ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

80.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

81.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

82.     Partners improperly reduce annuity benefits for participants and their beneficiaries who receive Non-SLA Annuities calculated using the Adjusted 1951 GAM table and the 7.5% interest rate below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires. By not providing actuarially equivalent benefits, Partners has violated

ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205, 29 U.S.C. §§ 1054 and 1055.

83.     Plaintiff is entitled to reformation of the Plans to require Partners to provide actuarially equivalent benefits.

84.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

85.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Plans following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

86.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

87.     As the Sponsor of the Partners Plan and the administrator of both of the Plans, Partners is a fiduciary of the Plans.

88.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.

89.     The Plans are not consistent with ERISA because, for certain participants, they use the Adjusted 1951 GAM table and a 7.5% interest rate to calculate Non-SLA Annuities. As a result, the Plans' calculation of benefits produces results that are not actuarially equivalent to the SLA

that participants earned under the Plans, resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

90.     In following the Plans, which did not conform with ERISA, Partners exercised its fiduciary duties and control over the Plans' assets in breach of its fiduciary duties.

91.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

92.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plans' established methodologies for calculating actuarial equivalence of Non-SLA Annuities violate ERISA because they do not provide actuarially equivalent benefits.

93.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits previously withheld from participants and beneficiaries receiving Non-SLA Annuities calculated using the Adjusted 1951 GAM table and a 7.5% interest rate under the Plans;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Partners on all claims and requests that the Court award the following relief:

A.     Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring that the Plans fail to properly calculate and pay Non-SLA Annuities calculated using the Adjusted 1951 GAM table and a 7.5% interest rate that are actuarially equivalent to SLAs, in violation of ERISA §§ 205 (d)(1)(B) and (d)(2)(A), and 204(c)(3), 29 U.S.C. §§ 1055 (d)(1)(B) and (d)(2)(A), and 1054(c)(3);

C.     Ordering Partners to bring the Plans into compliance with ERISA, including, but not limited to, reforming the Plans to bring them into compliance with ERISA with respect to calculation of actuarially equivalent QJSAs, QOSAs, and QPSAs;

D.     Ordering Partners to correct and recalculate benefits that have been paid to participants and beneficiaries receiving Non-SLA Annuities calculated using the Adjusted 1951 GAM table and the 7.5% interest rate;

E.     Ordering Partners to provide an "accounting" of all prior payments of benefits to participants and beneficiaries receiving Non-SLA Annuities calculated using the Adjusted 1951 GAM table and the 7.5% interest rate under the Plans to determine the proper amounts that should have been paid;

F.     Ordering Partners to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

27

G.      Ordering Partners to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plans;

K.      Ordering Partners to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Partners to pay future benefits in accordance with the terms of the Plans, as reformed;

M.      Awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.      Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.


Dated: June 28, 2019                        Respectfully submitted,


                                             */s/ Douglas P. Needham*
                                            **IZARD, KINDALL & RAABE LLP**
                                            Douglas P. Needham, BBO No. 671018
                                            Robert A. Izard (to be admitted *pro hac vice*)
                                            Mark P. Kindall (to be admitted *pro hac vice*)
                                            Seth R. Klein (to be admitted *pro hac vice*)
                                            Oren Faircloth (to be admitted *pro hac vice*)
                                            29 South Main Street, Suite 305
                                            West Hartford, CT 06107
                                            Tel: (860) 493-6292
                                            Fax: (860) 493-6290
                                            Email:  dneedham@ikrlaw.com
                                            Email:  rizard@ikrlaw.com
                                            Email:  mkindall@ikrlaw.com
                                            Email:  sklein@ikrlaw.com
                                            Email:  ofaircloth@ikrlaw.com

Gregory Y. Porter (to be admitted *pro hac vice*)
Mark G. Boyko (to be admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

***Counsel for Plaintiff***