## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**SCOTT BELKNAP, on behalf of himself**  )
**and all others similarly situated,**    )
                                        )
      **Plaintiff,**                 )      **Civil Action No.**
                                        )      **19-11437-FDS**
      **v.**                        )
                                        )
**PARTNERS HEALTHCARE**                   )
**SYSTEM, INC.,**                         )
                                        )
      **Defendant.**                 )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

**SAYLOR, C.J.**

      This is a putative class action under the Employee Retirement Income Security Act ("ERISA"). Plaintiff Scott Belknap is a former employee of defendant Partners Healthcare System, Inc. He retired early from Partners at age 62 and now receives a type of retirement benefit known as a joint and survivor annuity, which covers both him and his spouse.

      Belknap has filed suit on behalf of himself and all others similarly situated, alleging that the way in which Partners calculates the value of his type of annuity violates ERISA. Specifically, he alleges that Partners uses outdated actuarial information from 1951, which reduces the value of his annuity and thus violates the protections of ERISA. Partners has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

      ERISA requires Belknap's retirement benefits to be the "actuarial equivalent" of certain other annuities. Actuarial equivalence may be a term of art, but the statute does not define it, nor is its meaning clear on this record. And under at least one plausible definition of actuarial

equivalence, the way in which Belknap's retirement benefits are valued could violate that requirement.

Accordingly, and for the reasons set forth below, the motion will be denied without prejudice, at least to the extent the claims are based on alleged violations of 29 U.S.C. §§ 1054(c)(3) and 1055.  The parties will be given an opportunity to submit supplemental briefing as to the meaning of "actuarial equivalent" under the statute, or otherwise to propose a framework for resolution of the issue.

## I.     Background

### A.     Factual Background

#### 1.     The Benefit Plans

The facts are set forth as alleged by plaintiff in the complaint.

Partners Healthcare System, Inc. was formed in 1994 as a non-profit corporation.  It operates a health system that includes, among other facilities, Brigham and Women's Hospital and Massachusetts General Hospital.  (Compl. ¶ 15).

For more than 40 years, both hospitals have operated benefit plans to provide retirement income for eligible employees.  (Compl. ¶ 29).  Both plans have been amended periodically.  (*Id.*).  In the 1990s, the benefit plans for both hospital systems switched to a cash balance plan.  (*Id.*).  Today, Partners administers the plans of both hospitals.  (*Id.* ¶ 16).

Under both cash balance plans, Partners contributes a percentage of each participating employee's salary each year, and interest accrues on those contributions.  (*Id.* ¶ 2).  When a participant retires, he or she can receive benefits in one of several annuity options.  (*Id.*).  The ordinary retirement age for both plans is 65.  (*See id.* ¶ 60; *see also* Def. Mem., Ex. A ("Plan

Document") § 5.1).[1]

For unmarried plan participants, the normal form of benefit is a single-life annuity ("SLA") based on the balance of the participant's account.  (*Id.* ¶¶ 2, 32).  An SLA is a series of monthly payments that start when a participant retires and end when he or she dies.  (*See id.*).

For married plan participants, the normal form of benefit is a 50% qualified joint and survivor annuity ("QJSA").  (*Id.* ¶¶ 18, 33).  A joint and survivor annuity ("JSA") is a series of monthly payments that start when a participant retires and end only when both the participant and his or her spouse have died.  (*See id.*).  If the participant dies before his or her spouse does, the spouse will continue to receive monthly payments, but at a reduced portion of what the participant received while alive.  (*See id.*).  A 50% JSA means that the surviving spouse receives 50% of the monthly benefit that the participant received while alive.  (*See id.*).  A QJSA is a JSA that satisfies certain statutory requirements.  *See* 29 U.S.C. § 1055.

Alternatively, participants may choose from several qualified optional survivor annuities ("QOSAs").  (*Id.* ¶¶ 20, 33).  These include annuities of various types and terms, the details of which are not important for present purposes.

In addition, the plan permits participants to retire early after attaining age 55 and collect early retirement benefits.  (*See id.* ¶ 60; Plan Document §§ 6.1, 6.2).  Early retirement benefit options under the plan include an SLA, a JSA, and several other benefit forms.  (Plan Document §§ 6.1, 6.2, 11.1).

## 2.   <u>Actuarial Equivalence Calculations</u>

The monthly payments that a participant receives from an annuity that is not an SLA—

---

[1] While the Plan Document is not attached to the complaint, the Court may properly consider it at this stage because the complaint's "factual allegations are expressly linked to" and "dependent upon" it.  *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998)).

such as a JSA—are smaller than those that he or she would receive from an SLA.  This is because a participant who chooses to set money aside for his or her spouse to receive after the participant dies will leave less to be paid out while the participant is alive.

That raises the question of how to convert an SLA into a non-SLA annuity—that is, how to calculate what amount to pay each month to participants who choose a non-SLA while they are alive.  (*Id.* ¶¶ 36-37).  Under ERISA, in many cases these non-SLAs must be the "actuarial equivalent" of an SLA.  *See, e.g.*, 29 U.S.C. §§ 1054(c)(3), 1055(d)(1)(B).  (*Id.*).

According to the complaint, to calculate actuarial equivalence, the first step is to calculate the present value of the total future benefits that a participant would receive under both annuities.  (*Id.*).  There are two main inputs into the calculation of an annuity's present value:  an interest rate and a mortality table.  (*Id.*).

The interest rate is used to determine the present value of each future payment.  That rate reflects the time value of money:  the fact that money that is available now is worth more than the same amount available at some future date, because one can earn investment returns in the interim on money that is available now.  (*Id.* at 38).

A mortality table is a series of rates used to predict how many people of a certain age will survive to reach the next, higher age.  (*Id.* ¶ 40).  For example, one entry in a mortality table would describe how many 65-year-old people will survive to turn 66.  Mortality tables are based not only on an individual's age, but also on his or her year of birth.  (*Id.* ¶ 41).  This is because, as a general matter, life expectancies have improved over time; the average 65-year-old person today can expect to live several years longer than the average 65-year-old person could expect to live as of (for example) the 1980s.  (*Id.* ¶ 42).

The complaint alleges that Partners uses different interest rates and mortality tables to

calculate the actuarial equivalence of non-SLAs for different purposes. (*Id.* ¶¶ 49-58). According to the complaint, Partners uses typical and up-to-date actuarial assumptions when calculating the value of all benefit forms—SLA and non-SLAs alike—when preparing its financial statements. (*Id.*). Specifically, the complaint alleges that Partners uses (1) an interest rate that accurately reflects market conditions and (2) an updated mortality table from 2000 that is projected forward to 2014. (*Id.*).

According to the complaint, Partners uses different inputs to calculate actuarial equivalence for non-SLAs when paying out benefits. (*Id.*). Specifically, the complaint alleges that Partners uses (1) an interest rate of 7.5% and (2) a "1951 Group Annuity Mortality Table projected to the 1960 Mortality Table, set back two years for participants, and set back three years for beneficiaries" ("the 1951 Adjusted Mortality Table"). (*Id.* ¶¶ 6, 54). According to the complaint, using the 1951 Adjusted Mortality Table is unreasonable "because it is severely outdated." (*Id.*). The complaint alleges that because of this unreasonable input, participants who receive non-SLAs calculated using the 1951 Adjusted Mortality Table do not receive benefits that are actuarially equivalent to SLAs. (*Id.* ¶ 56).

### 3.   Belknap's Employment and Retirement

Scott Belknap is a participant in one of Partners's retirement plans. (*Id.* ¶ 14). He worked for Massachusetts General Hospital until he retired in 2016 at the age of 62 and 3 months—that is, before his plan's normal retirement age of 65. (*Id.* ¶¶ 14, 60). He receives a 50% JSA from Partners, which pays $787.94 each month. (*Id.*). He alleges that Partners has reduced the value of his annuity by 6.2%, compared to how he says it should be calculated, by calculating it using a 7.5% interest rate and the 1951 Adjusted Mortality Table. (*Id.*). Specifically, he alleges that if Partners used the 3.7% interest rate that it used to calculate its financial statements for the year ending September 30, 2016, and the mortality table applicable in

2016 that was provided by the United States Treasury Department, his annuity payout would increase to $840.13—a monthly difference of $52.19. (*Id.*). Partners's method of calculating actuarial equivalence, he alleges, has reduced the present value of his benefits at the time of his retirement by $10,099.77. (*Id.*).

### B.   Procedural Background

On June 28, 2019, Belknap filed this action on behalf of himself and other similarly situated persons. The complaint alleges that the methodology for calculating the value of non-SLAs violates three provisions in ERISA: 29 U.S.C. §§ 1053(a), 1054(c)(3), and 1055. It seeks declaratory and equitable relief under 29 U.S.C. § 1132(a)(3) and 28 U.S.C. §§ 2201, 2202 (Count One); reformation of the benefit plans and recovery of lost benefits under 29 U.S.C. §§ 1132(a)(1) and (a)(3) (Count Two); and equitable and declaratory relief for a breach of fiduciary duty under 29 U.S.C. §§ 1104, 1132(a)(3) and 28 U.S.C. §§ 2201, 2202 (Count Three).

On August 30, 2019, Partners moved to dismiss the complaint for failure to state a claim.

## II.   Legal Standard

On a motion to dismiss made pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Count One:  Declaratory and Equitable Relief under 29 U.S.C. § 1132(a)

Count One seeks declaratory and equitable relief under 29 U.S.C. § 1132(a)(3).  Section 1132(a)(3) authorizes a retirement plan participant or beneficiary to pursue a civil action "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan."  29 U.S.C. § 1132(a)(3).

The complaint does not allege that defendant violated any of the terms of its benefit plans.  Rather, it alleges that defendant violated ERISA by calculating the value of plaintiff's JSA using an unreasonable methodology that does not provide an actuarially equivalent benefit to an SLA, and that this practice violates 29 U.S.C. §§ 1053(a), 1054(c)(3), and 1055.

### 1.   29 U.S.C. § 1053(a)

Defendant first contends that the complaint does not allege a violation of the anti-forfeiture provision of ERISA, 29 U.S.C. § 1053(a), because it applies only to normal retirement benefits attained at normal retirement age and plaintiff retired before that age.

The anti-forfeiture provision reads, in relevant part:

Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

(1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

(2)(A)(i) In the case of a defined benefit plan, a plan satisfies the requirements of this paragraph if it satisfies the requirements of clause (ii) or (iii).

(ii) A plan satisfies the requirements of this clause if an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions.

(iii) . . .

29 U.S.C. § 1053(a).  Thus, the anti-forfeiture provision protects a participant's "normal retirement benefit . . . upon the attainment of normal retirement age."  *Id.*  It also imposes two other requirements, both of which give a participant a "nonforfeitable right" to his or her "accrued benefit."  *Id.* §§ 1053(a)(1)-(2)(A).

According to the plain language of the provision, the anti-forfeiture provision "attaches only *after* the employee attains 'normal retirement age.'"  *Estate of Balli v. Plumbers, Pipe Fitters & Mes Local Union No. 392 Pension Fund*, 2019 WL 2233347, at *4 (S.D. Ohio May 23, 2019).  Thus, because plaintiff retired at age 62, which was before the benefit plan's normal retirement age of 65, the anti-forfeiture provision "gives [him] no vested right to receive benefits until he reaches age 65."  *Gonzalez v. Local 553 Pension Fund*, 2017 WL 3242329, at *5 (S.D.N.Y. July 28, 2017) (internal quotations omitted); *see also Engers v. AT&T*, 2002 WL 32159586, at *8 (D.N.J. Oct. 17, 2002).  It is true that since his retirement in 2016, plaintiff has turned 65.  But his early retirement benefits are nonetheless not protected by the anti-forfeiture provision, which covers only "normal retirement benefits," even if he has reached normal retirement age.  *See Riley v. MEBA Pension Tr.*, 586 F.2d 968, 970 (2d Cir. 1978); *Engers*, 2002 WL 32159586, at *8 ("An employer is under no obligation to allow an employee to collect early

retirement benefits.").[2]

Plaintiff contends that the complaint nevertheless states a claim under the anti-forfeiture provision because the statute entitles him to his "accrued benefit" if he worked for defendant for more than five years. *See* 29 U.S.C. § 1053(a)(2)(A)(ii). However, under most of ERISA, including § 1053(a), an accrued benefit must be "expressed in the form of an annual benefit commencing at normal retirement age." *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Tr. Fund ex rel. Bolton*, 736 F.3d 33, 38 (1st Cir. 2013) (internal quotations omitted) (quoting 29 U.S.C. § 1002(23)(A)). "To translate, 'this means that an employee's accrued benefit is the amount she would receive annually as an annuity *after she reaches normal retirement age*.'" *DuBuske v. PepsiCo, Inc.*, 2019 WL 4688706, at *4 (S.D.N.Y. Sept. 25, 2019) (quoting *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 274 (2d Cir. 2015)), *vacated in part*, 2019 WL 5864995 (S.D.N.Y. Nov. 8, 2019). Thus, "an accrued benefit is not the amount of pension payment a recipient receives by retiring early, it is the amount of pension payment a recipient achieves at *normal retirement age*." *Engers*, 2002 WL 32159586, at *8 (emphasis added) (quoting *Atkins v. Northwest Airlines, Inc.*, 967 F.2d 1197, 1201 (8th Cir. 1992)). Because plaintiff retired early under the terms of the benefit plan, the anti-forfeiture provision's protection of an "accrued benefit" does not apply to him.

Accordingly, the complaint does not state a violation of 29 U.S.C. § 1053(a) and the motion will be granted as to Count One to the extent that it alleges such a violation.

---

[2] It is true that ERISA defines "normal retirement benefit" to "mean[] the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22). However, because plaintiff's benefit "is payable as an annuity in the same form upon early retirement and at normal retirement age"—specifically, a JSA—the "greater benefit is determined by comparing the amount of such annuity payments." 26 C.F.R. § 1.411(a)-7(c)(2)(i). Plaintiff does not allege that the monthly JSA payments he receives are greater than those he would have received if he retired at normal retirement age. Accordingly, in this case, his early retirement benefits are not the "normal retirement benefit."

2.      **29 U.S.C. § 1054(c)(3)**

Unlike the anti-forfeiture provision, 29 U.S.C. § 1054(c)(3) addresses what a plan owes its participants if it chooses to offer them an early retirement benefit.  Section 1054(c)(3) provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age," then that benefit "shall be the actuarial equivalent" of an annual benefit commencing at normal retirement age.  In substance, that means that "(1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at retirement age; and (2) if the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump-sum distribution, instead of annuity) it must be" actuarially equivalent to the normal retirement age benefit.  *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000).[3]

Plaintiff's retirement benefit is a JSA commencing at age 62.  That means that his benefit is paid both at a different time (age 62 rather than age 65) and in a different form (a JSA instead of an SLA) than an SLA commencing at the plan's normal retirement age of 65.  The complaint repeatedly compares plaintiff's age-62 JSA calculated using the 1951 Adjusted Mortality Table to the age-62 JSA he would have received if defendant had "used reasonable actuarial assumptions."  (*See, e.g.*, Compl. ¶ 59).  Defendant contends that this type of equivalence—

---

[3] Unlike in § 1053(a), an "accrued benefit" in § 1054(c)(3) need not be "expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A) (defining "accrued benefit" "except as provided in [§] 1054(c)(3)").  Thus, even for participants who retire before normal retirement age, § 1054(c)(3) requires actuarial equivalence between their early retirement benefits and the normal retirement benefit commencing at normal retirement age.  *See, e.g.*, *Smith v. U.S. Bancorp*, 2019 WL 2644204 (D. Minn. June 27, 2019).

between the early-retirement benefit that a plaintiff actually received and the one he would have received but for the alleged misconduct—is not required by § 1054(c)(3).  But that comparison is simply an illustrative intermediate step.  The complaint converts an age-65 SLA into an age-62 JSA using methods that it alleges are necessary for actuarial equivalence.  It then alleges that this counterfactual age-62 JSA is greater than the age-62 JSA that plaintiff in fact received.  The implication of the comparison is that plaintiff's actual age-62 JSA is not actuarially equivalent to an age-65 SLA.[4]  Indeed, the complaint makes this explicit:  it alleges that plaintiff's age-62 JSA is "less than the SLA he could have received at age 65."  (Compl. ¶ 60).  That is the exact comparison required by § 1054(c)(3).  If plaintiff's age-62 JSA is in fact less than the "actuarial equivalent" of an SLA commencing at normal retirement age, that would violate § 1054(c)(3).  *See Engers*, 2002 WL 32159586, at *8.

The question then becomes what it means to be an "actuarial equivalent" under § 1054(c)(3).  Plaintiff contends that the calculation of actuarial equivalence must be based on reasonable assumptions, and that defendant's use of the 1951 Adjusted Mortality Table is unreasonable.  Defendant contends that § 1054(c)(3) deliberately omits any such reasonableness requirement, and employers are free to calculate actuarial equivalence how they please.

On its face, § 1054(c)(3) contains no reasonableness requirement.  It provides only that a retirement benefit taken in some other form or at some other time "shall be the actuarial equivalent" of an SLA commencing at normal retirement age.  29 U.S.C. § 1054(c)(3).  It says nothing about how actuarial equivalence is to be calculated; it does not specify what inputs to

---

[4] This logic can be expressed in mathematical terms.  Assume that A is an age-65 SLA, B is the age-62 JSA that plaintiff says would be actuarially equivalent to an age-65 SLA, and C is plaintiff's actual age-62 JSA.  Plaintiff alleges that $B > C$.  And because plaintiff alleges that $A = B$, his comparison also implies that $A > C$.  Section 1054(c)(3), however, requires actuarial equivalence between A and C—or, in roughly appropriate mathematical terms, that $A = C$.

use, nor does it explicitly require them to be "reasonable"—either individually or in the aggregate.

Generally, courts must assume that any such omission from the text of ERISA is deliberate. "ERISA is a comprehensive and reticulated statute, which Congress adopted after careful study of private retirement pension plans." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981) (internal quotations omitted). ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)). Accordingly, the Supreme Court has been "especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Russell*, 473 U.S. at 147).

Such reluctance is warranted here. If Congress had intended § 1054(c)(3) to require actuarial equivalence to be calculated reasonably, or in some other specific way, it knew how to do so. For example, 29 U.S.C. § 1393(a)(1) requires employers to compute withdrawal liability using "actuarial assumptions and methods which, *in the aggregate are reasonable . . . .*" (emphasis added). Congress also knew how to distinguish between requiring actuarial factors to be reasonable in the aggregate versus requiring each of them to be reasonable on its own. *Compare id. with* 29 U.S.C. § 1085a(c)(3)(A) (requiring that for plan-funding purposes, plans must use "actuarial assumptions and methods . . . *each of which is reasonable*") (emphasis added). Finally, Congress also knew how to require employers to use specific actuarial factors, not just reasonable ones—but it did so only for calculating lump-sum benefits, not annuities. *See*

29 U.S.C. § 1055(g) (requiring the present value of an annuity to be calculated using the "applicable mortality table and the applicable interest rate," which are defined elsewhere, if it is to be "immediately distributed").  None of those statutory provisions apply here, but their existence clearly shows that if Congress had meant to include a reasonableness requirement in § 1054(c)(3), it could have done so.

Plaintiff contends that even if § 1054(c)(3)'s text does not require actuarial equivalence to be calculated reasonably, several U.S. Treasury Department regulations do so.  (Compl. ¶ 26; Pl. Opp. at 6).  Defendant replies that these regulations, all of which are promulgated under the Tax Code, do not provide a private right of action.  But *some* Treasury Department regulations promulgated under the Tax Code are also enforceable under ERISA.  29 U.S.C. § 1202(c) provides that "[r]egulations prescribed by the Secretary of the Treasury under [26 C.F.R. §§ 410(a), 411, or 412] . . . shall also apply" to certain portions of ERISA, including § 1054(c)(3). And two of the provisions cited by plaintiff are among those regulations.

First, plaintiff cites 26 C.F.R. § 1.411(d)-3(g)(1).  (Compl. ¶ 26(c); Pl. Opp. at 6). However, § 1.411(d)-3(g)(1) merely defines the term "actuarial present value":  "The term actuarial present value means actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using reasonable actuarial assumptions."  That term—actuarial present value—does not appear anywhere in 29 U.S.C. § 1054(c)(3).  Thus, the fact that § 1.411(d)-3(g)(1) defines it to require "reasonable actuarial assumptions" is not relevant when interpreting § 1054(c)(3)'s requirement of "actuarial equivalence."

Second, plaintiff cites 26 C.F.R. § 1.411(a)(13)-1(b)(3).  (Compl. ¶ 26(d)).  But that provision applies only to "benefits under a lump sum-based benefit formula."  Here, plaintiff seeks to impose a reasonableness requirement on the calculation of actuarial equivalence

13

between two types of *annuities*.  And that distinction matters; lump-sum benefits receive special treatment when calculating actuarial equivalence under ERISA.  *Compare* 29 U.S.C. § 1055(g) (requiring plans to use specific inputs when calculating actuarial equivalence for lump-sum benefits) *with* 29 U.S.C. § 1054(c)(3) (imposing no such requirement on plans more broadly).

Plaintiff also cites to two other Treasury Department regulations promulgated elsewhere under the Tax Code.  Neither, however, is enforceable under ERISA.

He first points to 26 C.F.R. § 1.401(a)-11(b)(2), which requires actuarial equivalence for QJSAs (qualified joint and survivor annuities) to be calculated based on "consistently applied reasonable actuarial factors."  But only regulations prescribed by the Secretary of the Treasury under 26 C.F.R. §§ 410(a), 411, or 412 are enforceable under ERISA.  29 U.S.C. § 1202(c).  By contrast, those under § 401 "relate solely to the criteria for tax qualification under the Internal Revenue Code" and are not enforceable under ERISA.  *Clark v. Feder, Semo & Bard, P.C.*, 808 F. Supp. 2d 219, 233 (D.D.C. 2011) (quoting *Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir. 1986)), *aff'd* 739 F.3d 28 (D.C. Cir. 2014); *see also Clark*, 739 F.3d at 29-30.

Similarly, plaintiff points to 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv), which requires numerical comparisons for optional benefit forms to be based on "assumptions that are reasonable and that are applied uniformly."  But on its own terms, § 1.417(a)(3)-1 only determines whether "[a] plan meets the survivor annuity requirements of [§] 401(a)(11)"—in other words, whether it satisfies criteria for tax qualification under the Tax Code.  Thus, § 1.417(a)(3)-1(c)(2)(iv) is also not enforceable under ERISA.  *See Clark*, 808 F. Supp. 2d at 233.

Finally, plaintiff cites to decisions by other federal courts that he says imposed a reasonableness requirement for actuarial equivalence calculations under ERISA.

First, in *Laurent v. PricewaterhouseCoopers*, 794 F.3d 272 (2d Cir. 2015), the Second

Circuit held that a plan's "normal retirement age" under ERISA "must have some *reasonable* relationship to the age at which participants would normally retire." *Id.* at 281 (emphasis added). But what drove that conclusion was the word "normal" in the phrase "normal retirement age." *Id.* The Second Circuit reasoned that "normal" meant consistent with "a usual or typical standard, pattern, level, or type." *Id.* (quoting AM. HERITAGE DICTIONARY 848, 1055 (2d ed. 1982)). Accordingly, it held that the defendant's benefit plan did not have "boundless discretion to select *any* point in or measure of time." *Id.* Thus, even if the *Laurent* court's construction of "normal retirement age" imposed a reasonableness requirement, it did so because of the presence of the word "normal." That term is absent from § 1054(c)(3)'s actuarial equivalence requirement.[5]

Next, in *Dooley v. American Airlines*, 1993 WL 460849 (N.D. Ill. Nov. 4, 1993), the court held that actuarial equivalence must be "determined on the basis of actuarial assumptions with respect to mortality and interest which are *reasonable in the aggregate*." *Id.* at *10 (emphasis added). But it did so in the context of lump-sum distributions, for which ERISA *does* explicitly require the use of reasonable actuarial inputs. It does not do so for annuities. *Compare* 29 U.S.C. § 1055(g) (requiring plans to use specific inputs when calculating actuarial equivalence for lump-sum benefits) *with* 29 U.S.C. § 1054(c)(3) (imposing no such requirement on benefits more broadly). Plaintiff has offered no persuasive reason to apply the *Dooley* court's imposition of a reasonableness requirement beyond the context of lump-sum benefits.

Finally, plaintiff cites to *Smith v. U.S. Bancorp*, 2019 WL 2644204 (D. Minn. June 27, 2019). *Smith* is directly on point: the court there held that actuarial equivalence under

---

[5] While the word "normal" does appear in § 1054(c)(3), it does so only in referring to benefits taken at "normal retirement age."

§ 1054(c)(3) must be determined based on reasonable actuarial assumptions. *Id.* at *3.  The *Smith* court appears to have relied on three sources of authority to reach that conclusion.  First, it cited to an appellate decision concluding that "Congress intended [actuarial equivalence] to have its established meaning."  *See Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011).  But the *Stephens* court went on to say that "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions."  *Id.*  It did not say that actuarial equivalence required that those assumptions be reasonable.  Second, the *Smith* court referred to tax provisions and regulations, which "require[] that the accrued benefit be discounted to present value at the 'applicable interest rate.'"  2019 WL 2644203, at *3.  But the cited provisions apply only to lump-sum benefits—not annuities.  *See* 26 U.S.C. § 417(e)(3)(A); 26 C.F.R. § 1.417(e)-1(d).[6]  Third, the *Smith* court cited *Dooley* for the proposition that actuarial inputs must be reasonable.  2019 WL 2644204, at *3.  But, as discussed above, *Dooley* defined actuarial equivalence in the context of lump-sum benefits, which are treated differently under ERISA.  Thus, none of these three sources of authority justify reading a reasonableness requirement into § 1054(c)(3).[7]  Accordingly, this Court respectfully disagrees with the *Smith* court's conclusion that actuarial equivalence under § 1054(c)(3) must be calculated based on reasonable assumptions.

In summary, this Court finds no basis to require that an "actuarial equivalent" under 29

---

[6] As discussed above, 26 C.F.R. § 1.417 is not directly enforceable under ERISA.  *See* 29 U.S.C. § 1202(c).  However, a provision of 26 C.F.R. § 411, which *is* enforceable under ERISA, requires that "plan[s] take into account specified valuation rules . . . as set forth in section 417(e)."  26 C.F.R. § 1.411(a)-11(d).  But even if the *Smith* court was correct that this reference makes §1.417(e)-1(d) enforceable under ERISA, those provisions still apply only to lump-sum benefits.

[7] The *Smith* court also cited to the Second Circuit's decision in *Esden* for the proposition that § 1054(c)(3) does not leave "plans free to determine their own assumptions" in a way that would "eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'"  *See Esden*, 229 F.3d at 164.  However, the limits on plans' discretion that the *Esden* court identified apply only to lump-sum benefits.  *Id.* (citing 26 C.F.R. § 1.417(e) (governing lump-sum benefits); 26 C.F.R. § 1.411(a)-11(a)(1) (referring to § 1.417(e))).

U.S.C. § 1054(c)(3) be based on reasonable assumptions.  Section 1054(c)(3) contains no such requirement, while other provisions in ERISA expressly do, which indicates that this omission was deliberate.  *See Mertens*, 508 U.S. at 251.  And for the reasons above, the regulations and cases cited by plaintiff do not justify inserting a new requirement into ERISA's carefully crafted scheme.

That does not, however, resolve the case.  Even without a reasonableness requirement, § 1054(c)(3) still requires that plaintiff's age-62 JSA be the "actuarial equivalent" of an age-65 SLA.  And it is by no means clear what is necessary for two benefit options to be actuarially equivalent.  Despite using the term, "ERISA does not further define actuarial equivalence." *Stephens*, 644 F.3d at 440.  One definition, set forth by the *Stephens* court, is that "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions."  *Id.* (citing JEFF L. SCHWARTZMANN & RALPH GARFIELD, EDUCATION & EXAMINATION COMM. OF THE SOC'Y OF ACTUARIES, ACTUARIALLY EQUIVALENT BENEFITS 1, EA1-24-91 (1991), available at https://www.soa.org/globalassets/assets/files/edu/edu-2009-fall-ea1-02-sn.pdf (archived at https://perma.cc/A7U2-G3M8)).  Under that definition, actuarial equivalence is determined by a direct comparison between two benefit forms based on a common set of assumptions—that is, one discount rate and one mortality table.  For example, the plan here allegedly converts at least some SLAs into non-SLAs by calculating the present values of both benefit options using a single set of assumptions:  a 7.5% discount rate and the 1951 Adjusted Mortality Table.  (Compl. ¶ 37; Plan Document §§ 1.3, A1.4, A2.4).[8]

But while the present values of two benefit options may be equivalent when compared

---

[8] The present values of these benefit forms are not exactly equal but are instead separated by a "conversion factor."  (Compl. ¶ 37).  Plaintiff does not contend that this conversion factor violates § 1054(c)(3)'s actuarial equivalence requirement.  *Compare Smith*, 2019 WL 2644204, at *1.

using a common set of assumptions, that does not necessarily mean each benefit option was calculated using the same set of assumptions.  It is important to remember that in the plan here, whatever benefit form a participant selects, her retirement benefit amount starts out as a hypothetical cash account balance.  The plan then converts that cash balance into an SLA using one mortality table and then, if she selects a non-SLA, converts that SLA into a non-SLA using a second mortality table.  (Plan Document § A2.4).  It appears that in some cases, those mortality tables differ.  The plan may convert a participant's cash balance into an SLA using a mortality table prescribed by the Secretary of the Treasury, but then convert that SLA into a non-SLA using the 1951 Adjusted Mortality Table.  (*See id.*).  As a result, it appears that the present value of a participant's SLA may be equivalent to her cash balance account using one set of assumptions, but her non-SLA may only be equivalent to her cash balance account under a different set of assumptions.  It is hard to see how two benefit options can be actuarially equivalent if their values are derived using different actuarial assumptions—even if their present values are equivalent when compared directly under specific actuarial assumptions.

In summary, whether plaintiff has stated a claim under 29 U.S.C. § 1054(c)(3) depends on the definition of an "actuarial equivalent."  And the definition of that term is far from clear. The D.C. Circuit "assume[d that] Congress intended that term of art to have its established meaning."  *Stephens*, 644 F.3d at 440.  But it is not obvious what that established meaning is. Actuarial equivalence may require that the present values of two benefit forms be equivalent when calculated and compared using the same actuarial assumptions.  Alternatively, it may require that the present value of two different benefit forms be derived using the same actuarial assumptions.  Or it may require something else entirely.  The answer—that is, the meaning of actuarial equivalence as a term of art—is not readily apparent on this record.

Accordingly, the Court will deny the motion to dismiss without prejudice as to Count One to the extent that it is based on a violation of 29 U.S.C. § 1054(c)(3).  It may be that the issue may be resolved as a matter of law on the current pleadings.  Or it may be that resolution of the issue requires expert testimony or other extrinsic evidence.  In any event, the Court will provide the parties an opportunity to file supplemental briefs concerning what is necessary for two benefit forms to be "actuarial equivalent[s]" under § 1054(c)(3).

### 3.   29 U.S.C. § 1055

Finally, 29 U.S.C. § 1055 requires that certain retirement plans provide a qualified joint and survivor annuity ("QJSA") to married plan participants.  Section 1055(a) requires that for participants who do not die before their annuity commences, "the accrued benefit payable to such participant shall be provided in the form of a [QJSA]."  Section 1055(d) defines the terms of a QJSA, which include a requirement in § 1055(d)(1)(B) that a QJSA be "the actuarial equivalent" of an SLA for the participant's lifetime.

Plaintiff contends that defendant's use of unreasonable actuarial assumptions violates the requirement of actuarial equivalence in § 1055(d)(1)(B).  Specifically, he contends that he receives a QJSA under § 1055 and that it is not the "actuarial equivalent" of an SLA because defendant uses the 1951 Adjusted Mortality Table.[9]

Thus, it appears that the claimed violation of ERISA also depends on the definition of an "actuarial equivalent"—this time under 29 U.S.C. § 1055.  As set forth above, the definition of that term under § 1054(c)(3) is far from clear, and it is not obvious why the definition of that term under § 1055 should be any different.  Accordingly, the Court will deny the motion to

---

[9] Defendant contends that the complaint fails to state a claim under § 1055 because it does not allege any specific comparison between his age-65 SLA and his age-62 JSA.  (Def. Mem. at 9).  As set forth above in the discussion of § 1054(c)(3), the complaint does in fact make such a comparison, although perhaps an implicit one.  (*See, e.g.*, Compl. ¶ 60).

dismiss without prejudice to the extent that Count One is based on a violation of 29 U.S.C. § 1055 and permit the parties to file supplemental briefs concerning what is necessary for two benefit forms to be "actuarial equivalent[s]" under 29 U.S.C. § 1055.

### B.   Count Two:  Reformation of the Plan and Recovery of Benefits under 29 U.S.C. § 1132(a)(1) and (a)(3)

Like Count One, Count Two seeks relief under 29 U.S.C. § 1132(a)(3).  Count Two also alleges that defendant violated 29 U.S.C. §§ 1053(a), 1054(c)(3), and 1055 by calculating the value of plaintiff's JSA using an unreasonable methodology that does not provide an actuarially equivalent benefit to an SLA.  It seeks as relief the reformation of defendant's retirement plans.

As set forth above, the complaint does not state a violation of 29 U.S.C. § 1053(a). However, whether it states a violation of §§ 1054(c)(3) or 1055 remains an open question that turns on the definition of "actuarial equivalent" under the relevant sections of ERISA.

Accordingly, the Court will grant the motion to dismiss as to Count Two to the extent that it is based on a violation of 29 U.S.C. § 1053(a) and deny the motion without prejudice as to Count Two to the extent that it is based on violations of 29 U.S.C. §§ 1054(c)(3) and 1055.

Count Two also seeks relief under 29 U.S.C. § 1132(a)(1)(B).  Section 1132(a)(1)(B) authorizes a plan participant or beneficiary to pursue a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The complaint alleges that plaintiff "is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits . . . ."  (Compl. ¶ 85).

The complaint does not allege a violation of the terms of the retirement plan, nor is it clear how the plan (as it now exists) would entitle plaintiff to recover more than the JSA he

already receives.  That JSA is calculated as the actuarial equivalent of an SLA, and plaintiff has

identified no provision of his retirement plan that entitles him to have actuarial equivalence

calculated in the way that he wants.  Accordingly, the motion will be granted as to Count Two

insofar as it seeks relief under 29 U.S.C. § 1132(a)(1)(B).

## C.    Count Three:  Breach of Fiduciary Duty

Count Three is a claim for breach of fiduciary duty under 29 U.S.C. § 1104(a)(1).

Section 1104(a)(1) requires a retirement plan fiduciary to act in accordance with the terms of the

plan to the extent those terms are consistent with ERISA.  Count Three seeks a declaration that

the defendants' methodology for calculating actuarial equivalence violates ERISA along with

various equitable remedies under § 1104(a)(1).[10]

As set forth above, the complaint does not state a claim for a violation of 29 U.S.C. §

1053(a), and whether it does so for §§ 1054(c)(3) and 1055 depends on the definition of

"actuarial equivalent."  Accordingly, the motion will be granted as to Count Three to the extent

that it is based on a violation of 29 U.S.C. § 1053(a) and denied without prejudice as to Count

Three to the extent that it is based on a violation of §§ 1054(c)(3) or 1055.

## IV.    Conclusion

For the foregoing reasons, the motion to dismiss of defendant Partners Healthcare

System, Inc., is GRANTED as to all counts to the extent that they are based on an alleged

violation of 29 U.S.C. § 1053(a), and DENIED without prejudice as to all counts to the extent

that they are based on alleged violations of 29 U.S.C. §§ 1054(c)(3) or 1055.  The parties may

submit supplemental briefing by February 21, 2020, as to the meaning of the term "actuarial

---

[10] Count Three also appears to seek relief for alleged violations of ERISA under 29 U.S.C. § 1132(a)(3).
As set forth above, the complaint does not allege a violation of any provision of ERISA, and therefore that claim for
relief fails.

equivalent" under 29 U.S.C. §§ 1054(c)(3) and 1055, or otherwise proposing a framework for resolution of the issues identified in this memorandum and order.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  January 24, 2020                                       Chief Judge, United States District Court