# UNITED STATES DISTRICT COURT
# OF MASSACHUSETTS

|  |  |
|---|---|
| Scott Belknap, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Partners Healthcare System, Inc., the Pension Management Committee, the Retirement Committee and Jane/John Does 1-5,<br><br>Defendants. | Civil Action No.: 1:19-cv-11437<br><br><br><br><br><br>CLASS ACTION |

## AMENDED COMPLAINT

Plaintiff Scott Belknap, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.     This is a class action against Defendant Partners Healthcare System, Inc. ("Partners"), the Pension Management Committee and the Retirement Committee (collectively, "Defendants") concerning the excessive reductions to participants' pension benefits under the Consolidated Cash Balance Program of Partners Healthcare and Member Organizations (the "Plan") when they retire before age 65.  As described below, Defendants have violated Section 204(c)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1054(c)(3) because the present value of the 50% joint and survivor annuity that Plaintiff began receiving at age 62 and 3 months is not actuarially equivalent to his single life annuity (SLA) beginning at age-65.

2.      In 2016, the Plan was amended.  Under the 2016 amendment, participants who worked for Massachusetts General Hospital ("MGH") as of December 31, 2015 are "Grandfathered Participants" and their benefits are calculated under the prior version of the Plan (the "Grandfathered Plan").  Plaintiff is a Grandfathered Participant.

3.      The Grandfathered Plan's Accrued Benefit is an SLA beginning at age 65. Grandfathered Plan at § 1.1.  But Grandfathered Participants can retire as early as age 55.  When a Grandfathered Participant retires before age 65, Partners reduces the participant's pre-2009 benefit from what it would be as an age-65 SLA by using the 1951 Group Annuity Mortality Table projected to 1960, set back two years for participants, and set back three years for beneficiaries (the "Adjusted 1951 GAM") and a 7.5% discount rate (the "Pre-2009 Adjustment").  For post-2008 accruals, Partners uses the applicable mortality table established by the Internal Revenue Service under 26 U.S.C. § 417(e) (the "Treasury Mortality Table") and a 7.5% discount rate (the "Post-2008 Adjustment") to calculate the early retirement reduction.  Both formulae violate ERISA.

4.      Section 204(c)(3) of ERISA, 29 U.S.C. § 1054(c)(3), requires that all forms of benefit — including early retirement benefits — be actuarially equivalent to the retirement benefit the participant would receive if he waited until age 65 to start receiving his benefits.

5.      Defendants' use of the Adjusted 1951 GAM and a 7.5% discount rate to calculate the reduction to Grandfathered Participants' Accrued Benefit when they retire early violates ERISA's actuarial equivalence requirement because these actuarial assumptions were not reasonable during the Class Period and do not reflect current mortality or interest rates.

6.      Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who recently retired are expected to live longer than people who

retired in previous generations. Older morality tables predict that people will die at a faster rate (i.e., a higher mortality rate) than current mortality tables.  As a result, using an older mortality table to calculate early retirement benefits decreases the present value of those benefits — interest rates being equal — causing the monthly payment that retiree receives to be lower than it should.

7.      The Adjusted 1951 GAM is based on mortality rates from more than 60 years ago. Even with the modest projections and setbacks, the Adjusted 1951 GAM depresses the present value of benefits for Grandfathered Participants who retire before age 65, resulting in monthly payments that are materially *lower* than they would be if Partners used reasonable, current actuarial assumptions — assumptions consistent with those Partners uses in its audited financial statements to calculate the benefits it expects to pay retirees.

8.      The interest rate also affects the calculation. Using higher interest rates — mortality rates being equal — decreases the present value of Grandfathered Participants' benefits when they retire before age 65, causing them to receive a lower monthly payment.

9.      Partners' use of a 7.5% discount rate, which is substantially above-market and significantly greater than the rates which were its "best estimate" in its audited financial statements, causes Grandfathered Participants to receive benefits that are not actuarially equivalent to their Accrued Benefit because it unreasonably decreases the present value of early retirement benefits.  This exacerbates the harm caused by the Pre-2009 Adjustment and creates an independent harm for the Post-2008 Adjustment applied to early retirees.

10.     Plaintiff worked for Massachusetts General Hospital for 37 years and is a Grandfathered Participant in the Plan, with his benefits calculated under the terms of the

Grandfathered Plan.[1] By using outdated mortality assumptions and an unreasonably high discount rate to calculate the reduction to his Accrued Benefit when he retired at age 62, Partners reduced the present value of Plaintiff's pension by $5,841.51. This improper reduction causes Plaintiff and other Grandfathered Participants who retire early to receive less than they should every month.

11.     Plaintiff seeks an Order from the Court reforming the Plan to conform to ERISA, payment of future benefits in accordance with the reformed Plan, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

13.     This Court has personal jurisdiction over Defendant because it is headquartered, transacts business or resides in, or has significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendant may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391

---

[1]     The Grandfathered Plan document, which is Appendix E to the Plan document, contains Articles I through XI which govern, among other things, the accrual and calculation of Grandfathered Participants' benefits and incorporates the terms of Articles XII through XVIII of the Plan which concern, among other things, plan administration, fiduciary responsibility and plan amendments as well as Appendix A, which contains the actuarial assumptions used to calculate certain forms of benefits.

because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

15.     Plaintiff Scott Belknap is a resident of Morrill, Maine, and a Grandfathered Participant in the Plan. Mr. Belknap worked for Massachusetts General Hospital from 1980 to 2016, retiring at age 62 and 3 months.  He is currently receiving a 50% joint and survivor annuity, with his wife as the beneficiary.

### Defendants

16.     In 1994, Partners was formed as a non-profit corporation to operate a health system that combined Brigham and Women's Hospital ("BWH"), Massachusetts General Hospital ("MGH") and their respective affiliated organizations.

17.     Partners is an integrated health system and physicians network headquartered in Boston, Massachusetts. Partners sponsors the Plan and has the power to amend or terminate the Plan.

18.     The Pension Management Committee is an incorporated association based in Boston, Massachusetts.  At all relevant times, the Pension Management Committee has been a named fiduciary under the Plan with the power to amend the Plan and the Grandfathered Plan and the obligation to "periodically review the actuarial status of the Plan."  2016 Grandfathered Plan Document at § 13.2.

19.     Since January 1, 2018, the Pension Management Committee's members are the individuals who hold the following titles: (a) Partner's Chief Investment Officer; (b) Massachusetts General Physicians Organization's Chief Executive Officer; (c) Partner's Chief

Financial Officer; (d) Partner's Chief Legal Officer; (e) Partner's Chief Human Resources Officer; and (f) Brigham and Women's Physician's Organization's President.  2018 Grandfathered Plan Document at § 13.2.

20.     The Retirement Committee is an incorporated association based in Boston, Massachusetts.  The Retirement Committee is the Plan Administrator within the meaning of ERISA 3(16), 29 U.S.C. § 1002(16) and a named fiduciary under the Plan.  2016 Grandfathered Plan at §§ 1.3, 13.1.

21.     Since January 1, 2018, the Plan has required that the Retirement Committee include Partner's director of benefits and other members of Partners' human resources department.  2018 Grandfathered Plan at § 13.3.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

22.     ERISA provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) (emphasis added).  This rule requires "that regardless of any option as to timing or form of distribution, a vested participant in a defined benefit plan must receive a benefit that is the actuarial equivalent of her normal retirement benefit (that is, the accrued benefit beginning at normal retirement age…)."  *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000); *see also* ECF No. 34, Memorandum and Order on Defendant's Motion to Dismiss, at 11 ("If plaintiff's age-62 JSA is in fact less than the 'actuarial equivalent' of an SLA commencing at normal retirement age, that would violate § 1054(c)(3))."

23.     Courts look to professional actuarial standards when defining the term "actuarial equivalence." *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)) ("Schwartzman & Garfield"); *see also McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1105–12 (9th Cir. 2000) (citing William F. Fellers & Paul H. Jackson, *Noninsured Pensioner Mortality: The UP-1984 Mortality Table*, 25 The Proceedings, Conference of Actuaries in Public Practice 456 (1975)) ("Fellers & Jackson").

24.     "Actuarial equivalence" means that two forms of payment have an equal present value under a given set of assumptions.  *Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield at 1).  For pension benefits, the primary assumptions used in the present value comparison are the mortality table and the interest rate.  Schwartzmann & Garfield at 11 ("The interest and mortality assumptions play a key role in determining the magnitude of the actuarial equivalence factor.").  Accordingly, courts have instructed that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018).

25.     Actuarial equivalence requires mortality and interest rate assumptions that are current and reasonable when a participant starts receiving benefits.  *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 WL 460849, * 10 (N.D. Ill. Nov. 4, 1993) (defining "actuarially equivalent" based on expert testimony as "equal in value to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate.").

26.     The American Academy of Actuaries' actuarial standards of practice ("ASOP"), which govern actuarial calculations in the United States, require mortality assumptions to be

"reasonable," and account for the "historical and current demographic data that is relevant as of the measurement date." ASOP 35, § 3.3.5. "The most important consideration in…selecting a mortality table to be used in calculating pension benefits is whether the population from which the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110 (citing Fellers & Jackson at 456).

27.     "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment." Schwartzmann & Garfield at 11. For example, if a plan calculates pension costs using different actuarial assumptions than to calculate early retirement benefits, a plan will experience a "gain," or be better off, when a participant retires early. Schwartzmann & Garfield at 18.

28.     ASOP 27 requires that "reasonable" interest rate assumptions which account for "historical and current economic data that is relevant as of the measurement date" be used in actuarial equivalence calculations. *See* ASOP 27, § 3.6; *see also Dooley*, 1993 WL 460849, at ** 10, 12 (defendants complied with ERISA's actuarial equivalence requirement by using a "reasonable" discount rate based on Moody's AAA corporate bond index); *Smith v. Rockwell Automation*, No. 19-C-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").[2]

---

[2]     Plaintiff's expert was a member of the American Academy of Actuaries' Actuarial Standards Board which promulgated ASOPs 27 and 35. He will testify that while ASOPs 27 and 35 state that they *generally* do not apply to *individual* benefit calculations, that standard merely allows the actuary to follow the directions in the plan document, a legal instrument, even if the actuary believes the actuarial assumptions are no longer reasonable. In other words, an actuary is not supposed to create individualized assumptions for a participant that are contrary to the plan's terms depending on, for example, whether the participant has a healthy lifestyle. However, when the actuary is asked to assist in amending the plan document to select new actuarial assumptions that will be used to calculate plan-wide benefits, the ASOPs must be followed.

29.     The actuarial assumptions used should also cause the calculation to be "cost-neutral," meaning that a pension plan should not be better or worse off if a participant selects a particular form of benefit. *Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1119–20 (M.D. Fla. 2005); *see also* Schwartzmann & Garfield at 11.

## SUBSTANTIVE ALLEGATIONS

### I.    The Plan

30.     On October 1, 1964, MGH established the Plan to provide retirement income for its eligible employees.

31.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

32.     In 2016, the Plan was amended, restated and merged with certain of Partners' other defined benefit pension plans. MGH employees that began participating in the Plan before January 1, 2016 and were employed by MGH on January 1, 2016 became "Grandfathered Participants," with their benefits calculated under the Plan's terms in effect as of December 31, 2015, i.e., the Grandfathered Plan. The Plan's other participants are "Non-Grandfathered Participants." Plaintiff is a Grandfathered Participant.

33.     Under the Grandfathered Plan, a Grandfathered Participant's Accrued Benefit is an SLA starting at age 65. 2016 Grandfathered Plan at §§ 1.1, 4.2. If a participant retires at age 65, the portion of the Grandfathered Participant's Accrued Benefit earned before 2009 is calculated using the Pre-2009 Adjustment. *Id*. at § 4.2, Appendix A at §§ A.1.4, 2.4.

34.     For the portion of the participant's benefits earned after 2008, Partners uses the Post-2008 Adjustment. 2016 Grandfathered Plan at § 4.2, Appendix A at §§ 1.4, 2.4.

35.     A Grandfathered Participant's Accrued Benefit is the total of his Pre-2009 Benefit and his Post-2008 Benefit.

36.     The Grandfathered Plan allows Grandfathered Participants to start receiving benefits as early as age 55.

37.     To calculate the reduction to a Grandfathered Participant's Accrued Benefit when he retires early, Partners divides his Cash Balance Account when he retires by an annuity factor associated with the participant's nearest age.  2016 Grandfathered Plan at §§ 4.1, 6.1.  The annuity factor for a participant's pre-2009 Benefit is based on the Pre-2009 Adjustment. The annuity factor for post-2008 Benefits is based on the Post-2008 Adjustment.  2016 Grandfathered Plan at § 4.1, Appendix A at §§ 1.4, A2.   The annuity factors described above are used to calculate the amount of the SLA that the Grandfathered Participant may receive when he retires before age 65.

38.     The Grandfathered Plan offers participants several benefit forms other than an SLA, including joint and survivor annuities of 50, 66-2/3, 75 and 100 percent ("JSAs"), certain and life annuities for 10, 15 or 20 years ("CLAs") and period-certain annuities for 10, 15 and 20 years ("Period-Certain Annuities").   2016 Grandfathered Plan at §§ 11.3.

39.     Partners calculates the early retirement JSAs and CLAs by converting a Grandfathered Participant's SLA when he retires (e.g., at age 62) to these other forms using the Pre-2009 Adjustment and the Post-2008 Adjustment.  2016 Plan Document at Appendix A, §§ A1 and A2.  In sharp contrast, Partners calculates the Period-Certain Annuities by converting the participant's SLA using the Treasury Assumptions that apply in the year the participant retires. 2016 Grandfathered Plan at Appendix A, §§ A1.2 and A2.3.[3]

---

[3]     Grandfathered Participants can also receive all or part of their Cash Balance Account as a lump sum.  2016 Grandfathered Plan at § 11.7.  The Grandfathered Participant's Accrued Benefit

40.     Non-Grandfathered Participants may also retire before age 65.   Unlike for Grandfathered Participants, Partners uses the Treasury Mortality Table and a 5% discount rate to reduce Non-Grandfathered Participants' Accrued Benefit when they retire early.   2016 Plan Document at Appendix A, §§ A1 and A2.

41.     The Plan Document specifically authorizes the Pension Management Committee to adopt updated actuarial assumptions to calculate early retirement and JSA benefits "from time to time" in consultation with the Plan's actuary.   2016 Grandfathered Plan at § 13.9.   But the assumptions have not been updated. For example, the Plan has used the Adjusted 1951 GAM and a 7.5% discount rate, the assumptions which comprise the Pre-2009 Adjustment, to calculate the reduction to a Grandfathered Participant's Accrued Benefit when he retires early since October 1, 1989.  2016 Plan Document at Appendix B.  Partners revised the Plan's actuarial assumptions in 1997, 2009, 2016 and 2017, but did not change the assumptions used in the Pre-2009 Adjustment. 2016 Plan Document at Appendix B. The assumptions used in the Post-2008 Adjustment have been in effect since 2009, despite the changes in 2016 and 2017.

## II.     The Plan Does Not Provide Actuarially Equivalent Benefits to Participants That Retire Before Age 65.

### A.     Converting an Accrued Benefit to Another Form.

42.     As set forth above, ERISA requires that all forms of pension benefits be the "actuarial equivalent" of a participant's SLA at age 65.   ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).   The Grandfathered Plan's Accrued Benefit is an SLA beginning at age 65.   2016 Grandfathered Plan at § 1.1.   Accordingly, *each* form of benefit under the Grandfathered Plan must be actuarially equivalent to the Grandfathered Participant's age-65 SLA.

---

is then calculated based on the remaining amount in his Cash Balance Account.   2016 Grandfathered Plan at §§ 11.7, 4.2.

43.     To convert an accrued benefit into another form, the present value of the ***aggregate*** (i.e., total) future payments that the participant (and, if applicable, the beneficiary) is expected to receive under both the age-65 SLA and the other form must be determined.  The present values of each form are then compared to determine the amount of the percentage of the participant's age-65 SLA he will receive if he chooses a different form.  For example, when someone retires early (e.g., at age 60 instead of age 65), they are trading a lower monthly benefit in exchange for receiving those benefits for a longer amount of time.  The present values of those different payment streams must be equal for those benefits to be actuarially equivalent.

44.     There are two main components of these present value calculations: an interest rate and a mortality table.

45.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is called a "discount rate" because it discounts the value of a future payment.  *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

46.     As set forth above, an actuarial equivalence calculation requires the use of a discount rate that is reasonable based on current market conditions.  *See* ASOP 27, § 3.6.  Pension plans commonly use the discount rates of high-grade corporate bonds to determine the present value of future pension payments. Bonds with durations that match (or closely track) the timing of projected future pension payments are used to calculate the present value of those future payments. For example, the interest rate for a bond with a 20-year maturity may be used to calculate the value of a pension payment expected to be made in 20 years.

47.    A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

48.    Recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions.  After the 1951 GAM table — which is used by the Plan — was published, the SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

49.    Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

50.     Thus, while a pension plan can choose from among several mortality tables when calculating actuarially equivalent forms of benefit, "*[t]he most important consideration* is whether the population from which the mortality experience is developed…has characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110 (emphasis added) (citing Fellers & Jackson at 456).

51.     Pursuant to para. 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in life expectancies.[4]  *See also* Schwartzmann & Garfield at 11 ("Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment.").

52.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[5] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[6]

53.     Using the selected interest rate and mortality table, the present value of an age-65 SLA and a different benefit form can be compared to determine whether they are actuarially equivalent.

---

[4]     Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on February 27, 2020).
[5]     Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf
[6]     Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

B.     **The Actuarial Assumptions Partners Uses to Calculate Its Plan Liabilities and Costs Are Significantly Different Than Those Used to Calculate Grandfathered Participants' Early Retirement Benefits.**

1.     **Partners Uses Reasonable, Updated Actuarial Assumptions to Calculate the Present Value of Its Liabilities to Pay Benefits.**

54.     Each year the Pension Management Committee hires an actuary to calculate the actuarial present value of Partners' liabilities under the Plan. 2016 Grandfathered Plan at §§ 13.2 and 13.9. The Grandfathered Plan requires the actuary to use "proper and reasonable" assumptions and methodologies about "rates of interest, mortality and other actuarial components" when performing this calculation. *Id.* at § 13.9. The actuary's calculation reflects the probability of payment (due to events such as participant death) and the time value of money (through discounts for interest). *See*, *e.g.*, Plan's Audited Financial Statements for the year ending September 30, 2016, at 9.

55.     Willis Towers Watson has been the Plan's actuary since at least 2014. Willis Towers Watson (and the actuaries it employs) are subject to the ASOPs and calculates the actuarial present value of Partners' liabilities under the Plan using reasonable, current actuarial assumptions.

56.     Each year, Partners calculates the actuarial present value of its liabilities under the Plan in its audited financial statements that are prepared under Generally Accepted Accounting Principles ("GAAP"). Under GAAP, the actuarial assumptions used in this calculation "should represent the 'best estimate' for that assumption as of the current measurement date."[7]

---

[7]     As noted in an October 2015 "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality

57.     Partners uses Willis Towers Watson's "proper and reasonable" actuarial assumptions as its "best estimates" for those assumptions when calculating the actuarial present value of its liabilities to pay Plan benefits.  Partners' fiscal year-end is September 30.  For the year ending September 30, 2014, Partners used the RP-2000 mortality table, projected to 2014 and beginning with the year ending September 30, 2015, Partners used the RP-2014 mortality table to calculate its liabilities.  The mortality tables Partners used each year have similar mortality rates as the applicable Treasury Mortality Table.[8]

58.     Partners also uses reasonable, updated discount rates to calculate its liabilities and future pension costs in its audited financial statements.  There are several indexes that plan sponsors use to determine which discount rate they will use for these calculations, including the Mercer Yield Curve, the "segment" interest rates prescribed by ERISA § 205(g)(3), 29 U.S.C. §

---

tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aersfra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits103015.pdf.

[8]     The applicable Treasury Mortality Table was the RP-2000 projected to the current year until 2017, which uses more conservative mortality rates than the RP-2014 that Partners began using for the year ending September 30, 2015.

1055(g)(3) and Section 417(e)(3) of the Internal Revenue Code, 26 U.S.C. § 417(e)(3), and the FTSE Above Mean Double-A Index.

59.     Based on the discount rates Partners uses in its audited financial statements, the index that is the best "match" and that would have provided a reasonable, actuarially equivalent discount rate is the FTSE Above Mean Double-A Index.  The FTSE Above Mean Double-A Index's discount rates at the end of Partners' fiscal years are provided below.

| Date | Discount Rate |
|------|---------------|
| September 30, 2018 | 4.29% |
| September 30, 2017 | 3.92% |
| September 30, 2016 | 3.71% |
| September 30, 2015 | 4.46% |
| September 30, 2014 | 4.39% |

60.     Accordingly, Partners should have used a discount rate tied to the FTSE Above Mean Double-A Index to calculate actuarially equivalent forms of benefit, applying the indexed rate in the following year, i.e., a 3.71% discount rate between October 1, 2016 and September 30, 2017, to calculate Grandfathered Participants' early retirement benefits.

61.     As alleged in ¶ 59, above, the discount rates Partners used in its audited financial statements during the Class Period followed market conditions, closely tracking the FTSE Above Mean Double-A Index, a commonly-used index to calculate the present value of pension benefits.

## 2.     Grandfathered Participants Who Retire Early Do Not Receive Actuarially Equivalent Benefits.

62.     Partners uses the Adjusted 1951 GAM to reduce Pre-2009 Benefits when Grandfathered Participants retire before age 65.  Since at least 2014, the Plan's actuary, Willis

Towers Watson, has determined, using "proper and reasonable" methods, that Plan participants have life expectancies which closely track those in the Treasury Mortality Table.  Likewise, Partners has used the applicable Treasury Mortality Table each year as its "best estimate" of Plan participants' life expectancies in its financial statements.

63.     Moreover, "upon the advice of [the Plan's] Actuary," Partners began using the Treasury Mortality Table in 2009 to calculate Post-2008 Benefits.  In 2016, Partners began using the Treasury Mortality Table to calculate Non-Grandfathered Participants' early retirement benefits.

64.     The Adjusted 1951 GAM is **not** an appropriate table to use in an actuarial equivalence calculation because it is **not** based on a population with "characteristics that are typical of the [Plan's] participants." *McDaniel*, 203 F.3d at 1110 (citing Fellers & Jackson at 456).  The Adjusted 1951 GAM uses mortality rates that are over half a century old and does not incorporate improvements in life expectancy that have occurred since it was published or 1960, the date it was "projected to." According to the Centers for Disease Control and Prevention, in 1960, a 65-year-old had an average life expectancy of 14.3 years.[9]  In 2010, a 65-year-old had a 19.1-year life expectancy, a 33% increase. Even with the setbacks in the Adjusted 1951 GAM, the average employee in 2010 would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than if the life expectancies in the Adjusted 1951 GAM were used.

65.     By using an outdated mortality table, Partners decreases the present values of Grandfathered Participants' early retirement benefits, thereby materially reducing the amount they

---

[9]     *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

and their beneficiaries receive compared to what they would receive if Partners used updated, reasonable mortality assumptions. *See*, *e.g.*, Schwartzmann & Garfield at 18.

66.     Partners also violates ERISA's actuarial equivalence requirement by using a 7.5% discount rate to calculate Grandfathered Participants' Pre-2009 and Post-2008 early retirement benefits because this rate is neither reasonable nor based on current market conditions. *See* ASOP 27, § 3.6; *see also* Schwartzmann & Garfield at 18.

67.     A 7.5% discount rate is substantially higher than the commonly used indexes that pension plan sponsors use to calculate their liabilities and costs.  Indeed, as set forth in ¶ 59, above, Partners used discount rates between 3.71% and 4.46% during the Class Period.   Since using an above-market discount rate causes early retirement benefits to decrease compared to a participant's accrued benefit (*see*, *e.g.*, Schwartzmann & Garfield at 18), Grandfathered Participants' monthly benefits are significantly lower than they would be if Partners used an updated, reasonable discount rate.

68.     The mortality and discount rate assumptions, together, also do not provide a Grandfathered Participant who retires before age 65 with the actuarial equivalent of his Accrued Benefit.  *See Dooley*, 1993 WL 460849, at * 10 (actuarial equivalence under ERISA § 204(c)(3) requires "actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate.").  Because Partners uses a mortality table with high mortality rates and an above-market discount rate, Grandfathered Participants' Pre-2008 Benefits are reduced in greater amounts than they should be when a Grandfathered Participant retires early.  Even with an updated, reasonable mortality table, Grandfathered Participants' Post-2008 Benefits are still excessively reduced, and lower than they should be, when they retire early because Partners uses a 7.5% discount rate, which is significantly above-market.  *See*, *e.g.*, *Berger*, 338 F.3d at 762 (Section

204(c)(3) of ERISA prohibits plans from inviting participants to "sell their pension entitlement back to the company cheap…").

69.     The actuarial assumptions that Partners uses to reduce a Grandfathered Participant's Accrued Benefit to an early retirement benefit are also **not** "cost-neutral." Partners calculates its cost to provide pension benefits using reasonable, updated actuarial assumptions. Accordingly, in contravention of basic actuarial equivalence requirements, Partners experiences a "gain" when a Grandfathered Participant retires before age 65. When Grandfathered Participants retire early, they are subsidizing the benefits for participants that do not retire early and, ultimately, Partners' funding of the Plan.

70.     The conflicting formulae Partners uses to calculate early retirement benefits also demonstrates that all benefits cannot be actuarially equivalent. Belknap, like many Grandfathered Participants who retire before age 65, had both a Pre-2009 Benefit and a Post-2008 Benefit. The mortality tables used in Partners' formulae are different for these benefits, but the interest rate is the same. Thus, Belknap's monthly benefit is calculated by a formula that assumes he will live **longer** with respect to his Post-2008 Benefit than he will for his Pre-2009 Benefit. This is arbitrary on its face. Belknap's life expectancy has nothing to do with when he earned his benefits. *See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 633 (1993) ("[u]sing different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.").

71.     Partners also uses an entirely different formula for Non-Grandfathered Participants' early retirement benefits, the Treasury Mortality Table and a 5% discount rate. 2016 Plan at Appendix A, §§ 1.3 and 2.4. These different sets of assumptions cannot all produce "actuarially

equivalent" benefits, or the same result compared to a participant's Accrued Benefit.  If a Non-Grandfathered Participant and a Grandfathered Participant retired on the same day and at the same age, the Non-Grandfathered Participant will receive a higher percentage of his Accrued Benefit because Partners uses current, reasonable actuarial assumptions for Non-Grandfathered Participants.

72.     Allowing a plan to use unreasonable actuarial assumptions thus undermines the whole purpose of Section 204's actuarial equivalence requirement, which is to ensure that participants' benefits have the same present value as their accrued benefit at age 65. "If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence." *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

73.     Had Partners used reasonable actuarial assumptions, such as the applicable Treasury Mortality Table and discount rates in the FTSE Above Median Double A Index, Plaintiff and the Class would have received, and would continue to receive, benefits which are actuarially equivalent to their Accrued Benefit and monthly payments greater than what they currently receive.

74.     Plaintiff retired on November 1, 2016, when he was age 62 and 3 months.  Under the Grandfathered Plan, his Accrued Benefit, i.e., his age-65 SLA, was $1,088.93 per month.   The SLA available to Belknap when he retired was $863.97 a month.  Belknap is receiving a 50% joint and survivor annuity which pays him $787.94 a month.  If Partners used the Treasury Mortality Table applicable in 2016 and the 3.71% discount rate based on the FTSE Above Median Double-A as of September 30, 2016 to calculate the reduction to his Accrued Benefit for retiring early, Plaintiff's 50% JSA benefit would be $821.42 per month, or $33.48 more than what he is receiving,

a 4.25% shortfall.  By using unreasonable actuarial assumptions, Partners reduced the present value of Plaintiff's benefits by $5,841.51.

75.     The loss Plaintiff suffered similarly affected all Grandfathered Participants who retired before age 65 during the Class Period.  For example, if Plaintiff had been 60 years-old when he retired in 2016, he would have suffered a 7% loss to his Accrued Benefit.  If Plaintiff had been 55 years-old when he retired, he would have suffered a 16% loss.

76.     While the amount of loss will vary depending on the participant's age, the year he retired and the allocation between his Pre-2009 Benefit and his Post-2008 Benefit, *all* Grandfathered Participants who retired before age 65 during the Class Period have received less than actuarially equivalent benefits.

77.     Each of the Defendants knew or should have known that the actuarial assumptions Partners used to calculate Grandfathered Participants' early retirement benefits were unreasonable and violated ERISA's actuarial equivalence requirements.  Each year, the Pension Management Committee hired Willis Towers Watson to calculate the Plan's actuarial liabilities, which Partners then incorporated into its audited financial statements.  Willis Towers Watson's reports and Partners' audited financial statements used significantly different actuarial assumptions than the ones Partners used to calculate Grandfathered Participants' early retirement benefits.  The Pension Management Committee knew or should have known about the discrepancy since sound practice and the Plan's terms required it to "periodically review the actuarial status of the Plan."  2016 Grandfathered Plan at § 13.3(a); *see also* Schwartzmann & Garfield at 11 ("Periodically, the assumptions used must be reviewed and modified…").  Moreover, Partners amended the Plan in 2009 to use the Treasury Mortality Table and amended the Plan again in 2016 to use a more

reasonable interest rate to calculate early retirement benefits.  2016 Plan Document at Appendix B.

78.     Further, the Retirement Committee was the Plan's administrator and was charged with preparing and filing, among other documents, the Plan's Forms 5500 with the Department of Labor which show the Plan used outdated, unreasonable actuarial assumptions that were inconsistent with the assumptions that Willis Towers Watson determined were reasonable and that Partners used to calculate its "best estimate" of its pension liabilities and costs.

79.     Discovery will show that Partners' use of unreasonable actuarial assumptions deprived Grandfathered Participants and their spouses of tens of millions of dollars.

80.     Because Partners used a grossly outdated, unreasonable mortality table and an unreasonably high discount rate throughout the relevant time period, the benefits paid to Grandfathered Participants (and their beneficiaries) who retired before age 65 are ***not*** actuarially equivalent to their Accrued Benefit in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

81.     Plaintiff has been harmed because he is receiving less each month than he would if Partners used current, reasonable actuarial assumptions to calculate his benefits.  Plaintiff, along with other Grandfathered Participants who retired before age 65, has been substantially damaged by receiving benefits that are not actuarially equivalent to his Accrued Benefit.

## **CLASS ACTION ALLEGATIONS**

82.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All Grandfathered Participants and their beneficiaries who started receiving a benefit in the form of an SLA, JSA or CLA before age 65 from June 28, 2013 until the date of judgement.  Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plan.

83.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

84.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices as alleged herein, including the same actuarial assumptions, and all members of the Class are similarly affected by Defendants' wrongful conduct.

85.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

> A.     Whether the formulae for calculating early retirement benefits for Grandfathered Participants provide benefits that are actuarially equivalent to the Accrued Benefit;
>
> B.     Whether the Grandfathered Plan's actuarial assumptions are reasonable;
>
> C.     Whether the Plan should be reformed to comply with ERISA; and
>
> D.     Whether Plaintiff and Class Members should receive additional benefits.

86.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

87.     This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct

for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

88.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

89.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

90.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Amended Complaint.

91.     Defendants improperly reduce annuity benefits for Grandfathered Participants who retire before age 65 by using unreasonable actuarial assumptions.  These unreasonable, outdated actuarial assumptions cause Grandfathered Participants to receive less than the actuarial equivalent of their Accrued Benefit in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

92.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

93.   Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating early retirement benefits for Grandfathered Participants do not provide actuarially equivalent benefits as ERISA § 204(c)(3) requires. By not providing actuarially equivalent benefits, Partners causes Grandfathered Participants to lose benefits in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

94.   Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)   re-calculation, correction and payment of benefits previously withheld from Grandfathered Participants who retired before age 65;

(b)   an "accounting" of all prior benefits and payments;

(c)   a surcharge;

(d)   disgorgement of amounts wrongfully withheld;

(e)   disgorgement of profits earned on amounts wrongfully withheld;

(f)   a constructive trust;

(g)   an equitable lien;

(h)   an injunction against further violations; and

(i)   other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
### (ERISA §§ 502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3))

95.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Amended Complaint.

96.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

97.     Partners improperly reduces annuity benefits for Grandfathered Participants who retire before age 65 below what they would receive if those benefits were actuarially equivalent to their Accrued Benefit as ERISA requires. By not providing actuarially equivalent benefits, Partners has violated ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

98.     Plaintiff is entitled to reformation of the Grandfathered Plan to require Partners to provide actuarially equivalent benefits.

99.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

100.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Grandfathered Plan following reformation.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**(ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

101.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Amended Complaint.

102.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

103.    ERISA requires that fiduciaries discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and must discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *See id.*

104.     The Pension Management Committee is a named fiduciary under the Grandfathered Plan.  Moreover, the Pension Management Committee has the fiduciary obligation to "periodically review the actuarial status of the Plan," hire an actuary and adopt new actuarial assumptions to calculate benefits "from time to time."   The Pension Management Committee breached these duties by not amending the Grandfathered Plan to change the outdated, unreasonable actuarial assumptions used to calculate Grandfathered Participants' early retirement benefits.  Accordingly, the Pension Management Committee breached its fiduciary duties of prudence and loyalty.

105.     ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan" *only if* the plan's terms "are consistent" with ERISA's substantive requirements.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

106.     The Retirement Committee is the Grandfathered Plan's administrator. It similarly breached its fiduciary duty by administering the Plan, which is inconsistent with ERISA because the Retirement Committee used outdated mortality assumptions that did not match the Plan's experience and a discount rate that is inconsistent with market conditions to calculate Grandfathered Participants' benefits when they retire before age 65.

107.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

108.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established

methodologies for calculating benefits to Grandfathered Participants who retire before age 65 violate ERISA because they do not provide actuarially equivalent benefits.

109.    Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

        (a)     re-calculation, correction and payment of benefits previously withheld from Grandfathered Participants who retired before age 65;

        (b)     an "accounting" of all prior benefits and payments;

        (c)     a surcharge;

        (d)     disgorgement of amounts wrongfully withheld;

        (e)     disgorgement of profits earned on amounts wrongfully withheld;

        (f)     a constructive trust;

        (g)     an equitable lien;

        (h)     an injunction against further violations; and

        (i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Partners on all claims and requests that the Court award the following relief:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Partners failed to provide benefits to Grandfathered Participants who retire before age 65 in amounts that are actuarially equivalent to their Accrued Benefit violates ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3);

C.      Ordering Partners to bring the Grandfathered Plan into compliance with ERISA, including, but not limited to, reforming the Grandfathered Plan to comply with ERISA's actuarial equivalence requirement in ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3);

D.      Ordering Defendants to correct and recalculate the benefits for Grandfathered Participants who retired before age 65;

E.      Ordering Partners to provide an "accounting" of all prior payments of benefits for Grandfathered Participants who retired before age 65 to determine the proper amounts that should have been paid;

F.      Ordering Partners to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Partners to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Grandfathered Plan;

K.      Ordering Partners to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Partners to pay future benefits in accordance with the terms of the Grandfathered Plan, as reformed;

M.      Awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.      Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.

Dated:  March 3, 2020                          Respectfully submitted,


                                               _/s/ Douglas P. Needham_____
                                               **IZARD, KINDALL & RAABE LLP**
                                               Douglas P. Needham, BBO No. 671018
                                               Robert A. Izard (admitted *pro hac vice*)
                                               Mark P. Kindall (admitted *pro hac vice*)
                                               Oren Faircloth (to be admitted *pro hac vice*)
                                               29 South Main Street, Suite 305
                                               West Hartford, CT 06107
                                               Tel: (860) 493-6292
                                               Fax: (860) 493-6290
                                               Email:  dneedham@ikrlaw.com
                                               Email:  rizard@ikrlaw.com
                                               Email:  mkindall@ikrlaw.com
                                               Email:  ofaircloth@ikrlaw.com


                                               Gregory Y. Porter (admitted *pro hac vice*)
                                               Mark G. Boyko (admitted *pro hac vice*)
                                               Alexandra L. Serber (admitted *pro hac vice*)
                                               **BAILEY & GLASSER LLP**
                                               1054 31st Street, NW, Suite 230
                                               Washington, DC 20007
                                               (202) 463-2101
                                               (202) 463-2103 fax
                                               gporter@baileyglasser.com
                                               mboyko@baileyglasser.com
                                               aserber@baileyglasser.com


                                               *Counsel for Plaintiff*

**<u>Certificate of Service</u>**

I, Douglas P. Needham, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing and that paper copies will be sent to all non-registered participants on March 3, 2020.

*/s/ Douglas P. Needham*
Douglas P. Needham