# UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Scott Belknap, on behalf of himself and all others similarly situated, | **Case No.: 1:19-cv-11437-FDS** |
| Plaintiff, | |
| vs. | |
| Partners Healthcare System, Inc., | |
| Defendant. | CLASS ACTION |

## DECLARATION OF MARK P. KINDALL

# EXHIBIT A

Declaration and Rebuttal Report of Lawrence Sher, FSA,
*Osberg v. Foot Locker, Inc.,* No. 1:07-cv-01358 (S.D.N.Y.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GEOFFREY OSBERG                                           :
                                                         :
On behalf of himself and on                              :
behalf of all others similarly situated,                 :
                                                         :       Case No.: 07 CV 1358 (KBF)
                                        Plaintiff,        :
                                                         :
               - against -                               :
                                                         :
FOOT LOCKER, INC.,                                        :
                                                         :
FOOT LOCKER RETIREMENT PLAN,                              :
                                                         :
                                      Defendants.  :
-----------------------------------------------------------------:

Declaration and Rebuttal Report of Lawrence Sher, FSA

        I, Lawrence Sher, depose and state pursuant to 28 U.S.C. § 1746 as follows:

        1.      I am a partner in October Three LLC, an actuarial and employee benefits
consulting firm.  I am a Fellow of the Society of Actuaries, an Enrolled Actuary, a
Fellow in the Conference of Consulting Actuaries, and a member of the American
Academy of Actuaries.  I am the penultimate Past President of the Conference of
Consulting Actuaries and continue to serve on its Board of Directors.  I was a member
of the Actuarial Standards Board, I have served on the Board of Directors of the
American Academy of Actuaries, and I have served on both the Council of U.S.
Presidents and the North American Actuarial Council.  I have practiced as an actuary
since 1973, primarily in the area of pension benefits.  I have extensive experience
designing and consulting with respect to defined benefit pension plans, including the
types of plans involved in this case.  Detail on my background is provided with my May
10, 2012 Report ("May 2012 Report") submitted in this case.

        2.      After I submitted my May 2012 Report, I received copies of reports
prepared by plaintiff's experts Truman Bewley ("Bewley"), Lawrence Deutsch

Exhibit
0008

A-1296

("Deutsch"), Chester Spell ("Spell"), James Stratman ("Stratman") and Richard Wiener ("Wiener"), collectively, "plaintiff's expert reports". Defendant's counsel asked me to review those reports and to comment on certain aspects of them. After reviewing those reports, I affirm all of the opinions I expressed in the May 2012 Report and hereby incorporate that report by reference.

3.      My comments on the plaintiff's expert reports deal primarily with Mr. Deutsch's report as we are the "opposing actuaries," although I cover elements of the other reports based primarily on my research and experience as a consulting actuary on participant communications involving cash balance pension plans.

4.      The documents that I received from defendants' counsel that I considered in preparing this Report are listed at Appendix 1. My firm is being compensated for my time at an hourly rate of $600 and for the time of other October Three employees at their regular hourly rates.

5.      The analysis presented in this Report was prepared by me or by other October Three employees under my supervision, based on the documents listed in Appendix 1, including proposed class member data provided by defendants' counsel. The calculations were performed based on assumptions I consider to be reasonable and appropriate given the purpose of the calculations. The calculations set forth in this Report should not be used or relied upon for purposes other than as specifically addressed herein. This Report contains seven major sections and an appendix, as follows:

Section I     **Summary and Conclusions.** In this section I summarize my key findings and conclusions that are discussed in more depth in later sections of the Report.

Section II    **Opening Balance Issues.** In this section, I discuss and address the contentions of plaintiff's experts related to opening balances.

Section III   **Wear-Away Issues.** In this section, I address the contentions of plaintiff's experts related to the wear-away effect.

Section IV    **Potential Remedies**. In this section, I address and correct Mr. Deutsch's remedy calculations, and provide my opinions and

A-1297

calculations on potential remedies.

Section V **Employee Communications Issues.**  In this section, I address the contentions of plaintiff's experts regarding employee communications.

Section VI **Other Deutch Issues.**  In this section, I cover other issues raised in Mr. Deutsch's report, including the cost impact of the conversion to a cash balance plan, the value of the 401(k) plan and his comparison of benefits in the pre-1996 and 1996 Plans.

Section VII **Issues Raised by Spell, Bewley, and Wiener and Stratman.**  In this section, I address issues raised by plaintiff's non-actuary experts.

Appendix 1 **Materials Reviewed**

## I.   Summary and Conclusions

6.   The following is a summary of the major points I address in this Report:

- Deutsch's view on "actuarial equivalency" is inconsistent with the nature of actuarial equivalency from an employer's perspective, and fails to reflect the value of the cash balance account.

- Foot Locker disclosed that it used a 9% interest rate in determining opening balances, based on the expected return on Plan assets, which I find to be a reasonable approach.

- All of the plaintiff's experts fail to recognize the significant additional value to participants and cost incurred by Foot Locker in providing lump sum distributions under the amended Plan.

- Deutsch acknowledges that the wear-away effect is sensitive to interest rate changes, yet bases his analysis on a single rate.

- As interest rates declined, the wear-away effect increased, yet plaintiff and many others benefited from increased lump sums.

- Deutsch's potential remedy calculations under his two approaches suffer from major conceptual and calculation errors, and I have

3

revised his calculations, with particular focus on his section 4B calculations which are more in line with an A+B scenario.

- Plaintiff's experts complain about Foot Locker's disclosures regarding wear-away, yet to fully and accurately describe the numerous possible impacts would likely do more harm than good.

- Deutsch's contention that the minimum protected benefit was not disclosed in the SPD is untrue, and he failed to point out the many individual communications that provided more details.

- Deutsch understates the value of the 401(k) plan, by disregarding its income tax benefits and he improperly treats the cash balance plan as if it does not provide any future benefits.

- Spell's and Bewley's analyses are based on a false premise that the cash balance conversion was no more than a selective temporary plan freeze, ignoring the values of providing lump sums as well as the 401(k) company contributions and income tax savings.

- Wiener says that the SPD used overly complex language for Plan participants, yet from my experience and from his own research, the readability of Foot Locker's SPD is typical among larger employers.

- ~~Stratman tries to impose disclosure standards on Foot Locker that became applicable following a 2001 law change and that was not the practice followed by employers prior to that law change.~~

## II.   Opening Balances Issues

### A.   Use of 9% Opening Balance Interest Rate Satisfies Common Definition of Actuarial Equivalence

7.     It is widely acknowledged that there were no minimum requirements in the 1990s for determining opening balances in a cash balance conversion.

8.     In its communications to Plan participants, Foot Locker indicated that

4

A-1299

opening balances were determined based on the actuarial equivalent of their accrued (age 65) benefits as of December 31, 1995 using a 9% interest rate.  Deutsch asserts that the opening balances were less than true actuarial equivalent values, largely because the 9% interest rate was too high.

9.      Deutsch leaves the impression that Foot Locker had no foundation for adopting the 9% interest rate for opening balances.  On page 7 of his report, he contends "…the interest rate Foot Locker used to make conversion calculations was a special, much higher rate (than) any of the interest rates used for other calculations: 9%."  However, communications to participants indicated that the 9% rate used to determine opening balances was equal to the 9% expected rate of return on Plan assets.

10.      The concept of actuarial equivalence in defined benefit plans originated to protect the financial integrity of plans (or the insurance companies guaranteeing plan benefits) when employees elect optional forms of benefits.

11.      Where the term "actuarially equivalent" is used in defined benefit plans of large employers (other than when intentionally subsidizing benefits[1] or when bound by the law to a particular basis, such as for lump sum distributions), actuarial equivalent assumptions continue to be set with the primary goal of protecting the financial integrity of the plan while at the same time being fair to plan participants.

12.      From Foot Locker's perspective, it was reasonable to determine actuarial equivalency using the expected rate of return on Plan assets, as set (and certified) by the Plan's enrolled actuary, as this would reflect the impact on plan assets and liabilities of paying a lump sums.  Using a lower rate would have exacerbated the cost increases associated with introducing a lump sum distribution option. (see D. below).

**B.  Deutsch 's View of Actuarial Equivalence in Unnecessarily Narrow and Fails to Reflect the Value of Cash Balance Account**

---

[1] Many employers decided to subsidize specified benefits, such as early retirement benefits, i.e., by providing more than the actuarial equivalent value of the normal retirement benefit.  Those employers were willing to accept the cost increases associated with the subsidized benefits to accomplish a desired outcome (e.g., in the case of early retirement subsidies, providing opportunities for younger workers to advance in the organization).

A-1300

13.    Deutsch reaches his conclusion that the 9% rate was too high to be considered a legitimate actuarial equivalent rate based on his apparent view that actuarially equivalency should be determined solely from the participant's perspective. As discussed above, that is not the view that employers have traditionally taken, at least in the context of defined benefit plans sponsored by large employers.

14.    Even assuming that Deutsch's participant-centric view of actuarial equivalence is correct, his analysis fails to take into account the special features of the Plan that conveyed additional value to participants.

15.    **Deutsch's buy-back approach.**   One of Deutsch's approaches to evaluating whether the opening balances were actuarially equivalent to the December 31, 1995 accrued benefits is to determine whether an opening balance, together with future interest credits, will produce an account balance at age 65 that, when converted to an annuity, reproduces the participant's December 31, 1995 accrued benefit.  Given the Plan's 6% fixed interest crediting rate (and 6% minimum rate to convert age 65 account balances to annuities), Deutsch asserts that actuarial equivalence would be achieved by using a 6% interest rate and no mortality rates before age 65 in determining opening balances.

16.    This approach indeed would produce an age 65 annuity that is equal to the December 31, 1995 accrued benefit if the applicable 30-year Treasury bond rate in the year of attaining age 65 is 6% or lower.  However, if the applicable rate is over 6%, the resulting age 65 annuity would *exceed* the December 31, 1995 accrued benefit.

17.    Thus, Deutsch's approach of "equal or better" would be expected, on average, to convey value to participants (with respect to the opening balance) above what they had accrued as of December 31, 1995.

18.    In asserting that this "buy-back" approach would result in an opening balance that is the actuarial equivalent of the December 31, 1995 accrued benefit, Deutsch also fails to take into account the significant value that employees acquired in connection with the conversion due to the introduction of a lump sum option  (see D. below).

19.    Another element of Deutsch's "buy-back" approach that overstates the value of the prior Plan accrued benefits is disregarding mortality rates before age 65,

i.e., he assumes all participants will survive to age 65.  For a 45 year old, for example, this overstates the value of his age 65 annuity by about 10%.

20.    The lump sum present value of an age 65 accrued benefit under IRC section 417(e), i.e., the statutory minimum lump sum, typically is determined by reflecting mortality rates at all ages – not just after age 65.  Moreover, in establishing opening balances, the dominant practice among major employers was to reflect mortality rates at all ages on the grounds that the accrued benefit (an age 65 annuity) would not become payable unless the employee survived until age 65.  Therefore, I see no reason to question Foot Locker's decision to include mortality at all ages in determining opening balances.  To do so would convey more value to participants than the actuarial equivalent of the age 65 accrued benefits.

21.    **Deutsch's outside investment approach**.  Deutsch's other approach to evaluate whether the opening balances were actuarially equivalent to the December 31, 1995 accrued benefits is to determine the value to the participant if he or she were to receive a lump sum distribution immediately after the conversion and invest the proceeds.

22.    Deutsch says "because ERISA requires a plan to use an assumed rate of interest published by the IRS (the 417(e) applicable interest rate) that was 6.06% at the time of the conversion, to determine a lump sum present value, that same rate would be used for this purpose."  I fail to see any connection between the 6.06% rate on 30-year Treasury bonds in 1996 and the rate the participant would likely be able to achieve in outside investments.  Furthermore, given that immediately before the conversion, lump sums were not generally available under the Plan, I also fail to see why a 30-year Treasury bond rate is necessarily relevant at all for determining the "value" of the annuities under the prior Plan terms.

23.    In order to assess the economic value of an annuity beginning at age 65 (or any age for that matter), its present value should be determined using a reasonable discount rate, not necessarily the discount rate that would have to be used by law in the event that a lump sum distribution *becomes available* under the plan.

24.    In Cathy Niden's ("Niden") May 10, 2012 report, she opined that the discount rate for this purpose should vary by employee depending on the employee's

"personal discount rate." A higher rate would apply for an employee who values current consumption relatively more than deferred consumption. Niden suggested that a conservative rate for this purpose is the 30-year mortgage rate, the lowest long-term rate generally available to the employee in the market. She indicated that a rate 150 basis points above the 30-year Treasury bond rate is a good proxy for the mortgage rate. I find Niden's analysis in this regard to be compelling.

25. In enacting the Pension Protection Act of 2006 (PPA) Congress recognized that the use of the "artificially-low 30-year Treasury rate" had the effect of "inflating lump sum distributions, which drain[ed] plan assets and represent[ed] a major source of systemic pension underfunding."[2] Congress further noted that use of the "artificially low" 30 year-Treasury rate "resulted in inflated lump sums which are **not** the actuarial equivalent of a lifetime annuity."[3] (emphasis added) Accordingly, the PPA amended IRC section 417(e) to replace the 30-year Treasury bond rate with a corporate bond interest rate to calculate minimum lump-sum distributions.[4]

26. Employers had recognized long before 2006 that the use of a 30-year Treasury bond rate (as well as the PBGC plan termination interest rates that had applied under section 417(e) before 1995) overstated the lump sum value of a life annuity. Also, in late 1995, interest rates had dropped to levels not seen in a long time. These factors led some employers that set up opening balances at around the time Foot Locker's conversion to use an opening balance interest rate that was higher than the then current 30-year Treasury Bond rates.[5]

27. The corporate bond rates used today under section 417(e) are more appropriate than either of the predecessor rate bases. However, even on the current basis, offering lump sums continues to potentially cost employers money – albeit to a lesser degree than before – see D. below.

28. Interestingly, the corporate bond rates were about 1.5% above the 30-year Treasury bond rates in late 1995 (i.e., about 7.5%) – the same spread that Niden

---

[2] See H.R. REP. NO. 109-232 (Part 1), at 67 (2005).
[3] See H.R. REP NO. 109-232 (Part 2), at 108 (2005)
[4] See 29 U.S.C. § 1055 (2006), amending 26 U.S.C. § 417(e)(3)(D) to incorporate the corporate bond yield in 25 U.S.C. § 430(h).
[5] See my May 2012 Report, paragraph 39 and footnote 11.

adopted for determining a present value of an annuity.

29.    In his "outside investment" approach for analyzing whether opening balances met his definition of actuarial equivalent, Deutsch fails to examine what kinds of investment opportunities participants would have outside the Plan as compared to the 6% fixed interest rate that cash balance accounts receive.  In paragraphs 44-50 of my May 2012 Report, I discussed and provided examples showing that the Plan's 6% rate has turned out to be quite generous as compared to outside investments with comparable risk-free rates (e.g., 1-year Treasury bills).

### C. Deutsch's Overstates Value of Subsidized Early Retirement Annuities versus Lump Sum Distributions

30.    Deutsch asserts that "for some participants who were age 55, or near age 55, and who had at least 15 years of service at the time they terminated employment, if they elected an annuity at age after 55, the value of that annuity in some cases would have been significantly larger than the lump sum they received."

31.    This assertion is theoretical, based on broad actuarial assumptions that may or may not be relevant for any particular individual, most important of which is the interest or investment discount rate assumed for each participant.  The greater the value that a participant attaches to getting a lump sum now versus an annuity that may itself not begin for many years, the higher the discount rate.[6]  Participants may prefer a lump sum for a variety of reasons.   That includes employees with impaired life expectancies and others who value the portability, investment flexibility and liquidity that lump sums provide.   These advantages can overcome any nominal "subsidy" included in the annuity.

32.    Deutsch focuses on the early retirement subsidy that was associated with the December 31, 1995 accrued benefit under the pre-1996 Plan provisions, in particular for participants who have 15 or more years of service when they terminate

---

[6] See paragraphs 23-24 above for a discussion of a "personal" discount rate.

9

employment.[7] He does not, however, examine the impact of another type of subsidy introduced in the 1996 Plan that can increase the annuity otherwise payable at **any** retirement age – including the December 31, 1995 minimum as well as the annuity derived from the cash balance account.

33.     This "1996 Plan subsidy" can apply when section 417(e) interest rates fall below 6%, which have occurred in all years after 1996 except 1997 and 2000.

34.     My understanding of the 1996 Plan's calculation procedures are that the December 31, 1995 accrued benefit is first converted to a lump sum at the benefit commencement age using the applicable section 417(e) assumptions. The resulting lump sum is then converted back to an annuity using the same 417(e) assumptions, **except that the minimum interest rate for this purpose is 6%**. When the 417(e) rate is under 6%, the annuity will be inflated – the lower the 417(e) rate the greater the 1996 Plan subsidy.

35.     The resulting annuity is compared to the December 31, 1995 accrued benefit, reduced for early commencement of benefits using the pre-1996 Plan early retirement factors (and to the annuity derived from the cash balance account – determined using the same annuity conversion factor). The participant is entitled to the highest of these amounts.

36.     With interest rates as low as they have been in the last few years, in many cases the 1996 Plan annuity calculation results in a higher annuity than under the pre-1996 Plan early retirement provisions, not just for participants with less than 15 years of service.

37.     The impact on early retirement benefits can be illustrated by considering what Mr. Osberg would have been entitled to if he had elected an annuity beginning at age 55 (rather than the lump sum he received at age 48).

38.     Osberg's account balance at his 2002 date of distribution was $20,094. If he had left his account in the Plan until age 55 in 2009, it would have grown to $29,322. However, the lump sum payable would have been equal to $47,700,

---

[7] A participant who has a December 31, 1995 accrued benefit of $1,000 per year beginning at age 65 can elect the annuity of $600 to begin at age 55 if he or she has 15 or more years of service; the age 55 annuity would be $400 if service is less than 15 years.

determined as the present value of his December 31, 1995 accrued benefit of $6,098.57 per year using the IRC section 417(e) assumptions in 2009 (which had dropped by more than 1% from the 5.48% rate in 2002). That lump sum would be converted under the 1996 Plan terms (using a 6% interest rate) to a monthly annuity starting at age 55 of $297.73. That compares to a monthly annuity from his December 31, 1995 accrued benefit, applying the pre-1996 early retirement provisions, of $304.93 per month[8].

39.    Thus, the so-called "subsidy" that Deutsch makes a big deal over amounts to $7.20 per month, or only 2.4% of his otherwise determined 1996 Plan benefit. Osberg's situation is by no means unique.

### D.  Lump Sum Option Provides Significant Value to Participants and Cost to Foot Locker

40.    **Added value to participants.**  One does not even have to get into the math (but I will) to conclude that Foot Locker participants considered the availability of a lump sum distribution to have real value.  The fact that the vast majority of participants elected lump sum distributions confirms that participants indeed have been ascribing greater value to lump sum distributions than to annuities starting at age 65 or any other age.

41.    The analysis by Niden, discussed in paragraphs 23-24 above indicates that to determine the value of an annuity, a discount rate of at least 1.5% above the 30-year Treasury bond rate would be appropriate.  From the participant's perspective, a lump sum determined using the 30-year Treasury bond rate plus 1.5% would conservatively capture the minimum true value of the annuity payments (the actual value would be lower for people with higher personal discount rates).  But participants who received lump sums with respect to their December 31, 1995 accrued benefits received them using a 30-year Treasury bond rate (through 2007).  The differential (at least 1.5%) translates to added value to participants when they receive lump sums.

---

[8] The annuity derived from the cash balance account is lower than both of these amounts.

42.     To estimate the added value for 12,912 participants who received lump sum distributions beginning in 1996, I have calculated the present value of their protected normal retirement benefits on participants' dates of distribution, using two different interest rates: (1) the applicable 417(e) rate in the year of distribution (used to determine lump sums)[9], and (2) the 417(e) rate plus 1.5% (a personal discount rate).

43.     The difference between the present values is about $34 million, which can be viewed as the additional value that participants receive as a result of the statutory requirement to subsidize lump sums.

44.     The adoption of a lump sum option in conjunction with establishing opening balances potentially provides even more value. This has not turned out to be the case, at least yet, because interest rates have continued on a generally declining path since 1995. But, had interest rates, instead, tracked the rates that had applied in the period leading up to the conversion, the cash balance account would have added significant value in some years.

45.     The following tables illustrate these points by projecting some key lump sum values for a hypothetical participant who was age 40 and had an annual accrued benefit of $10,000 (payable as an annuity beginning at age 65) on December 31, 1995. The resulting opening balance for this participant would have been $9,020.

46.     The first table is based on the actual 30-year Treasury bond rates that arose in the 16-years 1997 through 2012. The opening balance is projected, with the Plan's 6% annual interest credits. The last two columns show the present value in the year shown of the December 31, 1995 accrued benefit on two bases: (1) using the approximate applicable interest rate in the year under IRC section 417(e)[10] and (2) using a rate that approximates the minimum "personal discount rate" for determining

---

[9] Beginning in 2008, the 417(e) rate is actually 3 "segment rates." One rate applies in the 5 years after the calculation date, the second in the succeeding 15 years, and the third thereafter. For these calculations I substituted single rates intended to approximate the effect of using the three separate rates. Those single rates are: 2008 - 4.8%, 2009 – 4.4%, 2010 – 4.8% and 2011 – 4.1%.

[10] The 417(e) lump sum value was determined using the preceding December rate on 30-year Treasury bonds, rounded to the nearest half percent; for years 2008-2012, a margin of 1.5% was added (as an approximation to corporate bond rates).

the present value of an annuity in the year[11].

| Jan 1 | Age | 30-Yr. T-Bond | Opening Balance Account | Pres. Val. 12/31/95 Accrued Benefit | |
|---|---|---|---|---|---|
| | | | | IRC 417(e) Basis | Minimum Personal Discount |
| 1996 | 40 | 6.00% | $ 9,020 | **$22,435** | $14,124 |
| 1997 | 41 | 6.50% | $ 9,561 | **$20,464** | $13,129 |
| 1998 | 42 | 6.00% | $10,134 | **$25,258** | $16,355 |
| 1999 | 43 | 5.00% | $10,742 | **$35,773** | $23,261 |
| 2000 | 44 | 6.50% | $11,387 | **$24,805** | $16,596 |
| 2001 | 45 | 5.50% | $12,070 | **$34,530** | $23,211 |
| 2002 | 46 | 5.50% | $12,794 | **$36,487** | $24,876 |
| 2003 | 47 | 5.00% | $13,562 | **$43,748** | $30,108 |
| 2004 | 48 | 5.00% | $14,376 | **$46,028** | $32130 |
| 2005 | 49 | 5.00% | $15,238 | **$48,439** | $34,295 |
| 2006 | 50 | 4.50% | $16,153 | **$57,119** | $40,827 |
| 2007 | 51 | 4.50% | $17,122 | **$59,855** | $43,397 |
| 2008 | 52 | 4.50% | $18,149 | **$46,142** | **$46,142** |
| 2009 | 53 | 3.00% | $19,238 | **$65,784** | **$65,784** |
| 2010 | 54 | 4.50% | $20,392 | **$52,211** | **$52,211** |
| 2011 | 55 | 4.50% | $21,616 | **$55,565** | **$55,565** |
| 2012 | 56 | 3.00% | $22,913 | **$75,978** | **$75,978** |

47.    The difference between the numbers in the last two columns is the minimum additional value to the participant of the lump sum distribution versus the prior Plan annuity benefit. Note that the differential disappeared beginning in 2008 as a result of the change in the law to use corporate bond rates in place of 30-eyar

---

[11] The present value on the minimum personal discount rate basis was determined using the preceding December rate on 30-year Treasury bonds, rounded to the nearest half percent, plus 1.5% (See discussion in paragraphs 23-24 regarding this rate basis)

Treasury bonds for determining lump sum distributions under IRC section 417(e).[12]

48.     The participant was entitled to a lump sum of not just the opening account with 6% interest, but to the greater of that account balance and the lump sum value of the December 31, 1995 accrued benefit.   Thus as interest rates declined through most of this 16-year period, the participant did quite well.   By the beginning of 2012, the value of the annuity (and the lump sum) grew to $75,978.   That works out to a **compound annual return on the original $14,124 annuity value of 11.0%**.   This increase was caused by a combination of adding the lump sum option and the decline in interest rates.

49.     The next table repeats the analysis except considering what would have arisen if the rates on 30-year Treasury bonds had reverted to the actual historical rates in the 16-year period immediately before the conversion.   In order to transition more smoothly from the actual rate in effect in 1996, I have applied the historical rates in reverse order.   Thus, the rate I used in 1997 was the actual 1995 rate; the rate I used in 1996 was the actual 1994 rate, and so on.   In effect, this scenario assumes that the future rates will be the mirror image of the historical rates.

| Jan 1 | Age | 30-Yr T-Bond | Opening Balance Account | Pres. Val. 12/31/95 Accrued Benefit | |
| | | | | IRC 417(e) Basis | Minimum Personal Discount |
|---|---|---|---|---|---|
| 1996 | 40 | 6.00% | $ 9,020 | **$22,435** | $14,124 |
| 1997 | 41 | 8.00% | *$ 9,561* | **$13,129** | $ 8,538 |
| 1998 | 42 | 6.50% | $10,134 | **$21,817** | $14,194 |
| 1999 | 43 | 7.50% | $10,742 | **$17,602** | $11,717 |
| 2000 | 44 | 7.50% | $11,387 | **$18,946** | $12,788 |
| 2001 | 45 | 8.00% | $12,070 | **$17,949** | $12,335 |
| 2002 | 46 | 8.00% | $12,794 | **$19,416** | $13,529 |
| 2003 | 47 | 9.00% | *$13,562* | **$16,641** | $11,847 |
| 2004 | 48 | 9.00% | *$14,376* | **$18,176** | $13,818 |
| 2005 | 49 | 7.50% | $15,238 | **$27,448** | $19,856 |

---

[12] Actually, there would continue to be some differential in 2008-2011 because the law phased in the new corporate bond basis.  That phase-in was disregarded in this analysis to avoid this complication for these illustrations.

| 2006 | 50 | 9.50% | *$16,153* | **$19,617** | $14,601 |
| 2007 | 51 | 11.50% | **$17,122** | $14,828 | $11,330 |
| 2008 | 52 | 12.00% | **$18,149** | $11,815 | $11,815 |
| 2009 | 53 | 10.50% | **$19,238** | $17,097 | $17,097 |
| 2010 | 54 | 13.50% | **$20,392** | $12,230 | $12,230 |
| 2011 | 55 | 12.50% | **$21,616** | $16,298 | $16,298 |
| 2012 | 56 | 10.00% | $22,913 | **$26,030** | **$26,030** |

50.     This scenario paints a very different picture, but one that was certainly plausible at the time the Plan was amended in 1995.  Note, however, that the opening balance account amounts are the same numbers as in the preceding table.  That is no coincidence given that the cash balance accounts are credited with a fixed 6% interest rate and, therefore, are unaffected by changes in future interest rates.  Thus, the account provides a very stable floor of protection that provides value in scenarios such as this one.

51.     In the years 2007 through 2011, the opening balance account would have exceeded the present value of the December 31, 1995 accrued benefit under both the 417(e) and minimum personal discount bases. In four other years, 1997, 2003, 2004 and 2006, the opening balance account would have exceeded the present value of the December 31, 1995 accrued benefit on the minimum personal discount basis.

52.     Consider the year 2007.  The present value of the December 31, 1995 accrued benefit on the minimum personal discount basis was $14,124 on January 1, 1996.  That value would have declined to $11,330 on January 1, 2007, a loss of about 20% over the 11-year period.  The opening account, however, grew to $17,122, which was 51% higher than the present value on the personal discount basis and 15% higher than the 417(e) lump sum of $14,828.

53.     **Added cost to Foot Locker**.  Foot Locker's decision to offer lump sums with respect to the cash balance pay credits (and interest thereon) as well as on the opening balances (and the ERISA present value of the protected annuities) significantly increased the costs of the Plan.  (Deutsch recognized this too – see section VI. A. below)

54.     In fact, had Foot Locker merely amended its pre-1996 plan to introduce a lump sum distribution option, plan costs likely would have risen significantly.   Thus, the plaintiff's suggestion that Foot Locker could have just amended the prior Plan to provide lump sums would not have been possible given one of Foot Locker's stated objectives – to reduce costs.

55.     The increased cost is caused primarily by the differential between the statutory interest rate used to discount the annuity payments to a lump sum and the expected rate of return on Plan assets.[13]   In Foot Locker's case, this interest rate differential in 1996 was significant: the expected return on assets for minimum funding in 1996 (certified and used by the Plan's actuary) was 9.0%[14], while the section 417(e) lump sum rate was 6.06%.

56.     Without some kind of offsetting reduction in the amount of the lump sums payable (e.g., through how opening balances are set), the cost increase obviously would have been prohibitive in Foot Locker's case given that one of its objectives was to reduce costs.

57.     **Illustration of how a lump sum distribution increases Foot Locker's cost.**   The following illustrates how the Foot Locker Plan's liability (and resulting contribution requirements) can be affected by a lump sum distribution.   Assume that a participant was age 45 on December 31, 1995 and had an accrued age 65 annual annuity of $10,000.   The estimated assets needed on December 31, 1995 to finance that annuity would have been $13,959, under the Plan's 9% assumed investment return assumption at that time.[15]   The table shows the needed assets on December 31, 1995 at five-year intervals thereafter to provide the annuity beginning at age 65; the balance grows at 9% per year before and after age 65, and $10,000 is

---

[13] The other cause is the potential for "anti-selection," i.e., the tendency for employees with impaired life expectancies to elect lump sums and the healthiest employees to elect annuities.

[14] Foot Locker's expected rate of return on plan assets for financial accounting purposes was 10% in 1996.  In the mid-1990s, the use of expected returns on plan assets of 9%–10% (for minimum funding and financial accounting purposes) were common in the typical situations, like Foot Locker, where half or more of the plan assets were, and were anticipated to continue to be, invested in equity assets.

[15] This is an estimate because it is uncertain when the employee pension would have commenced and how long the employee will live (and, therefore, how many annuity payments will be made).  For this example, we assume that the annuity would start at age 65 and that the employee lives to about his or her life expectancy in accordance with the section 417(e) mortality table.

assumed to be withdrawn each year beginning at age 65.

| Age | Assets Remaining to Provide Annuity | | Age | Assets Remaining to Provide Annuity |
|---|---|---|---|---|
| 45 | $13,959 | | 65 | $78,232 |
| 50 | $21,478 | | 70 | $57,829 |
| 55 | $33,046 | | 75 | $26,437 |
| 60 | $50,845 | | 78 | $     0 |

58.     If the Plan were able to determine lump sum distributions using a 9% discount rate, the lump sum on January 1, 1996 also would have been $13,959. In that case, the Plan would not have expected to suffer a loss (or associated cost increase) on account of paying the lump sum distribution – plan assets and liabilities both would have reduced by $13,959. However, because of the statutory requirement under IRC section 417(e) to use a 6.06% discount rate to determine lump sums in 1996, the resulting lump sum would have been $29,721. Thus, by virtue of the Plan offering a lump sum and the participant electing it, the Plan's obligation to this employee on January 1, 1996 doubled, from $13,959 to $29,721. *By paying the lump sum, Plan assets would reduce by $29,721 and liabilities (for providing the annuity) by only $13,959; the difference would have had to be made up through higher company contributions in future years.*

59.     By setting opening balances using the Plan's 9% expected rate of return on assets, the cost impact of introducing the lump sum option was softened but, as it

turned out, not by very much.  That is because so many of the Plan participants terminated and received lump sums in the 3 year period following the conversion and received the lump sum present value of the minimum protected benefit at the 417(e) interest rate in the year of distribution (which was closer to 6% than 9%).

### III.    Wear-away Issues

#### A.  Deutsch's Wear-away Analysis Using a Single Assumed Interest Rate Was Incomplete at Best

60.    Deutsch correctly points out that proposed class members can be affected by the Plan amendment differently depending on their benefit entitlements and elections.  Because the vast majority of participants that terminated received lump sums, the focus of any wear-away analysis should be on lump sums.

61.    Because the lump sum present value of the December 31, 1995 accrued benefit is materially affected by changes in future interest rates, any wear-away analysis that is based on a fixed interest rate is incomplete and potentially misleading.

62.    Indeed Deutsch acknowledged in his report:  "The fluctuation in § 417(e) rates means that the lump sum value in a future year of even a frozen accrued benefit can be **difficult to predict**...A drop in the prescribed interest rate from 6.00% to 5.5% can cause a **23% increase** in the lump sum due a 30 year old."

63.    Nevertheless, Deutsch performed all of his wear-away analysis using a single assumption for section 417(e) rates in future years – 6.06% -- which happened to be the "spot" rate on 30-year Treasury bonds in one particular month, December 1995.

64.    The 6.06% rate was not even known while the Plan amendments were being considered, when the cash balance provisions were finalized and when the new provisions were communicated to employees.  The 30-year Treasury bond rates were higher than 6.06% throughout that period, and rebounded quickly after January 1996

18

to over 7% again within a few months.

65.    Deutsch seems to justify his focusing on a single interest rate in assessing the wear-away effect by trying to marginalize the impact of changing interest rates:  "This increase in the lump sum [due to interest rate decreases] does not reflect an increase in the participant's 'pension benefit' – rather, it reflects a different *spot* present value based on the prescribed rate."  (emphasis added)

66.    What Deutsch seems to be saying is that interest rate changes really don't matter so his selection of the 6.06% rate was just as good as any other rate, and has the advantage that it is the rate that applied on the effective date of the amendment.  I disagree.  Interest rates have a profound impact on participant's benefits and, therefore on the extent of any wear-away effect.

67.    When interest rates fall, the *true* value of the fixed dollar annuity (i.e., the December 31, 1995 accrued benefit) rises because it is expected to have greater purchasing power in a low interest rate economic climate.  Conversely, when interest rates rise, the fixed dollar annuity is expected to have less value in that economic environment.  These changes in values are indeed difficult to predict but are real.

68.    If one were going to perform a wear-away analysis using a single rate (which I do not agree with), a better choice would be to use the rate that would have been in effect during 1995 – for example, 7.87%, the rate for December 1994.

69.    Niden also performed a wear-away analysis using a 6.06% fixed rate; however, she repeated the analysis using an alternative rate of 7.5%, which is more in line with the 30-year Treasury bond rates in effect when the Plan amendments were being considered.  (A 7.5% rate is also in line with the corporate bond rate Congress adopted to replace the risk-free 30-year Treasury bond rates, even if one assumed use of the December 1995 rates; at earlier dates in 1995 that rate was correspondingly higher.)  By comparing the results under two different assumed future interest rates, one can get a sense as to how the wear-away effect will vary as interest rates change.

70.    When interest rates fell (both during 1995 before the conversion became effective and afterward), the lump sum payable with respect to the December 31, 1995 accrued benefit increased, thereby potentially lengthening the wear-away period.  Deutsch complains that participants who were experiencing the wear-away effect got

19

nothing more than what they were already entitled to under the prior formula.

71.     That is patently **false**.  Participants were **not** entitled to a lump sum under the prior formula -- their entitlement to a lump sum arose only under the amended plan.  And nothing required the amended plan to offer the prior accrued benefit as in a lump sum.  Rather, providing lump sums (including the lump sum value of the protected benefits using 417(e) assumptions) conveyed significant additional value to employees **under the new Plan**. (see section II.D. above).

72.     The fact that the law required that such minimum lump sums be provided using a conservative discount rate does not diminish the fact that there are real costs to Foot Locker (and benefits to employees) associated with that provision.  Deutsch unfairly and incorrectly associates that additional value with the pre-1996 formula.

### IV.     Potential Remedies

### A.  Deutsch Section 4B "Understated Amounts"

73.     The chart in section 4B (page 32) of Deutsch's revised report purports to determine the increase in lump sums that would have arisen had they been subject to a minimum equal to the lump sum present value of the protected accrued benefit plus the pay credits under the cash balance formula (with interest).  This approach resembles an A+B conversion approach, although in a true A+B approach there are no opening balances and Part A benefits typically are not available in a lump sum.  Had Foot Locker adopted an A+B scenario at the outset with Part A available in a lump sum, the cost of doing so likely would have been prohibitive given the goal to reduce, not raise, costs.

74.     Deutsch's total "pay credits not paid" are significantly overstated because they include the enhanced opening balance (with interest) for those who were entitled to the enhancements.  Deutsch justifies including the opening balance enhancement as a pay credit on the grounds that the enhancement should carry over to this scenario since otherwise it would be a take-away (i.e., there no longer would be an enhancement as compared to employees not entitled to the enhancement).  I find this

logic to be highly problematic.

75.   Clearly the purpose of imposing an A+B scenario would be to assure that participants receive all of their actual pay credits with interest – to eliminate wear-away.  The opening balance enhancements were intended to lessen or eliminate the wear-away effect for the eligible group.  Deutsch himself illustrates how this opening balance enhancement reduced or eliminated wear-away on page 18 of his report.

76.   Exhibit A, Part 1 illustrates this overstatement for proposed class member ID 00004.  The actual lump sum was $15,624 higher than the value of the protected benefit, but the pay credits were less than that differential, $10,457.  Yet, Deutsch's "understated" amount with respect to ID 00004 (included in the table in Section 4B) is $43,679 (developed in Column ET of his revised spreadsheet "Understated Amounts – Sec. 4B").

77.   To the extent that a participant, like ID 00004, already received more than his or her protected benefit plus *actual* pay credits with interest, there should not be any potential understated amount since there wasn't any wear-away to cure.

78.    Deutsch also overstates a true A+B by applying a "whipsaw" calculation to the pay credits. Surely participants could not have anticipated when the Plan was amended that the Plan's stated pay credits would be mysteriously increased due to a highly technical and unintuitive IRS position.

79.   In response to the 2006 Pension Protection Act, which eliminated whipsaw and any anti-cutback requirement that ordinarily would apply to plan amendments, Foot Locker, like many other employers, removed the whipsaw provision from its Plan.

80.   I see no legitimate reason to impose whipsaw today when considering any possible remedy involving an A+B approach.  To do so would clearly result in windfalls – i.e., participants receiving more than their December 31, 1995 accrued benefits plus the Plan stated pay credits with interest.

81.   Removing the opening balance enhancements from Deutsch's lost pay credits in the table on page 32 of his report for participants who received lump sums

would reduce the total from $44,960,759 to $24,946,153[16]. And removing the whipsaw calculation on the pay credits would further reduce the total to $20,820,205. Defendants' counsel asked me to provide a breakdown of this total by certain dates of termination of employment, and to calculate interest, based on the rates on 1-year Treasury bills[17], from the applicable lump sum distribution dates to January 1, 2011.

| Termination Dates | Additional Lump Sums @ Distribution Dates | Interest to 1/1/11 @ 1-Yr. T-Bill Rates | Total Including Interest |
|---|---|---|---|
| Before 2/23/01 | $ 13,102,945 | $ 5,915,839 | $19,018,784 |
| 2/23/01 – 2/22/04 | $ 3,177,088 | $ 564,090 | $ 3,741,178 |
| After 2/22/04 | $ 4,540,172 | $ 202,578 | $ 4,742,750 |
| Total | $ 20,820,205 | $ 6,682,507 | $27,502,712 |

82.     The chart on page 35 regarding annuities has the same problems. Removing the enhancements and whipsaw from pay credits reduces the "total monthly benefits not paid" ~~reduces~~ from $53,327 to $20,391 (and estimated liability from $6,665,875 to $2,548,853 using Deutsch's estimate of $125 liability for each dollar of monthly annuity). A breakdown of this corrected amount by dates of termination is as follows:

a.   Terminated before February 23, 2001 ............................................$ 7,321
b.   Terminated February 23, 2001 through February 22, 2004.............$ 3,141
c.   Terminated on or after February 23, 2004 .......................................$ 9,929
d.   Total.................................................................................................$20,391

83.     The magnitude of these numbers was significantly impacted by the reduction in section 417(e) interest rates after the time the amendments were being considered and approved during 1995. Participants could not have reasonably anticipated that rates would drop from the 7.5%-8.0% level in late 1994 through most of 1995 (when the new plan was designed and approved) to 6.06% at the end of 1995

---

[16] The 1999 pay credits on the data were not included for many participants, apparently in error. Therefore, I adjusted the 1999 pay credits by applying the formula that Deutsch used beginning in 2000. I also corrected an error Deutsch made with respect to his 417(e) factors for 2009 lump sums. He used interest rates for 2009 applicable to Plan funding calculations rather than the rates for lump sum distributions. The adjusted amount of $~~24,771,013~~24,946,153 includes an increase of about $720,000 for these two changes combined.
[17] I used the December 1-year Treasury bill rate for the following calendar year and prorated the rate in the year of distribution.

and to even lower rates in most subsequent years.

84.     I have rerun the Deutsch adjusted numbers by assuming that the 417(e) rate remained at 7.5%, a rate that Foot Locker decision makers could have reasonably anticipated when designing the cash balance plan.[18]  The total lost pay credits in the table on page 32 of Deutsch's report would reduce from my recalculated amount of $20,820,205 to $13,957,553 for participants who received lump sums; the total monthly benefits not paid would reduce from my recalculated amount of $20,391 to $19,084 (and the associated liability would reduce to $2,385,492).  A breakdown of the amounts by date of termination for participants who received lump sums, and the interest on such amounts from the dates of distribution to January 1, 2011 is as follows:

| Termination Dates | Additional Lump Sums @ Distribution Dates | Interest to 1/1/11 @ 1-Yr. T-Bill Rate | Total Including Interest |
|---|---|---|---|
| Before 2/23/01 | $ 10,011,813 | $ 4,820,780 | $ 14,832,593 |
| 2/23/01 – 2/22/04 | $  1,674,974 | $   295,762 | $  1,970,736 |
| After 2/22/04 | $  2,270,766 | $   142,956 | $  2,413,722 |
| Total | $ 13,957,553 | $ 5,259,498 | $ 19,217,051 |

The breakdown of the "total monthly benefits not paid" on this basis is as follows:

a.  Terminated before February 23, 2001 ............................................ $ 7,217
b.  Terminated February 23, 2001 through February 22, 2004 ............. $ 2,657
c.  Terminated on or after February 23, 2004 ...................................... $ 9,210
d.  Total......................................................................................................$19,084

**B.  Deutsch Section 7 "Corrected Payments"**

85.     **Expensive Buy-Back Approach**.  The chart in section 7 of Deutsch's revised report on pages 43 and 44 presents his calculations for a scenario where opening balances are recalculated using 6% interest and no mortality rates before age 65.  This is not an A+B approach, as Deutsch claims, but is a generous and expensive "buy-back" approach as discussed in paragraphs 15-20 above.  Under a true A+B scenario, Part A benefits would not be converted to opening balances and typically would be available only under the same forms of payment as under the pre-

---

[18] The issues discussed above regarding the errors in Deutsch's 2009 417(e) factors and his applying whipsaw to pay credits do not have an impact on these numbers because of the 7.5% assumed 417(e) rate.

amendment Plan.[18]  Providing generous opening balances that are payable in lump sums would have been prohibitively costly in 1996.

86.    **Major calculation errors overstate potential remedy cost**. Even though this "remedy" goes well beyond an A+B approach, I have examined Deutsch's calculations and discovered that he made key errors, each of which overstates the amounts for a large portion of the proposed class members.

87.    First, as in his section 4B calculations, Deutsch dramatically inflates benefits under this scenario with respect to participants who had enhanced opening balances – with even greater impact than in his 4B calculations.  When re-determining opening balances at 6% interest (with no pre-age 65 mortality rates), Deutsch took those already inflated (6%) amounts for these participants, and further enhanced such opening balances by the same percentage (as high as 67%) as used in the actual opening balances.

88.    Given the substantial increase in opening balances by switching from a 9% to a 6% interest rate, to then build an enhancement on top of the inflated opening balances by, as in Deutsch's section 4B calculations, characterizing the enhancement as a pay credit, is inappropriate.  Moreover, the cost of increasing opening balances without the enhancement would have already been prohibitive but then adding on this enhancement would have made matters even worse.

89.    Second, Deutsch neglected to reflect the fact that many participants' benefits were based on their December 31, 1995 accrued benefits (or the 417(e) lump sum equivalents).  Thus, while many participants' lump sum distributions already exceeded their account balances, Deutsch determined his section 7 amounts by taking the full differences between opening balances at 6% (reflecting mortality rates only after age 65) and the actual opening balances (at 9% and reflecting mortality at all ages).  In other words, Deutsch failed to reflect that many participants were already paid part of this difference.

90.    Third, Deutsch treated virtually all participants as if they had attained their next birthdays when determining opening balances at 6% interest on January 1,

---

[18] Despite its significant cost, this approach is not guaranteed to eliminate wear-away on lump sums due to declining interest rates.

1996.  For example, ID 00004 was age 52 and 8 months on January 1, 1996, yet Deutsch used age 53 in his 6% opening balance calculation.

91.     The table in Section 7 of Deutsch's report, adjusted for these errors reduces Deutsch's amounts (before reflecting pre-judgment interest) from $123,557,008 to $48,097,088, as follows[20]:

    a.  Deutsch's "corrected payments" total amount.....................................$123,557,008
    b.  Overstatement of Age on 1/1/96 ........................................ $  6,919,952
    c.  Overstatement by ignoring amounts paid above account balances . $ 26,989,129
    d.  Overstatement by treating enhancements as pay credits ................. $ 41,550,839
    e.  Adjusted Deutsch total to reflect corrections, (a)-(b)-(c)-(d)[21] $ 48,097,08845,465,138

92.     As discussed in paragraphs 19 and 20 above, Deutsch's assumption in determining his opening balances in this scenario that all participants will survive to age 65 introduces another overstatement.  If mortality were reflected at all ages, the corrected amount of $48,097,088 would further reduce to $34,419,919.

93.     Deutsch's calculated amounts for participants who elected annuities and related to early retirement lump sums would also be affected by these errors.  I have not recalculated these amounts.

94.     Exhibit A, Part 2, illustrates Deutsch's section 7 calculation for ID 00004 both before and after correcting his errors, two of which affected this participant (the miscalculation of his age and treating the opening balance enhancement as a pay credit).

95.     Deutsch determined the amount with respect to ID 00004 to be $112,410, before reflecting pre-judgment interest.  Because ID 00004 already received $132,572, this means that Deutsch would increase the lump sum distribution by 85%, to $244,982, which **would almost double the lump sum present value of the benefit that ID 00004 would have been entitled to assuming the pre-1995 benefit formula had continued**. After correcting the errors, the "corrected payments" for ID 00004 reduces to $15,841, again, before reflecting pre-judgment interest.

---

[20] The 1999 pay credits on the data were not included for many participants, apparently in error.  Therefore, I adjusted the 1999 pay credits by applying the formula that Deutsch used beginning in 2000.  The overstatement shown in item c. was reduced by about $538,000 to reflect his change.
[21] The corrections were made in the order shown.  A different allocation would have resulted if the order of each correction were changed.

A-1320

96.    If the Court ultimately were to consider a remedy in this case, an A+B type of approach like the one put forth in Deutsch's section 4B (as appropriately modified) would seem to make more sense than some kind of opening balance approach.

## V.    Employee Communications Issues

### A.  The Wear-away Effect and Participant Communications

97.    Because of the many variables that can affect Plan benefits, it would have been difficult to communicate in a definitive way what the extent of wear-away might be (and the fact that its impact is different on annuities versus lump sums and on normal versus early retirement benefits). Describing the potential impact of changes in interest rates would be daunting. If rates fall, should that be described in a negative way (since the wear-away period could be extended) or as a positive (since the lump sum value of the protected benefit would rise). Plaintiff apparently would adopt the former approach, but I think a reduction in interest rates can be beneficial since it *increases* the amounts paid to participants, and should not be masked by wear-away rhetoric.

98.    For example, the 30-year Treasury bond rate had decreased to 5.48% in 2002 when Mr. Osberg took a lump sum distribution. His wear-away period appeared to be longer due to the reduction in the interest rate, yet he clearly benefited from the additional dollars he received attributable to his frozen protected benefit.[22]  And that opportunity was made possible only because of Foot Locker's decision to offer lump sums, including for his prior accrued benefit.

99.    Given this background and the general difficulty in communicating complex pension plan features to employees (see discussion of Wiener report in

---

[22] See my May 10, 2012 Report, paragraph 69 et seq.

26

section VII below), employers were understandably reluctant to go down the path of extensive discussion regarding wear-away and its potential effect absent the regulatory guidance and "safe harbor" type protections that were later provided when the law was changed in 2001 on ERISA section 204(h) disclosures. I am not aware of any employer that provided employees the type of disclosure regarding wear-away that resembled the one that plaintiff's attorney Mr. Gottsdiener suggested before the 2001 law change.[23]

100.   This explains why it was not common practice in the 1990s to get into a discussion of wear-away but, rather, just indicate that the cash balance account will not be less than the benefit accrued under the prior formula on the conversion date. That puts the participant on notice that the actual benefit might exceed the benefit derived from the cash balance account.

### B.  Treatment of Minimum Benefits in Summary Plan Description

101.   On page 48 of his report, Deutsch examines language on pages 12 and 14 of the SPD (1996, Bates FSL-OSB 000561) and asserts that the language in question relates to whipsaw not to the minimum protected benefit.  I am not convinced that all of this language compels the conclusion that it was limited to whipsaw.

102.   The last sentence Deutsch quotes on page 12 reads: "The lump sum payable to you is the greater of your account balance or the amount determined by multiplying the annuity payable to you by factors required by federal law and IRS regulations."  It seems to me that "the annuity payable to you" can be read to encompass the minimum protected annuity if that is greater than the projected annuity derived from the cash balance account.  This interpretation is supported by language later on the same page 12: "…your accrued benefit at the time your employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or **your accrued benefit as of December 31, 1995**." (emphasis added).  Clearly this later language refers to the minimum protected benefit, yet Deutsch ignores it in his analysis.

---

[23] See my May 10, 2012 Report, paragraph 89 et seq.

103.   If the intent was to only reflect the cash balance age 65 annuity it would likely have said something like: "The lump sum payable to you is the greater of the cash balance account or the age 65 annuity derived from the cash balance account as described in the preceding sentence."

104.   I read the language on page 14 to encompass the minimum protected benefit:  "The lump sum payable to you is the greater of your account balance or the amount determined under federal law and IRS regulations."  It is federal law and IRS regulations that require protected benefits.

105.   It is implausible that the average employee would have known that the language on pages 12 and 14 was referring only to whipsaw and explicitly excluded other provisions of law or regulations that provide other protections.  Rather, what this language did was put employees on notice that they may be entitled to a lump sum above their account balances.

106.   An employee who was curious as to what this meant could have asked Foot Locker HR personnel for an explanation.  In fact, the record includes examples of responses to employee requests regarding how these calculations are performed.

107.   For example, in a letter from Marion Derham, Assistant Manager PensionStock Administration, dated July 9, 1997 (Bates No. FL-OSB-007632 et seq.), the following paragraph appeared on page 2:

> "Federal law requires that when a lump sum it paid, it cannot be less than a minimum determined by using the interest rate for 30 Year Treasury Bills.  For lump sums that were paid during 1996, we must use the rate for December 1995, which was 6.06%.  The lump sum payable at termination of employment is the greater of the account balance or the minimum lump sum calculated based on the interest rate in effect during the year in which payment is made.  Therefore, the amount shown on the pension estimate sheet which was provided to you by HROC reflected the minimum lump sum."

108.   This was immediately followed by a numerical display of the minimum lump sum, equal to the product of the "accrued benefit through 12/31/95" and an actuarial factor (reflecting the participant's age).  And that was followed by: "As the interest rate changes from year to year, the minimum lump sum will change.  When the interest rate goes down, the minimum lump sum increases.  When the interest rate

28

rises, the minimum lump sum will decrease."

109.    The following sentence appeared on the last page of that letter:

"The single life annuity payable to you on your normal retirement date will be the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as of December 31, 1995."

110.    Note, also, that on the first page of this letter, fourth paragraph, information was provided on how opening balances were determined "Your initial account balance was determined by multiplying your December 31, 1995 accrued benefit by an actuarial factor.  The factor is based on age as of December 31, 1995, a 9% rate of interest (which is the Plan's assumed rate of return on assets) and the mortality table set forth in Internal Revenue Code regulations."

111.    From this letter and other similar ones, it is clear that Foot Locker provided information to employees after the initial communications on the cash balance plan that reinforced earlier information that there was a minimum benefit based on the December 31, 1995 accrued benefit and that the opening balance was determined based on the 9% assumed rate of return on Plan assets.

112.    On page 49 of his report, Deutsch complains that the table he shows on the top part of the page that appeared on page 14 of the SPD shows the development of a cash balance account but did not follow up by indicating that the actual lump sum would be above the amounts in the table because the value of the protected benefit would be higher.  Deutsch misunderstands the purpose of the table.

113.    The table clearly was designed to focus solely on how a cash balance account flows from one year to the next.  It did show an opening balance, although the point was not on how the opening balance was determined but just to show how the math works assuming there is an opening balance.

114.    Deutsch then engages in a reverse engineering process to develop hypothetical December 31, 1995 accrued benefits associated with the $7,000 opening balance (see the table at bottom of page 49 of Deutsch's report).

115.    Because the example in the SPD did not say what the employee's age was at December 31, 1995, Deutsch considered different ages and developed different accrued benefits at each age that would result in the $7,000 opening balance.

Of course, all of this would have greatly complicated what was intended to be a simple example that just focused on showing how the cash balance account grows.

116.    There is another problem with the table Deutsch developed.  The SPD was distributed to employees in 1996 and the example shows projected account balances at the end of 1996, 1997 and 1998.  The example does not suggest that the employee was terminating and receiving a lump sum distribution as of the end of 1998.  That is important because in order to calculate the lump sum value of the protected benefit, one needs to know what the section 417(e) applicable interest rate is for the calendar year of distribution.

117.    Deutsch calculates his hypothetical protected benefit lump sums at the end of 1998, which implies benefit distribution at that date.  I know this because he used the 417(e) rate in effect in 1998, 5.99% in developing his lump sum factors.  But how could have the drafters of the SPD or anyone else known in 1996 when the SPD was published that the 1998 rate would be 5.99%?  That was not known until January 1998.

118.    For that matter, nobody could have known in 1996 what the rate would be in **any** future year.  Given the great historical volatility of interest rates, the rate in 1998 or any other year might have turned out to be 10% or 4% or almost anything else.

119.    For example, if interest rates had risen to 9% in 1998, the ERISA lump sums Deutsch shows in his table all would have been less than the $9,696 account balance.

120.    It is evident that a table like the one Deutsch suggests at the bottom of his page 49 would have been misleading.  In order to shed light on the potential impact of the protected accrued benefits, a range of potential protected lump sums would need to be provided at a variety of interest rates.  However, that would have likely overwhelmed participants (and made the document more intimidating to the average Foot Locker employee, likely turning off employees from reading anything else in the document).  And even if an employee managed to get through the tedious set of numbers, they would still have no idea whether the lump sum value of the protected benefit will actually apply in a future year.

30

### VI.  Other Deutsch Issues

### A.  Deutsch's Cost Analysis

121.   Deutsch's cost analysis in section 8 of his report is eye opening.  First Deutsch observes that the anticipated wear-away cash savings were relatively insignificant.  But after spending a good deal of his report trying to prove how wear-away was reducing employees' benefits, here he seems comfortable with concluding that there are so little cash savings associated with wear away.

122.   Deutsch goes on to say that the cash balance plan Foot Locker adopted saved the company less than what it had anticipated since Foot Locker paid out lump sums instead of annuities.  Since the savings, when reflecting the 401(k) plan cost, were already relatively modest, effectively, Deutsch is concluding that the cost savings were actually lower (or maybe even non-existent) reflecting a realistic assumption regarding lump sum elections.  (Note that Deutsch also understates the cash savings by offsetting them with the expected $8 million contribution costs of the 401(k) plan, which was to be funded with Foot Locker *stock*, not cash.)

123.   Deutsch is proving one of my points – that providing lump sums is costly.  But then Deutsch turns around and suggests remedies that would turn the modest savings he says that the conversion caused into what would have been a huge cost increase for Foot Locker.  Clearly that was far from what Foot Locker intended.

124.   Deutsch goes on to provide off-the-cuff consulting advice 16 years after the fact on what Foot Locker could have done to save cash in 1996 rather than amending the pension plan.  He reasons that if the company was willing to invest their 401(k) matching contributions in company stock (a point Deutsch ignores when he

31

miscalculated the expected cash savings), it should have just contributed stock to the pension plan rather than converting it to a cash balance plan.

125.     As I know from my actuarial experience advising large companies, contributing stock to a defined benefit plan involves many considerations, economic and legal, and to presume 16 years after the fact that Foot Locker either did not consider that approach or did consider it but improperly rejected it is entirely speculative.

126.     Finally, as were stated in the presentations to senior management and the Board, Foot Locker changed its retirement program for multiple reasons, not just to save cash.  Deutsch apparently does not appreciate or chooses to ignore that.

### B.  Comparison of Benefit Accruals in Career Average and Cash Balance Formulas

127.     The analysis in section 6 of Deutsch's report reveals that the cash balance formula is age neutral – which we already know from the face of the pay credits which vary by service not age.   What this analysis reveals is that the prior formula was heavily age biased.  Foot Locker decided to reward longer service rather than age in the CB plan.  As illustrated by the graph with a saw-tooth pattern in section 6 of Deutsch's report, those who have the potential to work for long periods of service can come close to or even surpass the benefits under the prior Plan formula through their pay and interest credits.  Having a steeply increased scale of pay credits (by service), while a permanent feature (i.e., it affects new employees as well), helps longer service employees in the transition – as compared to providing a uniform pay credit rate that many cash balance sponsors provide.

### C.  Benefits Provided by 401(k) Plan

128.     By adopting the 401(k) plan in addition to continuing a defined benefit plan, Foot Locker was encouraging employees to save for retirement (by providing tax deferral opportunity and the company match), consistent with one of its objectives – to

promote the sharing of responsibility for retirement savings.

129.   Deutsch complains that employees had to contribute 4% to get the 1% match and that is tantamount to a pay cut.  It makes no sense to view that as a pay cut – it is savings that the employee is sheltering from current taxes.  Deutsch does not reflect the value of the tax savings as Niden did.  Under the prior DB plan, if employees did not save outside that plan for retirement they would not have enough at retirement, as the replacement rates considered by senior management and the Board showed.  The 401(k) transforms what employees were doing (or should have been doing outside of the tax favored system) to a tax advantaged basis.

130.   Deutsch's analysis of what level of 401(k) contribution would have been required to replace the accruals in the prior career pay plan is a misguided comparison. The right comparison with the prior plan accruals would be to include not only the 401(k) plan 1% employer contribution, but also the tax savings provided on the 5% total contribution as well as the accruals under the cash balance plan.  For many employees, the cash balance accruals were expected to begin at or shortly after the conversion date and therefore should be reflected in this analysis from that time forward.

131.   Thus, Deutsch's graph in section 5 of his report significantly understates the true value of the combination of the cash balance accruals, the 401(k) match and the tax benefits from the 401(k) savings.

## VII.   Issues Raised by Spell, Bewley, and Wiener and Stratman

### A.  Spell Report

132.   Spell expressed his opinion on "how Woolworth senior management and Woolworth employees would have reacted had the true import of Foot Locker's wear-away conversion been disclosed to them."

133.   Spell concluded the "had the company known it would have had to tell employees the truth about the matter, Woolworth senior management would not have

33

imposed even a temporary, across-the-board pension freeze effective January 1996, let alone a freeze that selectively applied only to long-term current employees…"

134.   Spell reasons that management never seriously considered adopting even a temporary across-the-board freeze because it would have been demoralizing to employees – because Spell concludes that such a freeze "could not have been concealed from participants."

135.   Spell contends that a pension freeze would be perceived like a pay cut with the result being adverse employee reaction and negative effects to morale and productivity, a departure of employees to competitors and difficulty hiring new employees.

136.   Spell likens what Foot Locker did to a selective pension freeze for long-service employees that, if participants realized it, would have been taken even worse than an across-the-board freeze.

137.   Spell contents that had senior management and the Board been fully informed about the wear-away effect and nevertheless gone ahead with it and fully disclosed it, there "management almost certainly would have been forced to rescind it…"   He refers to the cases of Deloitte & Touche and IBM situations and certainly distorted the IBM one.

138.   The fundamental problem with Spell's analysis is that it is based on the false premise that the conversion to a cash balance plan was tantamount to a selective pension freeze.   Under a true pension freeze, employees would not have obtained the right to elect lump sum distributions.   As discussed in section II.D., the value added by providing a lump sum option is significant and Spell does not even seem to be aware of this change.   Thousands of employees benefited from that new option.

139.   Spell also does not seem to be aware of the significant additional value provided to many longer service workers – the victims in his selective temporary freeze theory.   Those who had 15 or more years of service and were within 5 years of early retirement eligibility were entitled to the enhanced opening balances.   Those enhancements greatly limited the wear-away effect in addition to making the benefits portable and much more flexible for those employees.

34

140.   Spell also does not acknowledge that Foot Locker implemented a 401(k) plan at the same time as the conversion, with company matching contributions.

141.   Spell mentions the need to have compensation in line with competitors.  I agree.  Many of Foot Locker's old competitors ended up freezing their pension plans or converting to a cash balance plan.  And Foot Locker's newer competitors did not have any kind of pension plan, traditional or cash balance.  Foot Locker's conversion was intended to address its competitive position regarding its retirement programs, including pension and 401(k), in light of the financial and competitive pressures facing Foot Locker.  This is discussed in my May 2012 Report at paragraphs 7 to 13.

### B.  Bewley Report

142.   Bewley expressed similar opinions as Spell, and my responses noted above for Spell apply to Bewley as well.  Bewley either was not aware of the extension of a full lump sum option or chose to ignore it.   In contrast, the thousands of participants who elected lump sums placed considerable value on the ability to receive lump sums in lieu of a fixed dollar annuity beginning in many cases many years in the future – i.e., an illiquid asset that is not responsive to inflation.  Taking the lump sum availability at very favorable rates into account – his statement that there has been a material reduction in compensation is simply not true.

### C.  Wiener Report

143.   Wiener's report focuses on communications material provided to employees, in particular the summary plan description.   He concludes that the language in the SPD was too complex for the typical Foot Locker employee to understand.  The concepts were difficult and the sentences too long.

144.   His solution, apparently, would have been to either dummy-down the text, which would have meant either dropping discussion of the more complex sections or expanding the discussion perhaps using more sentences with fewer and simpler words.  I am very skeptical that any such approach would have materially improved the readability of the SPD.  The very subject matter of the SPD is complex, as Wiener

accurately notes in his discussion of financial literacy.  Moreover, leaving out complex issues would likely be viewed by some employees as hiding the details.  Trying to breakdown complex issues into bite-size pieces surely would have made the document longer, but that would have run the risk of turning off more employees from attempting to read it.

145.   Pension plans, especially defined benefit plans, are complex because of their numerous provisions designed to cover a broad array of contingencies and due to the myriad of legal requirements.  In my opinion, the Foot Locker SPD was typical insofar as its readability and detail, and Wiener's own SPD research confirms this, as it shows Foot Locker's grade level (equivalent to one year of college) was the same as the SPDs he had researched and reported on in his article.  As noted above, this reflects the fact that SPDs are addressing complex subject matter.

146.   One of the primary motives of employers in switching their traditional defined benefit plans to cash balance plans was to address Wiener's concern of readability and understandability directly – by simplifying the plan benefits themselves.  Employees like account based plans, such as 401(k) plans because they are easy to understand and the benefits are portable.

### ~~D.  Stratman Report~~

> **Formatted:** Strikethrough

~~147.   Stratman's report, like those of the plaintiff's other experts, contains background information that is misleading in some important respects.  For example, Stratman states as a fact that "the cash balance account contribut(ed) no additional value…"  Stratman, like the other experts, failed to reflect the significant additional value provided by providing a lump sum option not only on the future cash balance pay credits but on the opening balance and on the value of the protected December 31, 1995 accrued benefit, if higher.~~

~~148.   Another misleading statement by Stratman was "…the pension benefit payable according to the new cash balance formula was in almost all cases initially lower – in many cases more than 50% lower – than the benefit that had been payable under the old formula."  The lump sum value of the benefits under either formula are affected by many variables, including future interest rates.  And, this simplistic~~

~~statement obviously does not take into account the fact that the value of the prior plan~~
~~benefit was significantly increased when lump sums became available.~~

~~149.   Finally, Stratman seems to impose the standard for disclosures (*i.e.*, set~~
~~forth the expected detailed impacts of the changes) that became applicable in 2001.~~
~~As discussed in my May 2012 Report in Section VII, this was not the practice followed~~
~~by employers prior to this change in the law.~~

_____

Lawrence J. Sher, F.S.A.

June 7, 2012

37

### Exhibit A.  Part 1:  Deutsch Section 4 Remedy for ID 00004
### Illustration of Deutsch Overstatement and Sher Correction

The following are key data for ID 00004:

Date of birth: April 25, 1943
Date of hire: July 1, 1965
December 31, 1995 accrued benefit: $23,895
Opening balance: $109,717 (includes $43,887 enhancement)

Date of termination:  October 17, 1997
Date of lump sum distribution: November 1, 1997 (age 54, 6 months)
Account balance on DOD: $132,572
Lump sum value of 12/31/95 accrued benefit: $116,948 (6.55% 417(e) rate)

ID 00004 received the $132,572 account balance because it exceeded the lump sum value of the December 31, 1995 accrued benefit (by $15,624).

Deutsch's remedy amount, before reflecting pre-judgment interest, in section 4B of his report with respect to ID 00004 (included in the table in Section 4B) is $43,679 (developed in Column ET of his revised spreadsheet "Understated Amounts – Sec. 4B").  Deutsch purports to calculate in that spreadsheet the accumulated pay credits that were not paid due to the wear-away effect.

The $43,679 remedy amount for ID 00004 was derived by Deutsch, as follows:

a.  Total account balance on date of distribution.....................................$132,572
b.  Initial account balance without enhancement.......................................$65,830
c.  Amount in (b), with 6% annual interest to date of distribution  ............$73,269
d.  Pay credits with interest to date of distribution per Deutsch, (a)-(c).....$59,303
e.  Lump sum value of December 31, 1995 accrued benefit....................$116,948
f.  Amount paid on date of distribution, greater of (a) and (e)................$132,572
g.  Deutsch Remedy before pre-judgment interest, (d)+(e)-(f) .................$43,679

Deutsch's remedy treats the enhanced opening balance as if it was a pay credit – item (d) includes $10,457 actual pay credits (with interest) and the $48,846 opening balance enhancement (with interest).  Removing the opening balance enhancement results in a true A+B lump sum of $127,405 ($116,948 protected lump sum plus $10,457 pay credits with interest).  Because this amount is less than the amount already paid ($132,572), there would be no remedy under a true A+B scenario for ID 00004.

**Exhibit A.  Part 2:  Deutsch Section 7 Remedy for ID 00004**
**Illustration of Deutsch Overstatements and Sher Corrections**

Continuing the example in Part 1 for ID 00004, Deutsch determines his remedy, before reflecting pre-judgment interest, under his Section 7 approach as follows:

a.  Initial account balance with enhancement @9% ............................... $109,717
b.  Initial account balance with enhancement @6% ............................... $210,714
c.  Increase in initial balance due to change from 9% to 6% (b)-(a) ........ $100,997
d.  Remedy (c) x 1.113 (6% interest factor to distribution date) ............. $112,410

Because ID 00004 already received $132,572, this means that Deutsch would increase the lump sum distribution by 85%, to $244,982.

It is interesting to compare the lump sum of $244,982 that Deutsch proposes for ID 00004 in his section 7 to the lump sum present value of the accrued benefit under the pre-1996 Plan formula, assuming it had continued unchanged but using the IRC section 417(e) assumptions.   That value would be about $127,700 (based on an accrued benefit of about $26,100).  **Thus, Deutsch's "remedy" in section 7 would almost double the benefit that ID 00004 would have been entitled to assuming the pre-1995 benefit formula had continued.**  Note also that the $127,700 is virtually identical to the $127,405 true A+B benefit developed in Exhibit A, Part 1.

Here are the Deutsch's remedy amounts under section 7 for ID 00004, removing the opening balance enhancement and correcting for the error in determining age at date of distribution[24]:

a.  Initial account balance without enhancement @6% ........................... $123,950
b.  Increased by 11.3% (6% interest from 1/1/96 to distribution date) ..... $137,956
c.  Pay credits with interest to date of distribution .................................... $10,457
d.  Adjusted account balance, (b)+(c) .................................................... $148,413
e.  Actual lump sum paid on date of distribution ..................................... $132,572
f.  Adjusted remedy, (d)-(e) ..................................................................... $15,841

Thus, after correcting the errors, the "corrected payments" for ID 00004 reduces to $15,841, again, before reflecting pre-judgment interest.

---

[24] The third error did not apply to ID 00004 because his distribution was equal to his account balance (i.e., the value of the protected benefit was less).

### Appendix 1:  Materials Reviewed

The following documents / files were reviewed, at least in part, in connection with the preparation of this Report:

- The Woolworth Retirement Plan, As Amended and Restated As of January 1, 1989
- The Woolworth Retirement Plan, As Amended and Restated As of January 1, 1996
- "Woolworth Retirement Program Review", 9/13/95
- "Retirement Plan Survey" of other plans, undated
- "Retirement Plan Philosophies, Goals and Objectives, A Survey of Retailers", undated
- Plaintiff's Complaint, 2/1/12
- Declaration and Expert Report of Cathy Niden, 7/2/10
- Expert Report of Cathy Niden, 5/10/12
- Letter from Woolworth CEO and COO, 9/15/95
- Memo from Corporate Benefits Department "Highlights of the Woolworth Retirement Plan, As Amended January 1, 1986", 11/17/95
- The Woolworth Retirement Plan Summary for Greenville Associates, undated
- 1996 Woolworth Retirement Plan Summary Plan Description
- Your Retirement Plan Statement as of January 1, 1996, sample form
- Sample of annual Personal Benefit Statements
- Estimated Pension Benefits and Explanation of Pension Options forms
- Letters from Don Kappel to plan participants dated May 15, 1997 and September 15, 1997 (with names redacted)
- 2003 Treasury Regulations 54.4980F-1, Notice requirements for certain pension plan amendments significantly reducing the rate of future benefit accrual
- Deposition transcript of Geoffrey Osberg
- Proposed class data provided on excel files
- Internal Revenue Code of 1986, as amended
- The Employee Retirement Income Security Act of 1974, as amended
- Regulations and other guidance issued by the Department of Treasury
- Expert reports of Truman Bewley, Lawrence Deutsch (original and revised), Chester Spell, James Stratman and Richard Wiener
- Spreadsheets prepared by Deutsch

i

- Background information related to changes in the lump sum distribution rules enacted by Congress under the Pension Protection Act of 2006
- Various individual pension related communications, including:
    - FL-OSB 010196-97
    - FL-OSB 009527-28
    - FL-OSB 007583-87
    - FL-OSB 010132-37
    - FL-OSB 007598-7609
    - FL-OSB 010187-88
    - FL-OSB 007632-35,
    - FL-OSB 010191-92,
    - FL-OSB 007638-42
    - FL-OSB 010194-95
    - FL-OSB 009330-31