**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                            )
**SCOTT BELKNAP, on behalf of himself**   )
**and all others similarly situated,**      )
                            )
       **Plaintiff,**           )      **Civil Action No.**
                            )      **19-11437-FDS**
      **v.**                   )
                            )
**PARTNERS HEALTHCARE**        )
**SYSTEM, INC.; THE PENSION**    )
**MANAGEMENT COMMITTEE;**     )
**THE RETIREMENT COMMITTEE;**  )
**and JANE/JOHN DOES 1-5,**      )
                            )
       **Defendants.**        )
_____)

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**<u>MOTIONS TO DISMISS</u>**

**SAYLOR, C.J.**

      This is a putative class action under the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff Scott Belknap is a former employee of

defendant Partners Healthcare System, Inc.[1] He retired early from Partners at age 62 and now

receives a type of retirement benefit known as a joint and survivor annuity, which covers both

him and his spouse.

      Belknap has filed suit on behalf of himself and all others similarly situated, alleging that

the way in which Partners calculates the value of his annuity violates ERISA. Specifically, he

contends that under the relevant portion of ERISA, 29 U.S.C. § 1054(c)(3), the type of retirement

---

[1] Partners Healthcare System, Inc., is now known as Mass General Brigham, Inc.

benefit he receives (a joint and survivor annuity payable at age 62) must be the "actuarial equivalent" of a more typical retirement benefit (a single life annuity payable at age 65).[2] According to plaintiff, when determining whether the two types of benefits are actuarially equivalent, the underlying actuarial assumptions (the interest rate and the mortality tables) must be "reasonable."  He contends that the actuarial assumptions used to determine his benefit were outdated, and thus unreasonable, and therefore Partners violated the protections of ERISA.

Partners has moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(1) for lack of standing and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Pursuant to Fed. R. Civ. P. 12(d), the Court has converted the motion to dismiss for failure to state a claim to a motion for summary judgment.

For the following reasons, the motion to dismiss for lack of standing will be denied and the motion to dismiss for failure to state a claim, as converted to a motion for summary judgment, will be granted.

## I.    Background

The following facts are presented in the light most favorable to the non-moving party and are undisputed unless otherwise noted.

### A.    Factual Background

#### 1.    The Benefit Plans

Partners Healthcare System, Inc. was formed in 1994 as a non-profit corporation.  It operates a health system that includes, among other facilities, Brigham and Women's Hospital and Massachusetts General Hospital ("MGH").  (Am. Compl. ¶ 16).

_____

[2] The statutory language uses the term "actuarial equivalent."  29 U.S.C. § 1054(c)(3).  For the sake of convenience, the Court will use that term and terms such as "actuarially equivalent" and "actuarial equivalence" interchangeably.

For more than 50 years, MGH operated a benefit plan to provide retirement income for eligible employees.  (*Id.* ¶ 30).  The plan has been amended periodically.  (*Id.* ¶ 32).  In 2016, the MGH plan was merged with other Partners benefit plans.  (*Id.*).  Today, Partners administers the benefit plan (the "Plan").  (*Id.* ¶ 17).

Under the Plan, when a participant retires, he or she can receive benefits in one of several ways.  (*Id.* ¶ 38).  The normal retirement age under the Plan is 65.  (*See id.* ¶¶ 3, 42; *see also* Dkt. No. 14, Ex. A ("Plan Document") § 5.1).  The normal form of benefit is a single-life annuity ("SLA") based on the balance of a participant's account.  (Am. Compl. ¶ 3).[3]  An SLA is a series of monthly payments that start when a participant retires and end when he or she dies.  (*See* Plan Document § 5.1).

Participants can also receive a benefit in the form of a joint and survivor annuity.  (Am. Compl. ¶ 38).  A joint and survivor annuity ("JSA") is a series of monthly payments that start when a participant retires and end only when both the participant and his or her spouse have died.  (*See* Plan Document § 11.3).  If the participant dies before his or her spouse, the spouse will continue to receive monthly payments, but at a reduced portion of what the participant received while alive.  (*See id.*).  A 50% JSA means that the surviving spouse receives 50% of the monthly benefit that the participant received while alive.  (*See id.*).

In addition, the Plan permits participants to retire early after attaining age 55 and collect early retirement benefits.  (*See* Am. Compl. ¶ 36; Plan Document §§ 6.1, 6.2).  Early retirement benefit options under the Plan include an SLA and a JSA, among other benefit forms.  (Plan Document §§ 6.1, 6.2, 11.1).

---

[3] The Plan document refers to an SLA as a straight-life annuity, the Court uses the term single-life annuity instead, to be consistent with § 1054(c)(3) of ERISA.  The terms single-life annuity and straight-life annuity are synonymous and used interchangeably within the industry.

2.      <u>**Actuarial Equivalence Calculations**</u>

Under ERISA, a retirement benefit in the form of a JSA paid beginning at early retirement must be the "actuarial equivalent" of an SLA paid beginning at normal retirement age. *See, e.g.*, 29 U.S.C. § 1054(c)(3).  The principal dispute here is whether the benefit paid by Partners to plaintiff is, in fact, actuarially equivalent to an age-65 SLA.  (Am. Compl. ¶¶ 64-68).

According to the amended complaint, to calculate actuarial equivalence, the first step is to calculate the present value of the total future benefits that a participant would receive under both annuities.  (*Id.* ¶¶ 42-44).  There are two main inputs into the calculation of an annuity's present value:  an interest rate and a mortality table.  (*Id.* ¶ 44).

The interest rate is used to determine the present value of each future payment.  That rate reflects the time value of money:  the fact that money that is available now is worth more than the same amount available at some future date, because one can earn investment returns in the interim on money that is available now.  (*Id.* ¶ 45).

A mortality table is a series of rates used to predict how many people of a certain age will survive to reach the next, higher age.  (*Id.* ¶ 47).  For example, one entry in a mortality table would describe how many 65-year-old people will survive to turn 66.  Mortality tables are based not only on an individual's age, but also on his or her year of birth.  (*Id.* ¶ 48).  This is because, as a general matter, life expectancies have improved over time; the average 65-year-old person today can expect to live several years longer than the average 65-year-old person could expect to live as of (for example) the 1980s.  (*Id.* ¶¶ 48-49).

According to the amended complaint, Partners uses typical and up-to-date actuarial assumptions when calculating the value of all benefit forms—SLA and non-SLAs alike—when preparing its financial statements.  (*Id.* ¶¶ 54-61).  Specifically, the complaint alleges that Partners uses (1) an interest rate that accurately reflects market conditions and (2) an updated

mortality table from 2000 that is projected forward to 2014.  (*Id.*).

However, Partners uses different interest rates and mortality tables to calculate the actuarial equivalence of non-SLAs for other purposes.  (*Id.* ¶¶ 64-67).  For example, when paying out benefits, the amended complaint alleges that Partners uses different inputs to calculate actuarial equivalence for non-SLAs.  (*Id.* ¶¶ 62-68).  Specifically, the amended complaint alleges that Partners uses (1) an interest rate of 7.5% and (2) a "1951 Group Annuity Mortality Table projected to the 1960 Mortality Table, set back two years for participants, and set back three years for beneficiaries" ("the 1951 Adjusted Mortality Table").  (*Id.*).

According to the amended complaint, using the 1951 Adjusted Mortality Table is unreasonable because it is "not based on a population with 'characteristics that are typical of the [Plan's] participants.'"  (*Id.* ¶ 64) (quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000)).  The amended complaint alleges that because of this unreasonable input, participants who receive non-SLAs calculated using the 1951 Adjusted Mortality Table do not receive benefits that are actuarially equivalent to SLAs.  (*Id.* ¶ 65, 68).

The language of the Plan is essentially consistent with those allegations.  As required by ERISA, the Plan provides that [non-SLAs] must be actuarially equivalent to [SLAs].  (Plan Document §§ 1.1, 1.3).  The Plan defines "actuarial(ly) equivalent(ce) as "a benefit of equivalent value to the Accrued Benefit [for present purposes, a benefit payable as an SLA] determined on the basis of the assumptions described in the Appendix A to the Plan."  (Plan Document, § 1.3).  The relevant assumptions include, for present purposes, an interest rate of 7.5% and the 1951 Adjusted Mortality Table.  (Plan Document, Appendix A, §§ A1.4, A2.5).

### 3.      **Belknap's Employment and Retirement**

Scott Belknap is a participant in one of the retirement plans of Partners.  (*Id.* ¶ 15).  He worked for Massachusetts General Hospital until he retired in 2016 at the age of 62 and 3

months—that is, before his plan's normal retirement age of 65.  (*Id.*).  He receives a 50% JSA from Partners, which pays $787.94 each month.  (*Id.* ¶¶ 15, 74).  He alleges that Partners has reduced the value of his annuity, compared to how he says it should be calculated, by calculating it using a 7.5% interest rate and the 1951 Adjusted Mortality Table.  (*Id.* ¶ 74).  Specifically, he alleges that if Partners used the 3.7% interest rate that it used to calculate its financial statements for the year ending September 30, 2016, and the mortality table applicable in 2016 that was provided by the United States Treasury Department, his annuity payout would increase to $821.42—a monthly difference of $33.48.  (*Id.*).  Partners' method of calculating actuarial equivalence, he alleges, has reduced the present value of his benefits at the time of his retirement by $5,841.51.  (*Id.*).

### B.    Procedural Background

On June 28, 2019, Belknap filed this action on behalf of himself and other similarly situated persons.  The complaint alleged that the methodology for calculating the value of non-SLAs violates three provisions in ERISA:  29 U.S.C. §§ 1053(a), 1054(c)(3), and 1055.  It sought declaratory and equitable relief under 29 U.S.C. § 1132(a)(3) and 28 U.S.C. §§ 2201, 2202 (Count One); reformation of the benefit plans and recovery of lost benefits under 29 U.S.C. §§ 1132(a)(1) and (a)(3) (Count Two); and equitable and declaratory relief for a breach of fiduciary duty under 29 U.S.C. §§ 1104, 1132(a)(3) and 28 U.S.C. §§ 2201, 2202 (Count Three).

On August 30, 2019, Partners moved to dismiss the complaint for failure to state a claim. On January 24, 2020, this Court granted the motion as to all counts that were based on an alleged violation of § 1053(a), and denied without prejudice all counts that were based on alleged violations of §§ 1054(c)(3) or 1055.

On March 3, 2020, plaintiff filed an amended complaint.  On April 3, 2020, Partners moved to dismiss the amended complaint for failure to state a claim.  On August 5, 2020, that

motion was denied without prejudice.  The parties were provided an opportunity to submit additional information as to the meaning of "actuarial equivalence."

After a period of expert discovery, Partners moved again to dismiss, this time for lack of standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Both parties submitted expert affidavits and supplemental briefs on the meaning of the term "actuarial equivalence."  (Dkt. No. 65, Pl. Supp. Brief; Dkt. No. 77, Def. Supp. Brief; Dkt. No. 71, Ex. 1, Aff. of Lawrence Sher; Dkt. No. 73, Ex.1, Aff. of Mitchell Serota).

Because the parties submitted evidence outside the pleadings, the Court provided notice under Fed. R. Civ. P. 12(d) that it intended to treat the motion as one for summary judgment under Fed. R. Civ. P. 56 and gave the parties "a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009); *Trans–Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

## II.   Legal Standard

On a motion to dismiss made pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)).  A court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Essentially, Rule 56[ ] mandates the entry of summary judgment 'against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## III.   Analysis

### A.   Standing

Article III standing is a prerequisite for subject-matter jurisdiction, and "the plaintiff bears the burden of pleading facts necessary to demonstrate standing." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).  "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." *Id.* at 731 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," *Lujan*, 504 U.S. at 561, which here is "the plausibility standard applicable under Rule 12(b)(6)," *Hochendoner*, 823 F.3d at 730.

Defendants here contend plaintiff does not have constitutional standing for essentially two reasons:  that he does not allege a current injury and that the alleged harm is not redressable.

#### 1.   Injury in Fact

"An injury in fact must be both 'concrete and particularized and accurate or imminent, not conjectural or hypothetical.'" *Van Wagner Bos., LLC v. Davey*, 770 F.3d 33, 37 (1st Cir. 2014) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Defendants reason that plaintiff has not suffered an injury from the use of allegedly outdated actuarial assumptions in calculating his retirement benefit because had the Plan used the "reasonable"

assumptions he requests, instead of the Plan's assumptions, his benefit would be lower than what he is currently receiving.  Plaintiff contends that his benefit would be higher than what he is currently receiving—$33.48 more per month.  (Am. Compl. ¶ 74).  These arguments depend on how the benefit is calculated.

ERISA requires that an employee's accrued benefit be the "actuarial equivalent" of the retirement benefit the participant would have received if they waited until normal retirement age to begin receiving benefits.  *See* 29 U.S.C. § 1054(c)(3).  Plaintiff alleges that calculating an actuarial equivalent benefit requires the use of "reasonable" actuarial assumptions.  (Am. Compl. ¶¶ 64-67, 72-73).  According to the complaint, the retirement benefit plaintiff would have received if he had waited until normal retirement age to begin receiving benefits—that is, his age-65 SLA—is $1,088.93 per month.  (*Id.* ¶ 74).  The accrued benefit that he is currently receiving—a 50% joint and survivor annuity—pays him $787.94 per month.  (*Id.*).  He alleges that his age-62 JSA is not actuarially equivalent to his age-65 SLA because Partners did not use "reasonable" actuarial assumptions.  And he contends that if Partners had done so, his current benefit would be $821.42 per month ($33.48 more than what he is receiving).  (*Id.*)

On a motion to dismiss, it is not for this Court to determine the proper method for calculating an actuarially equivalent benefit; rather, this Court "must credit the plaintiff's well-[pleaded] factual allegations."  *Merlonghi*, 620 F.3d at 54.  Plaintiff's factual allegations—including the allegation that the use of outdated mortality tables and an above-market interest rate has reduced the present value of his retirement benefits—must be accepted as true.  *See Masten v. Metro. Life Ins. Co.*, 643 F. Supp. 3d 25, 33 (S.D.N.Y. 2021) (accepting as true that the use of outdated mortality assumptions reduced the present value of plaintiff's benefits).  The complaint has sufficiently alleged that plaintiff's retirement benefits were reduced because of the

outdated mortality assumptions and interest rates used by Partners.

As a result, the complaint sufficiently pleads an injury in fact for purposes of the standing analysis.

### 2. <u>Redressability</u>

Defendants further contend that the alleged injuries are not redressable.  The redressability element of standing requires that the requested relief directly redress the injury alleged.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-10 (1998) (holding that plaintiffs lacked standing where the violations had been abated at the time of the suit).  Plaintiff must establish that it is "likely," as opposed to merely "speculative," that its claimed injuries will be "redressed by a favorable decision."  *Lujan*, 504 U.S. at 560 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

Defendants again reason that plaintiff's alleged injury is unlikely to be redressed by the requested relief because use of the "reasonable" factors plaintiff suggests would actually lower his benefit rather than increase it.  Again, however, that assertion depends on how the benefit is calculated.  Defendants' calculation converts what is in the employee's Cash Balance Account to an age-62 JSA benefit using the Plan's actuarial assumptions.  Defendants then also calculated an age-62 JSA benefit from the Cash Balance Account using plaintiff's preferred "reasonable" assumptions and determined that the amount is lower than the benefit he is currently receiving. (Dkt. No. 71, Def. Mem. at 6).

Plaintiff's calculations begin with the age-65 SLA benefit and convert that to an age-62 JSA benefit, using "reasonable" assumptions.  In doing so, his age-62 JSA benefit is higher than the benefit he is currently receiving—again, $33.48 more per month.  (Am. Compl. ¶ 74); (*see also* Dkt. No. 73, Pl. Mem., Ex. 1 at 5).

Again, at this stage in the proceedings, it is not for this Court to determine which

calculation is appropriate.  Instead, the question is whether plaintiff has sufficiently established that his injuries would likely be redressed by a favorable decision.  And the complaint sufficiently alleges that a favorable decision would result in an increase in his benefits.

Accordingly, the motion to dismiss for lack of standing will be denied.

**B.**     **Actuarial Equivalence**

There does not appear to be any dispute that Partners followed the requirements of the Plan—specifically, by using an interest rate of 7.5% and the 1951 Adjusted Mortality Tables— when calculating the benefit owed to plaintiff.  Nor is it disputed that the language of the Plan states that the use of those assumptions produces a result that is "actuarially equivalent" to the benefit that would have been paid to plaintiff as an SLA.  The question is whether ERISA requires that those assumptions be "reasonable"—more precisely, whether the statutory requirement that such benefits be "actuarially equivalent" necessarily implies the use of reasonable assumptions.[4]  Put another way, the issue is not whether Partners violated the terms of the Plan; it is whether the Plan violates ERISA.

The issue presented is thus one of statutory interpretation, which is a matter of law for the court to decide.  This Court considered, in its prior opinions, the meaning of "actuarial equivalence" under 29 U.S.C. § 1054(c)(3).  Some of that prior analysis will be repeated here for the convenience of the reader.

Section 1054(c)(3) of ERISA addresses what a plan owes its participants if it chooses to offer them an early retirement benefit.  Specifically, § 1054(c)(3) provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at

---

[4] If the statute so requires, there is of course a further question as to whether the assumptions used were in fact reasonable.  Because the Court concludes that the statute does not require "reasonable" assumptions, it does not reach that issue.

normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age," then that benefit "shall be the actuarial equivalent" of an annual benefit commencing at normal retirement age.  In substance, that means that "(1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at retirement age; and (2) if the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump-sum distribution, instead of annuity) it must be" actuarially equivalent to the normal retirement age benefit.  *Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000).

Plaintiff's retirement benefit is a JSA commencing at age 62.  That means that his benefit is paid both at a different time (age 62 rather than age 65) and in a different form (a JSA instead of an SLA) than an SLA commencing at the Plan's normal retirement age of 65.  The complaint compares plaintiff's age-62 JSA calculated using the 1951 Adjusted Mortality Table to the age-62 JSA he would have received if defendant had "used reasonable actuarial assumptions."  (*See, e.g.*, Am. Compl. ¶¶ 65-67, 73).  It essentially alleges that his actual age-62 JSA is not actuarially equivalent to the SLA he would have received at age 65.  (Am. Compl. ¶ 74).  If plaintiff's age-62 JSA is in fact less than the "actuarial equivalent" of an SLA commencing at normal retirement age, that would violate § 1054(c)(3).  *See Engers v. AT&T*, 2002 WL 32159586, at *8 (D.N.J. Oct. 17, 2002).

The question then becomes what it means to be "actuarially equivalent" under § 1054(c)(3).  Plaintiff alleges that defendants' use of the 1951 Adjusted Mortality Table and 7.5% interest rate violates ERISA's actuarial equivalence requirement because those assumptions are not reasonable and do not reflect current mortality or interest rates.  (Am.

Compl. ¶ 5).  Defendants contend that two benefits are "actuarially equivalent" if "values of the two benefits are equal using the interest rate and mortality table specified in the defined benefit document."  (Dkt. No. 67, Def. Mem. at 2).  They assert that § 1054(c)(3) does not require disregarding plan terms in favor of "reasonable" and "current" mortality tables and interest rates.  (*Id.*).

Again, the question is one of statutory construction:  whether § 1054(c)(3) of ERISA requires "reasonable" actuarial assumptions.  The starting point for the construction of a statute is, of course, the text of the statute itself.  *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 706 (1st Cir. 1992) (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)).

On its face, § 1054(c)(3) contains no reasonableness requirement.  It provides only that a retirement benefit taken in some other form or at some other time "shall be the actuarial equivalent" of an SLA commencing at normal retirement age.  29 U.S.C. § 1054(c)(3).  It says nothing about how actuarial equivalence is to be calculated; it does not specify what inputs to use, nor does it explicitly require them to be "reasonable"—either individually or in the aggregate.

Generally, courts must assume that any such omission from the text of ERISA is deliberate.  "ERISA is a comprehensive and reticulated statute, which Congress adopted after careful study of private retirement pension plans."  *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981) (internal quotations omitted).  ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'"  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)).

Accordingly, the Supreme Court has been "especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Russell*, 473 U.S. at 147).

Such reluctance is particularly warranted here. If Congress had intended § 1054(c)(3) to require actuarial equivalence to be calculated using "reasonable" assumptions, it knew how to do so. For example, 29 U.S.C. § 1393(a)(1) requires employers to compute withdrawal liability using "actuarial assumptions and methods which, *in the aggregate are reasonable . . . .*" (emphasis added). Congress also knew how to distinguish between requiring actuarial factors to be reasonable in the aggregate and requiring each of them to be reasonable on its own. *Compare id. with* 29 U.S.C. § 1085a(c)(3)(A) (requiring that for plan-funding purposes, plans must use "actuarial assumptions and methods . . . *each of which is reasonable*") (emphasis added). And Congress knew how to require employers to use specific actuarial factors, not just reasonable ones—but it did so only for calculating lump-sum benefits, not annuities. *See* 29 U.S.C. § 1055(g) (requiring the present value of an annuity to be calculated using the "applicable mortality table and the applicable interest rate," which are defined elsewhere, if it is to be "immediately distributed"). None of those statutory provisions apply here, but their existence clearly shows that if Congress had meant to include a reasonableness requirement in § 1054(c)(3), it could have done so.

That does not, however, necessarily resolve the case. Even without an explicit statutory requirement of reasonableness, § 1054(c)(3) nonetheless requires that plaintiff's age-62 JSA be the "actuarial equivalent" of an age-65 SLA. And "ERISA does not [] define actuarial equivalence." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011). That

raises the question whether "actuarial equivalence" has been defined elsewhere, by regulation or case law, to require "reasonable" assumptions.  Alternatively, it is possible that "actuarial equivalence" has an accepted or ordinary meaning among experts in the field, and that it includes a "reasonableness" component.

To begin, ERISA expressly provides that certain tax regulations promulgated by the Treasury Department under the Internal Revenue Code are also applicable to ERISA.  *See* 29 U.S.C. § 1202(c) (providing that "[r]egulations prescribed by the Secretary of the Treasury under [26 C.F.R. §§ 410(a), 411, or 412] . . . shall also apply" to certain portions of ERISA, including § 1054(c)(3)).  But there is no relevant tax regulation that defines "actuarial equivalence" in the context of § 1054(c)(3).

It is true that 26 C.F.R. § 1.411(a)(13)-1(b)(3) addresses actuarial equivalence and requires the use of "reasonable actuarial assumptions."  But that regulation does not apply to annuities; it applies only to "benefits under a lump sum-based benefit formula."  *See* 26 C.F.R. § 1.411(a)(13)-1(a) ("Paragraph (b) of this section describes special rules for certain statutory hybrid plans that determine benefits under a lump sum-based benefit formula.").  That distinction is significant.  Among other things, lump-sum benefits receive special treatment when calculating actuarial equivalence under ERISA.  *See* 29 U.S.C. § 1055(g) (requiring the use of specific inputs to calculate actuarial equivalence for lump-sum benefits).  Furthermore, and in any event, the fact that the regulations are silent with respect to *annuities* is not an invitation to borrow freely from the regulations concerning *lump-sum benefits*; to the contrary, the omission should be presumed to be significant, not accidental.

Section 1.411(d)-3 of the same regulations addresses the amendment of plans.  Section 1.411(d)-3(g)(1) of that regulation defines the term "actuarial present value": "The term

actuarial present value means actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using reasonable actuarial assumptions."  Again, that regulation does not address the payment of annuities.  Furthermore, the defined term— "actuarial present value"—does not appear anywhere in 29 U.S.C. § 1054(c)(3).  Thus, the fact that § 1.411(d)-3(g)(1) defines it to require "reasonable actuarial assumptions" is not relevant when interpreting § 1054(c)(3)'s requirement of "actuarial equivalence."

The case law is even less clear, as courts have yet to agree on a definition of actuarial equivalence.  For example, in *Laurent v. PricewaterhouseCoopers*, 794 F.3d 272 (2d Cir. 2015), the Second Circuit stated that the actuarial-equivalence requirement limits the discretion enjoyed by plan administrators in selecting actuarial methodology.  *See id.* at 286 ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit.").  And in *Esden*, the court noted that "[i]f plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'"  *Esden*, 229 F.3d at 164.  However, because the challenged plans in each of those decisions violated specific statutory requirements, neither case expressly defined actuarial equivalence, nor addressed whether ERISA requires actuarial assumptions to be reasonable.  *See id.* at 162 (holding that plan's interest rates violated provisions of the internal revenue code); *Laurent*, 794 F.3d at 280 (finding plan definition of "normal retirement age" to be inconsistent with definition in ERISA § 3(24)).

In *Dooley v. Am. Airlines*, 1993 WL 460849 (N.D. Ill. Nov. 4, 1993), the court held that actuarial equivalence must be "determined on the basis of actuarial assumptions with respect to mortality and interest which are *reasonable in the aggregate*."  *Id.* at *10 (emphasis added).  But it did so in the context of lump-sum distributions, for which ERISA *does* explicitly require the

16

use of reasonable actuarial inputs.  It does not do so for annuities.  *Compare* 29 U.S.C. § 1055(g)

(requiring plans to use specific inputs when calculating actuarial equivalence for lump-sum

benefits) *with* 29 U.S.C. § 1054(c)(3) (imposing no such requirement on benefits more broadly).

As discussed, this Court may not freely extend the reasonableness requirement of one section of

ERISA to another section; to the contrary, it must be assumed that Congress intended the statute

to mean what it says.

The opinion in *Smith v. U.S. Bancorp*, 2019 WL 2644204 (D. Minn. June 27, 2019),

more directly addresses the issue presented here, although the Court disagrees with its analysis.

There, the court denied a motion to dismiss on the basis that it was plausible that actuarial

equivalence under § 1054(c)(3) must be determined using reasonable actuarial assumptions.  *Id.*

at *3.  The *Smith* court appears to have relied on three sources of authority to reach that

conclusion.  First, it cited to an appellate decision concluding that "Congress intended [actuarial

equivalence] to have its established meaning."  *See Stephens*, 644 F.3d at 440.  But the *Stephens*

court went on to say that "[t]wo modes of payment are actuarially equivalent when their present

values are equal under a given set of actuarial assumptions."  *Id.*  It did not say that actuarial

equivalence required that those assumptions be reasonable.  Second, the *Smith* court referred to

tax provisions and regulations, which "require[] that the accrued benefit be discounted to present

value at the 'applicable interest rate.'"  2019 WL 2644203, at *3.  But, as noted, the cited

provisions apply only to lump-sum benefits—not annuities.  *See* 26 U.S.C. § 417(e)(3)(A); 26

C.F.R. § 1.417(e)-1(d).[5]  Third, the *Smith* court cited *Dooley* for the proposition that actuarial

---

[5] As discussed, 26 C.F.R. § 1.417 is not directly enforceable under ERISA.  *See* 29 U.S.C. § 1202(c).
However, a provision of 26 C.F.R. § 411, which is enforceable under ERISA, requires that "plan[s] take into
account specified valuation rules . . . as set forth in section 417(e)."  26 C.F.R. § 1.411(a)-11(d).  But even if the
*Smith* court was correct that this reference makes § 1.417(e)-1(d) enforceable under ERISA, those provisions still
apply only to lump-sum benefits.

inputs must be reasonable.  2019 WL 2644204, at *3.  But, as noted, *Dooley* defined actuarial equivalence in the context of lump-sum benefits, which are treated differently under ERISA. Thus, none of those three sources of authority require, or even permit, reading a reasonableness requirement into § 1054(c)(3).[6]  Accordingly, this Court respectfully disagrees with the *Smith* court's analysis as to whether actuarial equivalence under § 1054(c)(3) must be calculated based on reasonable assumptions.

Other district courts, based on similar reasoning, have also denied motions to dismiss based on claims that challenge the use of purportedly unreasonable actuarial assumptions, under § 1054 of ERISA.  Again, the Court does not find the analysis in these cases to be persuasive.

For example, in *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640 (N.D. Tex. 2019), the court looked to 26 C.F.R. § 1.401(a)-11(b)(2) and 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) to support its opinion.  *Id.* at 648.  But as discussed, §§ 401 and 417 are not enforceable under ERISA.  The *Torres* court also looked to 26 C.F.R. § 1.411(d)-3(g)(1), which defines "actuarial present value."  *Id.*  Again, that term is not present in § 1054 of ERISA.  And *Torres* relied on *Dooley*, which dealt with lump-sum benefits, not annuities.  *Id.*; *see also Cruz v. Raytheon Co.,* 435 F. Supp. 3d 350, 352 (D. Mass. 2020) (similarly referring to (1) 26 C.F.R. § 401, which is unenforceable under ERISA, (2) the meaning of "actuarial present value" under 26 C.F.R. § 411, which is not mentioned in § 1054 of ERISA, and (3) various cases that impose a reasonableness standard under ERISA, but for provisions not relevant here); *Herndon v. Huntington Ingalls Indus., Inc.*, 2020 WL 3053465, at *2 (E.D. Va. Feb. 20, 2020) (finding that "[u]nder a

---

[6] The *Smith* court also cited to the Second Circuit's decision in *Esden* for the proposition that § 1054(c)(3) does not leave "plans free to determine their own assumptions" in a way that would "eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'"  *See Esden*, 229 F.3d at 164.  However, the limits on the discretion of plans that the *Esden* court identified apply only to lump-sum benefits.  *Id.* (citing 26 C.F.R. § 1.417(e) (governing lump-sum benefits); 26 C.F.R. § 1.411(a)-11(a)(1) (referring to § 1.417(e))).

straightforward and plain reading of the statute and regulations, Defendants must use 'reasonable' data to ensure that Plaintiff is receiving benefits that are equivalent to a single life annuity" but citing to a case that does not deal with § 1054 of ERISA); *Masten*, 543 F. Supp. 3d at 34 (stating that the "Act nowhere defines actuarial equivalent" and "[n]or have courts agreed on a definition" but still finding that "ERISA requires that Plan administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits").

In *Urlaub v. CITGO Petroleum Corp.*, 2022 WL 523129 (N.D. Ill. Feb. 22, 2022), the court denied a motion to dismiss on the basis that the plain meaning of "actuarial equivalence" requires that "[o]nly accurate and reasonable actuarial assumptions can convert benefits from one form to another. . . ." *Urlaub*, at *6. The court's source for that interpretation of actuarial equivalence was the definition of "equivalent" in a Merriam-Webster dictionary. *Id.* The court concluded that "to be equivalent means to be 'equal in force, amount, or value.'" *Id.* However, this Court does not find that analysis persuasive. Among other things, plaintiff's own expert, Ian Altman, reported that "the phrase is 'actuarial equivalent'" because "actuarial judgment must be an inherent part of the process"; otherwise, "[h]ad actuarial training and judgment not been intended as part of the process, language such as 'equal in value' could be used when addressing the comparison of different payment streams."[7]

Finally, it does not appear that "actuarial equivalence," to the extent it is a term of art in the field, necessarily requires or implies "reasonable" actuarial assumptions. Neither of plaintiff's experts so testified. Plaintiff's experts noted that they consider the reasonableness and

---

[7] It should be noted that in the same part of the report, Altman stated that "actuaries must exercise their professional judgment to *select* reasonable and current actuarial assumptions." (Dkt. No. 69, Appendix of Expert Reports and Testimony, Appendix Part 1 at EA 00006) (emphasis added). However, what may be required when selecting actuarial assumptions is not at issue here. What is at issue here is what "actuarial equivalent" means in terms of calculating benefits as provided within a defined benefit plan.

currentness of actuarial assumptions when *selecting* rates for a plan.  (*See* Dkt. No. 69, Appendix Part 3, EA00313-315); (*see also* Dkt. No. 69, Appendix Part 5, EA00870 (explaining that an actuary's role is to advise clients as to what would be an appropriate discount rate for a plan)).  However, the selection of plan terms is not what is at issue; rather, it is the calculation of individual benefits.  And when asked how to calculate an "actuarially equivalent" benefit, both of plaintiff's experts unambiguously testified that if a plan defines "actuarial equivalence," then the actuary should use the plan's actuarial assumptions to calculate a participant's benefit.

Plaintiff's expert Ian Altman explained actuarial equivalence as follows:

Q.  Can you tell me, sir, how does an actuary calculate benefits under a plan's terms?

A.  By conducting the arithmetic specified under the terms of the plan.

Q.  And that includes, if the plan has a definition of actuarial equivalence to apply the plan's terms?

A.  The plan's terms will specify how to convert from one form of benefit to another, and those terms should be followed by anyone performing a calculation.

Q.  And some of those terms often include a definition of actuarial equivalence in the plan, correct?

A.  The plan can define actuarial equivalence, yes.

Q.  And if the plan defines the term "actuarial equivalence," then you, an actuary, when you're calculating benefits would use the plan's definition of actuarial equivalence to calculate benefits?

A.  In the performance of calculating individual benefits, I followed the terms of the plan.  If those terms are defined under the category of actuarial equivalence, then those are the terms I follow.

(Dkt. No. 69, Appendix Part 3, EA00210-211).

Plaintiff's expert Mitchell Serota testified to a similar effect:

Q. Dr. Serota, in all of the circumstances where you have done benefit calculations, have you ever used different actuarial assumptions then those set forth in the plan documents to calculate actuarial equivalent benefits?

A. Different from the plan document?

Q. Correct.

A. No.

. . .

Q. Do you know if any other actuaries anywhere have ever done that?

A. If they have used actuarial assumptions that were not dictated by the plan document.  No, I am not aware of anybody.

(Dkt. No. 69, Appendix Part 5, EA00843-844).

Thus, it appears that it is industry practice to refer to the plan documents to determine the actuarial assumptions used to calculate an actuarially equivalent benefit.  In fact, the only place where "actuarial equivalence" is defined, that is relevant here, is within the Plan itself.  As noted, the Plan specifically defines actuarial equivalence as "a benefit of equivalent value to the Accrued Benefit, determined on the basis of the assumptions described in Appendix A to the Plan."  (Plan Document § 1.3).  Appendix A dictates that the interest rate to be used for the benefit calculation relevant here is 7.5% and the 1951 Adjusted Mortality Table.  (Plan Document, Appendix A, §§ A1.4, A2.5).

In summary, the ERISA statute does not define "actuarial equivalence," or provide that the calculation of actuarial equivalence requires the use of "reasonable" assumptions.  The term "reasonable" appears throughout ERISA, but not in § 1054(c)(3), the provision relevant here. There are no Treasury Department regulations that define "actuarial equivalence," at least in the context of annuity benefits.  There is no clear appellate authority agreeing on a definition of "actuarial equivalence," or agreeing that it requires the use of "reasonable" actuarial

21

assumptions.  And there does not appear to be an industry practice of calculating actuarial equivalence with respect to objectively "reasonable" criteria, without regard to the terms of the relevant plan itself.  The only relevant place where "actuarial equivalence" is defined is in the Plan itself, and the parties appear to agree that the terms of the Plan were followed.

Under the circumstances, the Court cannot conclude that the calculation of actuarial equivalence under § 1054(c)(3) of ERISA requires the use of "reasonable" assumptions, particularly when the plan itself specifically requires the use of particular actuarial assumptions. It therefore follows that the calculation of plaintiff's retirement benefit here did not violate ERISA.

It should be noted that the fact that § 1054(c)(3) does not mandate a reasonableness standard does not mean that plan sponsors have unfettered discretion in calculating plan benefits; the assumptions used to determine actuarially equivalent benefits must be expressly stated in the plan documents.  Here, those assumptions were (and are) set forth in the Plan, not hidden somehow from the participants.

Nor is it by any means obvious that the result in this case is irrational or unfair.  And that is true even though the actuarial assumptions used seem to be clearly out of date, at least when viewed from the perspective of 2022.

To begin, retirement plans are not generally required to provide protection against various forms of economic or social change.  For example, they are not required to provide cost-of-living adjustments—even though that might appear unfair to employees who expected a generous benefit, only to have the purchasing power of those benefits significantly eroded by inflation.  The plans are private arrangements, not part of a government social welfare program.

Moreover, this litigation is premised on the notion that the mortality tables are

unreasonable because life expectancy has substantially increased, and the interest rate is unreasonable because it is unduly high in light of current market conditions.  But what happens if life expectancy decreases—as it did in 2020, as a result of the COVID-19 pandemic?  Would benefits be decreased?  And what happens if there is a period of hyperinflation, and the interest rate turns out to be unduly low?

It is also far from clear how often adjustments to the assumptions would need to be made to make them "reasonable," and therefore in compliance with the law.  The Plan at issue here is at least a half a century old.  The assumptions that were made 50 years ago presumably seemed appropriate at the time.  At what point do they become unreasonable—and how often must a plan recalibrate them?  Furthermore, there is necessarily some aspect of retroactivity involved in changing the assumptions used to calculate benefits.  It is unclear how burdensome that would prove in practice, and what unintended consequences might follow the retroactive adjustment of benefits.

Finally, it is doubtful that changing the underlying assumptions would actually prove beneficial to many retirees.  As noted, Partners contends that plaintiff here would be worse off.  And at least two courts have refused to certify class actions based on similar concerns.  Thus, in *Torres*, even though the court allowed the ERISA claims to survive the motion to dismiss, the court denied a motion for class certification because plaintiff failed to show that reforming the "actuarial equivalent" assumptions in the plan document would benefit all class members.  *Torres v. Am. Airlines, Inc.*, 2020 WL 3485580, at *11 (N.D. Tex. May 22, 2020).  In fact, the use of the allegedly outdated mortality table (with a shorter life expectancy) would increase the actuarial factor and therefore *increase* benefits for participants who retired after normal retirement age.  *Torres*, 2020 WL 3485580, at *10.  Likewise, in *Smith v. U.S. Bancorp*, No. CV

18-3405, Dkt. No. 152 (D. Minn. May 18, 2021), the court concluded that a motion for class certification would be denied because not all "potential class members who currently receive actuarially equivalent benefits are [] injured by the Plan." *Id.* at 4.[8]

In any event, this Court does not have the power to simply rewrite the Plan, or to create new statutory requirements. If Congress had intended § 1054(c)(3) to require actuarial equivalence to be calculated using reasonable actuarial assumptions, or in some other specific way, it knew how to do so. It is not for this Court to impose a reasonableness standard that Congress chose to omit. And if fairness requires the imposition of a reasonableness standard, it is of course free to enact appropriate legislation.

In summary, because § 1054(c)(3) does not impose a requirement that an "actuarially equivalent" benefit must be based on "reasonable" actuarial assumptions, summary judgment will be granted in favor of defendants.

## IV.   <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss for lack of standing is DENIED. Defendants' motion to dismiss for failure to state a claim, as converted to a motion for summary judgment, is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  March 4, 2022                               Chief Judge, United States District Court

---

[8] The same expert that plaintiffs rely on in the case before this Court, Dr. Serota, is the same expert whose testimony the court in *Smith* relies on to deny class certification. *See Smith*, No. CV 18-3405, Dkt. No. 152 at 4 ("Indeed, Serota acknowledged that some potential class members' benefits would decrease using each of his models. . . ."). Here, Partners similarly contends that plaintiff would actually receive a lower benefit using the actuarial assumptions for which he is advocating.